**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF NORTH CAROLINA**
**WESTERN DIVISION**
**No. 5:20-CV-00257-BR**

UNITED STATES OF AMERICA for the use
and benefit of SCHNEIDER ELECTRIC
BUILDINGS AMERICAS, INC., SPC
MECHANICAL CORPORATION; AND,
WATSON ELECTRICAL CONSTRUCTION
CO., LLC,

    **Plaintiffs,**

    **vs.**

CBRE HEERY, INC f/k/a HEERY
INTERNATIONAL, INC., BALFOUR
BEATTY CONSTRUCTION, LLC.,
TRAVELERS CASUALTY AND SURETY
COMPANY OF AMERICA, LIBERTY
MUTUAL INSURANCE COMPANY,
FEDERAL AND DEPOSIT COMPANY OF
MARYLAND; AND,
FEDERAL INSURANCE COMPANY

    **Defendants.**

                    **AMENDED**
                    **COMPLAINT**

---

## AMENDED COMPLAINT

COMES NOW Schneider Electric Buildings Americas, Inc. ("Schneider"), SPC Mechanical Corporation ("SPC"), and Watson Electrical Construction Co., LLC ("Watson"), altogether, the "Plaintiffs," filing this Complaint against CBRE Heery, Inc. f/k/a Heery International, Inc. ("CBRE Heery"), Balfour Beatty Construction, LLC. ("Balfour"), Travelers Casualty and Surety Company of America ("Travelers"), Liberty Mutual Insurance Company ("Liberty"), Federal and Deposit Company of Maryland ("Federal Company"), and Federal Insurance Company ("Federal Insurance"), altogether, the "Defendants" or "CBRE Heery et. al.," and allege and state the following:

1

## NATURE OF THE CASE

1.      This case concerns causes of action arising from the circumstances surrounding a construction project that was substantially impacted by certain events that ultimately resulted in an over 44-month delay, and which resulted in damages sustained by three subcontractors.

## PARTIES

2.      The Plaintiffs reallege and incorporate Paragraph 1 as if fully set forth herein.

3.      Plaintiff Schneider (the "Controls Contractor"), with its principal place of business located at 1650 W. Crosby Road, Carrollton, Texas 75006, is, and at all relevant times was, a corporation duly organized and existing under the laws of Delaware.

4.      Plaintiff SPC [previously, "Southern Piping Company"] (the "Mechanical Contractor"), with its principal place of business located at 1908 Baldree Road, Wilson, North Carolina 27895-3006, is, and at all relevant times was, a corporation duly organized and existing under the laws of North Carolina.

5.      Plaintiff Watson (the "Electrical Contractor"), with its principal place of business located in 1500 Charleston St. Wilson, NC 27893, is, and at all relevant times was, a corporation duly organized and existing under the laws of North Carolina.

6.      Defendant CBRE Heery (the "Construction Manager At-Risk"), with its principal place of business located at 999 Peachtree Street, NE, Suite 300 Atlanta, Georgia 30309, is, and at all relevant time was, a corporation duly organized and existing under the laws of Georgia.

7.      Defendant Balfour (the "Indemnitor"), which can be served through its registered agent, at 2626 Glenwood Ave., Suite 550, Raleigh NC 27608, is authorized to transact business in North Carolina.

8.      Defendant Travelers (the "Surety"), is a compensated surety with its principal place of business located at One Tower Square, Hartford, Connecticut 06183, is, and at all relevant time was, a corporation duly organized and existing under the laws of Connecticut.

9.     Defendant Liberty (the "Surety"), is a compensated surety with its principal place of business located at 175 Berkeley Street, Boston Massachusetts 02116, is, and at all relevant time was, a corporation duly organized and existing under the laws or Massachusetts.

10.     Defendant Federal Company (the "Surety"), is a compensated surety with its principal place of business located at 1400 American Lane, Tower 1, 18th Floor, Schaumburg, Illinois, is, and at all relevant time was, a corporation duly organized and existing under the laws of Illinois.

11.     Defendant Federal Insurance (the "Surety"), is a compensated surety with its principal place of business located at 15 Mountain View Road, Warren, New Jersey 07059, is, and at all relevant time was, a corporation duly organized and existing under the laws of New Jersey.

12.     At all times mentioned in this Complaint, each defendant was an agent, principal, representative, partner, co-developer, joint venture partner, predecessor-in-interest, successor-in-interest, alter-ego, parent, subsidiary, or employee of the others, and each, at all times, acted within the scope of authority provided to it by the Defendants.

13.     At this time, the Plaintiffs do not know the extent of the specific liability amongst the Defendants, but upon information and belief, all Defendants are in some way liable to the Plaintiffs on the claims and prayers for relief made within this Complaint.

## **SUBJECT MATTER JURISDICTION**

14.     The Plaintiffs reallege and incorporate by reference Paragraph 1 through Paragraph 13 as if fully set forth herein.

15.     Pursuant to 28 U.S.C. § 1331, this Court has original jurisdiction because this action arises out of and implicates federal laws of the United States including the Federal Acquisition Regulation (the "FAR"), the Miller Act, 40 U.S.C. §§ 3131-3134, and the Unified Facilities Guide Specification.

## **SUPPLEMENTAL JURISDICTION**

16.     The Plaintiffs reallege and incorporate by reference Paragraph 1 through Paragraph 15 as if fully set forth herein.

3

17. Under 28 U.S.C. § 1367(a), this Court has supplemental jurisdiction over all claims plead in this Complaint because they are so related that they form part of "the same case or controversy" in term of Article III of the United States Constitution.

18. Pursuant to 28 U.S.C. § 1367(a), this Court's supplemental jurisdiction shall include claims that involve the joinder or intervention of all parties named to this Complaint.

## CONTRACTS

19. The Plaintiffs reallege and incorporate by reference Paragraph 1 through Paragraph 18 as if fully set forth herein.

20. On September 13, 2013, CBRE Heery entered into a written contract (the "Prime Contract") with the United States of America (Contract No. W9126G-08-D-0056), by and through the United States Department of Army, Corps of Engineers, US Army Engineer District, Savannah (the "USACE") located at 100 West Oglethorpe Ave. Savannah GA 31401-3640.

21. Exhibit 1 is a true and accurate copy of the Prime Contract by and between the USACE and CBRE Heery, dated 09/13/13.

22. According to the Prime Contract, CBRE Heery had an obligation, in general, to design and construct certain federal work of improvement known as the Seymour Johnson Air Force Base Clinic, located at 1050 Jabara Avenue, Goldsboro, North Carolina, 27531, with a contract duration of 1,095 calendar days from the Notice to Proceed, for a total amount of $47,362,130.54 (the "Project").

23. Pursuant to 40 U.S.C. §§ 3131-3134, CBRE Heery, as Principal, and Travelers, Fidelity, Liberty, and Federal, as co-sureties (the "Surety"), furnished to the USACE payment bonds referenced as numbers 105989306, 09134238, 016057832, and 82332858, securing payment for all labor, equipment, materials, services, and supplies furnished to the Project (the "Payment Bonds").

24. Pursuant to the Payment Bonds, CBRE Heery and the Surety are jointly and severally bound for the purpose of allowing a joint action against any or all of them under the Payment Bonds.

25. Exhibit 2 is a true and accurate copy of the Payment Bonds, dated 09/18/13.

4

26.     On January 6, 2014, SPC entered into an agreement (the "Mechanical Contract") with CBRE Heery, pursuant to which SPC agreed to furnish labor, equipment, materials, services, and supplies to complete certain portions of the heating, ventilation, air conditioning, and plumbing work on the Project (the "Mechanical Work").

27.     Exhibit 3 is a true and accurate copy of the Mechanical Contract by and between CBRE Heery and SPC, dated 01/06/14.

28.     On May 9, 2014, Watson entered into an agreement with CBRE Heery (the "Electrical Contract"), pursuant to which Watson agreed to furnish labor, equipment, materials, services, and supplies to complete certain portions of the electrical work on the Project (the "Electrical Work").

29.     Exhibit 4 is a true and accurate copy of the Electrical Contract by and between CBRE Heery and Watson, dated 05/09/14.

30.     Under Article 1, Contract Documents, Section 1.1, the Mechanical Contract and the Electrical Contract states:

> "The Contract agreed to and entered into this day between Construction Manager and Subcontractor consists of the following . . . The Prime Contract, including all documents incorporated therein by reference . . . Contract Documents as defined in the Prime Contract . . . C. Schedule Requirements [Exhibit C] . . . which are incorporated herein by reference. The above constitute the entire Contract between Construction Manager and Subcontractor, and hereinafter will collectively be referred to as the 'Contract.'"

31.     Pursuant to Article 1 Contract Documents, Section 1.1 of the Mechanical Contract and the Electrical Contract, the Prime Contract, the Schedule Requirements, and all documents incorporated into the Prime Contract by reference, which includes certain provisions of the Federal Acquisition Regulation are applicable Contract Documents.

32.     On February 4, 2015, Schneider entered into an agreement (the "Controls Contract") with SPC, pursuant to which Schneider agreed to furnish labor, equipment, materials, services, and supplies to complete certain portions of the controls work on the Project (the "Controls Work").

5

33.     Exhibit 5 is a true and accurate copy of the Controls Contract, by and between SPC and Schneider, dated 02/04/15.

## VENUE ASSIGNMENT

34.     The Plaintiffs re-allege and incorporate by reference Paragraph 1 through Paragraph 33 as if fully set forth herein.

35.     Under Section 15.9 "Legal Forum," the Mechanical Contract and the Electrical Contract states:

> "Any disputes or claim arising out of the Contract, or from a material breach of the Contract, and which is not resolved by the terms and provisions of the Contract, will be submitted to the court in and where the Project is located . . ."

36.     According to the Electrical Contract and the Mechanical Contract, and pursuant to 40 U.S.C. § 3133(b)(3), Venue in this Court is proper because the parties performed and executed the Project within this judicial district of the United States, the Eastern District of North Carolina.

## CHOICE OF LAW

37.     The Plaintiffs reallege and incorporate by reference Paragraph 1 through Paragraph 36 as if fully set forth herein.

38.     Under Article 14 Contract Interpretation Section 14.2 "Law and Effect," the Mechanical Contract and the Electrical Contract states:

> "This Contract will be governed by the laws of the State of North Carolina. Subcontractor hereby submits to the jurisdiction of the State of North Carolina."

39.     Pursuant to Article 14, Contract interpretation, Section 14.2 "Law and Effect," the Mechanical Contract and the Electrical Contracts are governed by the laws of the State of North Carolina.

## PERMISSIVE JOINDER

40.     The Plaintiffs reallege and incorporate by reference Paragraph 1 through Paragraph 39 as if fully set forth herein.

41.     Under Rule 20 (a) "Persons Who May Join or Be Joined," the Federal Rules of Civil Procedure states:

> "(1) Plaintiffs. Persons may join in one action as plaintiffs if: (A) they assert any right to relief jointly, severally, or in the alternative with respect to or arising out of the same transaction, occurrence, or series of transactions or occurrences; and, (B) any question of law or fact common to all plaintiffs will arise in the action."

42.     The Plaintiffs' claims against the Defendants arise out of the same transaction, occurrence, or series of transactions or occurrences, specifically related to the Project, including but not limited to the General Allegations and the specific allegations made in the various Causes of Action set forth below, which include the following generally applicable questions of law and fact common to the Plaintiffs (the "Common Facts"):

(1)     CBRE Heery, acting as the Project's DBIO Contractor, failed to deliver a final, accurate, complete, and constructible Project design by December 17, 2014, as represented by both the Mechanical Contract and the Electrical Contract;

(2)     CBRE Heery failed to provide a realistic performance schedule, and repeatedly failed to accurately represent the Project's status over the course of construction, and materially failed to perform its duty to mitigate damages caused by other contractors, which were under CBRE Heery's care and control;

(3)     CBRE Heery materially hindered, delayed, disrupted, and actively interfered with the Plaintiffs' performance of the Mechanical Work, the Controls Work, and the Electrical Work;

(4)     CBRE Heery failed to perform critical predecessor activities according to the times, order, and priority sequence established by both the Mechanical Contract and the Electrical Contract;

(5)     CBRE Heery failed to perform its duties as Prime Contractor, Construction Manager At-Risk, and Project DBIO Contractor, including its duties to properly schedule, manage, coordinate, and administer the Project; and,

(6)     CBRE Heery failed to perform its duties to make prompt payment of amounts duly owed pursuant to the Mechanical Contract, the Electrical Contract, and North Carolina law.

43.     As a direct and proximate cause of these Common Facts, as well as the other facts specifically alleged in this Complaint, the Plaintiffs have been substantially damaged.

44.     Pursuant to Federal Rules of Civil Procedure Rule 20, because the Plaintiffs have asserted rights to relief jointly, severally, or in the alternative with respect to or arising out of the same transaction, occurrence, or series of transactions or occurrences, and because questions of law or fact common to all Plaintiffs will arise in this action, Watson, SPC, and Schneider may be joined together as Plaintiffs.

## COMPULSORY JOINDER

45.     The Plaintiffs reallege and incorporate by reference Paragraph 1 through Paragraph 44 as if fully set forth herein.

46.     Under Rule 19, Section (1) "Required Party," the Federal Rules of Civil Procedure states:

"A person who is subject to service of process and whose joinder will not deprive the court of subject-matter jurisdiction must be joined as a party if: (A) in that person's absence, the court cannot accord complete relief among existing parties; or (B) that person claims an interest relating to the subject of the action and is so situated that disposing of the action in the person's absence may: (i) as a practical matter impair or impede the person's ability to protect the interest."

47.     On October 30, 2017, CBRE Group, Inc. ("CBRE") announced that it had completed its previously announced acquisition of Heery International, Inc. ("Heery"), (the "Heery Acquisition Agreement") the project management and design engineering business of the international infrastructure group, Balfour Beatty Construction, LLC (the "Heery Acquisition Press Release").

48.     Exhibit 6 is a true and accurate copy of CBRE Heery Acquisition Press Release, published by CBRE, dated 10/30/17.

49.     Among other things, the CBRE Heery Acquisition Press Release states:

"The business that CBRE is acquiring generally does not include, or CBRE is indemnified for, the at-risk construction management business within Heery International."

50.     At the date that CBRE acquired Heery, pursuant to the Prime Contract, Heery acted as the "Construction Manager At-Risk" on the Project.

51.     Upon information and belief, pursuant to the Heery Acquisition Agreement, Balfour has a contractual obligation to indemnify CBRE from certain, if not all, damages sustained by the Plaintiffs resulting from the allegations made in this Complaint.

52.     Accordingly, pursuant to the Federal Rules of Civil Procedure Rule 19, Balfour is a "Required Party," because this Court cannot accord complete relief among existing and interested parties without joining Balfour to this Complaint.

53.     Travelers, Liberty, Federal Deposit, and Federal Insurance are co-sureties on the Payment Bonds, which are subject to the Miller Act Claim described in greater detail below.

54.     Accordingly, pursuant to the Federal Rules of Civil Procedure Rule 19, Travelers, Liberty, Federal Deposit, and Federal Insurance are "Required Parties," because this Court cannot accord complete relief among existing and interested parties without joining them.

55.     The Plaintiffs may seek leave to amend this Complaint to show the true nature and capacities of the various parties, especially Balfour and CBRE, when it has been ascertained through Discovery.

**DEMAND FOR JURY TRIAL**

56.     The Plaintiffs reallege and incorporate by reference Paragraph 1 through Paragraph 55 as if fully set forth herein.

57.     The Plaintiffs demand a trial by jury pursuant to Rule 38(b) of the Federal Rules of Civil Procedure.

9

## GENERAL ALLEGATIONS

58.     The Plaintiffs reallege and incorporate by reference Paragraph 1 through Paragraph 57 as if fully set forth herein.

59.     On September 29, 2008, the United States Army Corps of Engineers awarded Multiple Award Task Order Contract ("MATOC") (No. W9126G-08-D-0056) to CBRE Heery to provide certain design and construction goods and services for the United States Air Force Medical Service, United States Army Medical Command, and Other Customers of the USACE.

60.     On June 1, 2012, the USACE's architect, Leo Daly, completed the architectural design of certain floor plans that formed part of the USACE's Design-Build Installation & Outfitting Request for Proposal (the "BDIO RFP").

61.     On November 30, 2012, the USACE issued the DBIO RFP to the MATOC pool, which included CBRE Heery and two other bidders, for the design and construction of a replacement medical clinic at Seymour Johnson Air Force Base, located at 1050 Jabara Avenue, Goldsboro, North Carolina, 27531.

62.     The DBIO RFP described the Project as a 108,000 square-foot two-story medical facility, which included certain features including open-air atriums, as well as a sodded and fabric roof membrane.

63.     On December 3, 2012, CBRE Heery invited Watson and two other bidders to attend a pre-bid meeting to discuss specific electrical portions of the DBIO RFP (the "Electrical RFP")

64.     On January 11, 2013, Watson, relying upon the representations that CBRE Heery made in the Electrical RFP, submitted its electrical proposal (the "Original Electrical Proposal").

65.     On February 7, 2013, CBRE Heery submitted its "Technical Proposal" in response to the DBIO RFP ("CBRE Heery's Technical Proposal").

66.     On March 19, 2013, Watson, relying upon CBRE Heery's Technical Proposal, submitted a revised electrical proposal to CBRE Heery (the "Revised Electrical Proposal").

67.     On March 22, 2013, CBRE Heery submitted its "Revised Technical Proposal" to the USACE.

68.     Under III. Administrative Requirements, A. Design meetings, 5. Meeting logistics, the

Prime Contract states:

> "Design Builder is responsible to coordinate the meeting preparation at the facility with HFO, USACE, and Med Group ahead of the design review meetings."

69.     Pursuant to the Prime Contract, CBRE Heery assumed the responsibility to act as the

Project's "Design-Build Installation & Outfitting" ("DBIO") contractor.

70.     Under the Prime Contract, CBRE Heery had a duty to complete, in part, the following

Scope of Work:

> "[D]esign and construct a replacement medical clinic (Koritz Clinic) for Seymour Johnson's 4th Medical Group. The Contractor shall provide all personnel, management, tools, materials, supervision, general and specialized equipment, clothing and other items and construction services necessary to repair, replace and construct the project to include the renovation and modernization of portions of the existing Seymour Johnson's 4th Medical Group. Project will provide medical clinic, specialty clinics, ancillaries, support, and administrative departments. Supporting facilities include utilities, site improvements, access roads, and parking. Vacated facilities will be demolished to include the existing buildings 2800 and 2810. Asbestos removal may be required during demolition. The project will be designed in accordance with the criteria prescribed in Unified Facilities Criteria UFC 4-510-01, DoD Minimum Antiterrorism Standards for Buildings UFC 4-010-01, barrier-free design in accordance with DoD, 'ABA (Architectural Barriers Act) Accessibility Standard' and DEPSECDEF Memorandum 'Access for People with Disabilities' dated 10/31/2008, Evidence Based Design principles, MHS World Class Checklist Requirements (version 2.0, 2011), Executive Order 13514, DoD Strategic Sustainability Performance Plan (SSPP), Energy Policy Act of 2005 (EPAct05), and other applicable codes and regulations. The project will be designed to LEED 3.0 Silver Certified rating standard. Operation and Maintenance Manuals, Commissioning and Comprehensive Interior Design will be provided. Air Conditioning: approx. 400 tons."

71.     Under Project Instructions-Government Provided Information, Section D., Subsection 2.

"Contractor Responsibilities," the Prime Contract states:

> "It is the responsibility of the Contractor to identify risks that may impact scope, schedule, costs, safety or quality. As soon as the risk presents itself the Contractor shall document the risk on the 'Weekly Report-Risk Tab.'"

72.     Pursuant to the Prime Contract, in addition to its role as the Project's DBIO Contractor, CBRE Heery assumed the responsibility to act as the Project's "Construction Manager At-Risk."

73.     In terms of the Prime Contract, CBRE Heery had a duty to maintain an updated Project file, lead Project meetings, manage the submittal and Request for Information process, draft and issue meeting minutes, to provide a realistic Project schedule, to accurately update the Project schedule, to monitor the progress of the Project Work, to produce Daily Reports, to review and approve Pay Applications, to review and approve Change Order Requests, to coordinate construction amongst its various subcontractors, to perform estimating functions, to obtain certain permits, to perform design coordination meetings and constructability reviews, to perform construction bidding, and to perform overall construction management functions, to name a few.

74.     In terms of the Prime Contract, CBRE Heery held all contracts for construction and design and had the responsibility to manage the Project and all building tasks, including developing the Critical Path Method baseline schedule for the USACE's approval.

75.     On October 11, 2013, CBRE Heery completed the "Master Construction Schedule," which represented CBRE Heery's plan to meet the Prime Contract's requirements by November 30, 2016.

76.     Exhibit 7 is a true and accurate copy of CBRE Heery's Master Construction Schedule, dated 10/11/13.

77.     On October 24, 2013, the USACE issued and CBRE Heery acknowledged the USACE's Notice to Proceed with the Project (the "Project NTP").

78.     On October 24, 2013, CBRE Heery conducted a preliminary Kick-off Meeting with Project participants to discuss CBRE Heery's plan to execute the Prime Contract.

79.     On October 25, 2013, CBRE Heery issued Watson its "Letter of Intent" to issue Watson the Electrical Contract (the "Electrical LOI").

80.     On October 28, 2013, CBRE Heery conducted the DBIO Kick-off Meeting, at which CBRE Heery issued all Project participants a revised copy of CBRE Heery's Master Construction Schedule, which represented a revised overall Project completion date of October 21, 2016.

81.     Exhibit 8 is a true and accurate copy of CBRE Heery's Revised Master Construction Schedule, dated 10/28/13.

82.     On November 25, 2013, CBRE Heery published a schedule that CBRE Heery later submitted to the USACE as part of its obligations to schedule the Project under the Prime Contract, which included a revised overall Project completion date of October 20, 2016 (the "Contract Schedule").

83.     Exhibit 9 is a true and accurate copy of CBRE Heery Master Construction Schedule, dated 11/25/13.

84.     On December 3, 2013, CBRE Heery conducted a "Design Charette," which was an intensive planning session with certain Project participants, and which included a review of the USACE's "35% Design Review Notes" (the "Design Charette").

## FIRST CLAIM FOR RELIEF

(Recovery on Miller Act Payment Bonds)

(*SPC v. CBRE Heery et. al.*)

85.     The Plaintiffs reallege and incorporate by reference Paragraph 1 through Paragraph 84 as if fully set forth herein.

86.     Under Title 40. Public Buildings, Property, And Works, § 3133. "Rights of persons furnishing labor or material," Section (b) "Right to bring a civil action," Subsection (1) "In general," the Miller Act Statute states:

> "Every person that has furnished labor or material in carrying out work provided for in a contract for which a payment bond is furnished under section 3131 of this title and that has not been paid in full within 90 days after the day on which the person did or performed the last of the labor or furnished or supplied the material for which the claim is made may bring a civil action on the payment bond for the amount unpaid at the time the civil action is brought and may prosecute the action to final execution and judgment for the amount due."

87.     The Payment Bond inures to SPC's benefit.

88.     A period of at least 90 days has elapsed since SPC last furnished labor, equipment, materials, services, or supplies to the Project.

89.     On August 21, 2018, the USACE issued SPC a letter stating, in part:

"In reference to your letter dated August 13, 2018, concerning unpaid debts on the subject contract. In response to your inquiry, [CBRE Heery] is the Prime Contractor for the subject contract. You are advised that the Miller Act, Title 40 U.S. Code Section 270a-d, was enacted for the protection of subcontractors, suppliers, and laborers who furnish labor or materials on U.S. Government construction contracts."

90.     Exhibit 10 is a true and accurate copy of the USACE's Letter to SPC, dated 08/21/18.

91.     SPC has fully performed all obligations according to the terms established by the Mechanical Contract as well as the Payment Bond.

92.     All conditions precedent to the Surety's performance have occurred or been waived.

93.     As SPC had a direct contractual relationship with CBRE Heery through the Mechanical Contract, SPC had no obligation to provide the Surety with a 90-day preliminary notice pursuant to 40 U.S.C. § 3133(b)(2).

94.     Nevertheless, on May 12, 2019, SPC notified the Surety that SPC intended to file a civil action on the Payment Bonds and subsequently provided the Surety with substantial information and documentary evidence supporting SPC's intended action.

95.     Exhibit 11 is a true and accurate copy of SPC's Letter to the Surety, dated 05/12/19.

96.     CBRE Heery and SPC amended the Mechanical Contract through bilateral change orders from its original amount $5,905,700 (the "Mechanical Contract Amount") to $6,046,978 (the "Mechanical Contract Changes").

97.     In addition to the Mechanical Contract Amount and the Mechanical Contract Changes, SPC performed extra work at CBRE Heery's direction and incurred additional costs due to CBRE Heery's actions and inactions, which have increased the cost of the Mechanical Work by at least $3,514,737, for a revised total amount of at least $9,561,715 (the "Total Mechanical Contract Amount").

98.     CBRE Heery has only paid SPC $5,823,339, which leaves an unpaid balance of at least $3,738,376 due to SPC for the uncompensated value of labor, equipment, materials, services, and supplies furnished to the Project (the "Minimum Mechanical Amount Owed").

99.     CBRE Heery and the Surety have failed to perform their obligations under the Mechanical Contract and the Payment Bond to, among other things, pay SPC at least $3,738,376.

100.     Under TITLE 40. PUBLIC BUILDINGS, PROPERTY, AND WORKS § 3133. "Rights of persons furnishing labor or material," (4) "Period in which action must be brought," the Miller Act Statute states:

> "An action brought under this subsection must be brought no later than one year after the day on which the last of the labor was performed or material was supplied by the person bringing the action."

101.     SPC last furnished labor, equipment, materials, services, or supplies to the Project within one year preceding the date that the Plaintiffs filed this Complaint.

102.     As a result of CBRE Heery and the Surety's failure and refusal to pay SPC the Minimum Mechanical Amounts Owed, SPC has been damaged by an amount to be proven at trial, but which is at least $3,738,376, together with interest at the maximum legal rate, from dates according to proof, and attorneys' fees, expert fees, and costs.

## SECOND CLAIM FOR RELIEF

### (Recovery on Miller Act Payment Bonds)
#### (*Watson v. CBRE Heery et. al.*)

103.     The Plaintiffs reallege and incorporate by reference Paragraph 1 through Paragraph 102 as if fully set forth herein.

104.     Under Title 40, Public Buildings, Property, and Works, § 3133. "Rights of persons furnishing labor or material," Section (b) "Right to bring a civil action," Subsection (1) "In general," the Miller Act Statute states:

> "Every person that has furnished labor or material in carrying out work provided for in a contract for which a payment bond is furnished under section 3131 of this

title and that has not been paid in full within 90 days after the day on which the person did or performed the last of the labor or furnished or supplied the material for which the claim is made may bring a civil action on the payment bond for the amount unpaid at the time the civil action is brought and may prosecute the action to final execution and judgment for the amount due."

105.    The Payment Bond inures to Watson's benefit.

106.    Watson has fully performed all obligations according to the terms established by the Electrical Contract as well as the Payment Bond.

107.    All conditions precedent to the Surety's performance have occurred or been waived.

108.    As Watson had a direct contractual relationship with CBRE Heery through the Electrical Contract, Watson had no obligation to provide the Surety with a 90-day preliminary notice pursuant to 40 U.S.C. § 3133(b)(2).

109.    CBRE Heery and Watson amended the Electrical Contract through bilateral change orders from its original amount of $4,978,000 (the "Electrical Contract Amount") to $5,025,610 (the "Electrical Contract Changes").

110.    In addition to the Electrical Contract Amount and the Electrical Contract Changes, Watson performed extra work at CBRE Heery's direction and incurred additional costs due to CBRE Heery's actions and inactions, which have increased the Electrical Contract Amount by at least $3,385,466, for a revised contract amount of $8,411,076.00 (the "Total Electrical Contract Amount").

111.    CBRE Heery has only paid Watson $4,851,660.00, which leaves an unpaid balance of at least $3,559,416 due to Watson for the uncompensated value of labor, equipment, materials, services, and supplies furnished to the Project (the "Minimum Electrical Amount Owed").

112.    CBRE Heery and the Surety have failed to perform their obligations under the Electrical Contract and the Payment Bond to, among other things, pay Watson at least $3,559,416.00.

113.    Under Title 40. Public Buildings, Property, and Works § 3133. "Rights of persons furnishing labor or material," (4) "Period in which action must be brought," the Miller Act Statute states:

"An action brought under this subsection must be brought no later than one year after the day on which the last of the labor was performed or material was supplied by the person bringing the action."

114. Watson last furnished labor, equipment, materials, services, or supplies to the Project within one year preceding the date that the Plaintiffs filed this Complaint.

115. As a result of CBRE Heery and the Surety's failure and refusal to pay Watson the Minimum Electrical Amount Owed, Watson has been damaged in the amount of at least $3,559,416.00 together with interest at the maximum legal rate, from dates according to proof, and attorneys' fees, expert fees, and costs.

## THIRD CLAIM FOR RELIEF

(Recovery on Miller Act Payment Bonds)

(*Schneider v. CBRE Heery et. al.*)

116. The Plaintiffs reallege and incorporate by reference Paragraph 1 through Paragraph 115 as if fully set forth herein.

117. Under Title 40. Public Buildings, Property, and Works, § 3133. "Rights of persons furnishing labor or material," Section (b) "Right to bring a civil action," Subsection (1) "In general," the Miller Act Statute states:

"Every person that has furnished labor or material in carrying out work provided for in a contract for which a payment bond is furnished under section 3131 of this title and that has not been paid in full within 90 days after the day on which the person did or performed the last of the labor or furnished or supplied the material for which the claim is made may bring a civil action on the payment bond for the amount unpaid at the time the civil action is brought and may prosecute the action to final execution and judgment for the amount due."

118. The Payment Bond inures to Schneider's benefit.

119. On June 13, 2019, Schneider last furnished materials to the Project.

120. Exhibit 12 is a true and accurate copy of evidence proving Schneider's last day providing materials to the Project, dated 06/13/19.

121.     A period of at least 90 days has elapsed since Schneider last furnished labor, services, materials, equipment, or supplies for the Project.

122.     Schneider has fully performed all obligations according to the terms established by the Controls Contract as well as the Payment Bond.

123.     All conditions precedent to the Surety's performance have occurred or been waived.

124.     SPC and Schneider amended the Controls Contract through bilateral change orders from an original amount of $750,000 (the "Controls Contract Amount") to $763,976 (the "Controls Contract Changes").

125.     In addition to the Controls Contract Amount and the Controls Contract Changes, Schneider performed extra work at CBRE Heery's direction, through SPC, and incurred additional costs due to CBRE Heery's actions and inactions, which have increased the Controls Contract Amount by at least $477,799, for a revised contract amount of $1,241,775 (the "Total Controls Contract Amount").

126.     CBRE Heery has only paid Schneider, through SPC, $711,733, which leaves an unpaid balance of at least $530,042 due to Schneider for the uncompensated value of labor, equipment, materials, services, and supplies furnished to the Project (the "Minimum Controls Amount Owed").

127.     CBRE Heery and the Surety have failed to perform their obligations under the Payment Bond to, among other things, pay Schneider at least $530,042.

128.     Under the Miller Act, Schneider had a duty to provide notice to the Surety within 90 days of the last date that it furnished labor or materials to the Project that Schneider intended to file a claim to enforce its rights under the Miller Act.

129.     On July 19, 2019, Schneider properly filed notice to the Surety that Schneider intended to file a claim to enforce its rights under the Miller Act, which contained substantial information and documentary evidence supporting Schneider's action ("Schneider's Miller Act Claim Notice").

130.     Exhibit 13 is a true and accurate copy of Schneider's Miller Act Claim Notice, dated 07/16/19.

131.   On July 29, 2019, the Surety issued Schneider a letter ("Claim No. 198-SC-T1801765-NR"), which acknowledged receipt of Schneider's Miller Act Claim Notice in connection with the Project.

132.   Exhibit 14 is a true and accurate copy of Surety's claim acknowledgement Letter to Schneider, dated 07/29/19.

133.   Under TITLE 40. PUBLIC BUILDINGS, PROPERTY, AND WORKS § 3133. "Rights of persons furnishing labor or material," (4) "Period in which action must be brought," the Miller Act Statute states:

> "An action brought under this subsection must be brought no later than one year after the day on which the last of the labor was performed or material was supplied by the person bringing the action."

134.   Schneider last furnished labor, equipment, materials, services, or supplies to the Project within one year preceding the date that the Plaintiffs filed this Complaint.

135.   As a result of CBRE Heery and the Surety's failure and refusal to pay the Minimum Controls Amount Owed, Schneider has been damaged in the amount of at least $530,042, together with interest at the maximum legal rate, from dates according to proof, and attorneys' fees, expert fees, and costs.

**FOURTH CLAIM FOR RELIEF**

(Breach of Contract & N.C.G.S. § 22C – CBRE Heery Failed to Make Prompt Payment)

(*SPC v. CBRE Heery et. al.*)

136.   The Plaintiffs reallege and incorporate by reference Paragraph 1 through Paragraph 135 as if fully set forth herein.

137.   CBRE Heery breached the Mechanical Contract and North Carolina law by, among other things, failing and refusing to pay SPC amounts duly owed as compensation for the labor, equipment, materials, services, and supplies that SPC furnished to the Project in accordance with the Mechanical Contract and CBRE Heery's directions to complete the Mechanical Work.

138.    Under Article 6 Payment Section 6.2 "Progress Payments," Subsection 6.2.5 "Amount and Time of Payment," the Mechanical Contract states:

> "Progress payments will be made no later than fifteen (15) days after receipt by Construction Manager of payment from Owner for such Subcontractor's Work. Payment by Owner to Construction Manager for a particular payment period will be a condition precedent to payment from Construction Manager to Subcontractor."

139.    Under Chapter 22C "Payments to Subcontractors," § 22C-2, "Performance by subcontractor," the North Carolina General Statute states:

> "Performance by a subcontractor in accordance with the provisions of its contract shall entitle it to payment from the party with whom it contracts. Payment by the owner to a contractor is not a condition precedent for payment to a subcontractor and payment by a contractor to a subcontractor is not a condition precedent for payment to any other subcontractor, and an agreement to the contrary is unenforceable. (1987 (Reg. Sess., 1988), c. 946; 1991, c. 620.)"

140.    Pursuant to Chapter 22C "Payments to Subcontractors,", payment by the owner to a contractor is not a condition precedent for payment from a contractor to a subcontractor.

141.    As such, Section 6.2.5 of the Mechanical Contract is void and unenforceable, and § 22C-2, "Performance by subcontractor," of the North Carolina General Statute governs payment by and between CBRE Heery and SPC.

142.    Payment by the USACE to CBRE Heery is not a condition precedent for payment to SPC for work that SPC performed in accordance with the Mechanical Contract.

143.    On December 25, 2017, SPC properly submitted to CBRE Heery "Pay Application 32," which requested $156,093 in compensation for Mechanical Work duly performed in accordance with the Mechanical Contract ("SPC's Pay Application 32").

144.    Exhibit 15 is a true and accurate copy of SPC's Pay Application 32, dated 12/25/17.

145.    CBRE Heery has failed to pay SPC for the amounts owed pursuant to SPC's Pay Application 32.

146.     On April 25, 2018, SPC properly submitted to CBRE Heery "Pay Application 33," which requested $24,552 in compensation for Mechanical Work duly performed in accordance with the Mechanical Contract ("SPC's Pay Application 33").

147.     Exhibit 16 is a true and accurate copy of SPC's Pay Application 33, dated 04/25/118.

148.     CBRE Heery has failed to pay SPC for the amounts owed pursuant to SPC's Pay Application 33.

149.     On April 25, 2018, SPC properly submitted to CBRE Heery "Pay Application 34," which requested $22,008 in compensation for Mechanical Work duly performed in accordance with the Mechanical Contract ("SPC's Pay Application 34").

150.     Exhibit 17 is a true and accurate copy of SPC's Pay Application 34, dated 04/25/18.

151.     CBRE Heery has failed to pay SPC for the amounts owed pursuant to SPC's Pay Application 34.

152.     Upon proper request, CBRE Heery has failed and repeatedly refused to compensate SPC for amounts duly owed under SPC's Pay Application 32, SPC's Pay Application 33, and SPC's Pay Application 34.

153.     On July 24, 2018, Ms. Kristy Surles, SPC's Senior Construction Administrator, demanded that CBRE Heery make prompt payment of amounts duly owed in an email, which states:

> "All attempts made by SPC Mechanical for payment information, via countless emails, phone calls and messages, have gone unanswered. The account is well over 7 months past due. If you do not respond regarding payment by close of business Wednesday, July 25th, we will be forced to contact the bonding agency. Thank you in advance for your immediate attention to this urgent matter."

154.     Exhibit 18 is a true and accurate copy of the SPC Email to CBRE Heery, dated 07/24/18.

155.     As of the date of this Complaint, SPC has completed the entire scope of Mechanical Work and is therefore entitled to recover $202,653, which represents the unpaid base Mechanical Contract amounts owed.

156.     CBRE Heery's failure to make prompt payment according to NCGS § 22C-2, as compensation for Mechanical Work duly performed in good faith in accordance with the Mechanical Contract is a violation of North Carolina law.

157.     Under North Carolina common law, certain actions by a contracting party involved in construction have been found to be misrepresentations constituting unfair trade practices, including obtaining funds to pay a subcontractor and then failing to pay it.

158.     Upon information and belief, CBRE Heery has failed to pay SPC funds that CBRE Heery has obtained from the USACE as a result of Mechanical Work performed by SPC in good faith and in accordance with the Mechanical Contract (the "CBRE Heery Unfair Payment Withholding Acts").

159.     As a direct and proximate cause of CBRE Heery's failure to make prompt payment pursuant to NCGS § 22C-2, SPC has been damaged in the amount of at least $202,653, together with interest at the maximum legal rates from dates according to proof thereof, and attorneys' fees and costs.

**FIFTH CLAIM FOR RELIEF**
(Breach of Contract & N.C.G.S § 22C – CBRE Heery Failed to Make Prompt Payment)
(*Watson v. CBRE Heery et. al.*)

160.     The Plaintiffs reallege and incorporate by reference Paragraph 1 through Paragraph 159 as if fully set forth herein.

161.     CBRE Heery breached the Electrical Contract and North Carolina law by, among other things, failing and refusing to pay Watson amounts duly owed as compensation for the labor, equipment, materials, services, and supplies that Watson furnished to the Project in accordance with the Electrical Contract and CBRE Heery's directions to complete the Electrical Work.

162.     Under Article 6 Payment, Section 6.2 "Progress Payments," Subsection 6.2.5 "Amount and Time of Payment," the Electrical Contract states:

> "Progress payments will be made no later than fifteen (15) days after receipt by Construction Manager of payment from Owner for such Subcontractor's Work. Payment by Owner to Construction Manager for a particular payment period will

be a condition precedent to payment from Construction Manager to Subcontractor."

163.    Under Chapter 22C "Payments to Subcontractors," § 22C-2, "Performance by subcontractor," the North Carolina General Statute states:

> "Performance by a subcontractor in accordance with the provisions of its contract shall entitle it to payment from the party with whom it contracts. Payment by the owner to a contractor is not a condition precedent for payment to a subcontractor and payment by a contractor to a subcontractor is not a condition precedent for payment to any other subcontractor, and an agreement to the contrary is unenforceable. (1987 (Reg. Sess., 1988), c. 946; 1991, c. 620.)"

164.    Pursuant to Chapter 22C "Payments to Subcontractors,", payment by the owner to a contractor is not a condition precedent for payment from a contractor to a subcontractor.

165.    As such, Section 6.2.5 of the Electrical Contract is void and unenforceable, and § 22C-2, "Performance by subcontractor," of the North Carolina General Statute governs payment by and between CBRE Heery and Watson.

166.    Payment by the USACE to CBRE Heery is not a condition precedent for payment to Watson for work that Watson performed in accordance with the Electrical Contract.

167.    On July 23, 2019, Watson properly submitted to CBRE Heery "Pay Application 38," which requested $63,907 in compensation for Electrical Work duly performed in accordance with the Electrical Contract ("Watson's Pay Application 38").

168.    Exhibit 19 is a true and accurate copy of Watson's Pay Application 38, dated 07/23/19.

169.    CBRE Heery has failed to pay Watson for the amounts owed pursuant to Watson's Pay Application 38.

170.    On November 25, 2019, Watson properly submitted to CBRE Heery "Pay Application 39," which requested $3,911 in compensation for Electrical Work duly performed in accordance with the Electrical Contract ("Watson's Pay Application 39").

171.    Exhibit 20 is a true and accurate copy of Watson's Pay Application 39, dated 11/25/19.

23

172. CBRE Heery has failed to pay Watson for the amounts owed pursuant to Watson's Pay Application 39.

173. On November 25, 2019, Watson properly submitted to CBRE Heery "Pay Application 40," which requested $106,132 in compensation for Electrical Work duly performed in accordance with the Electrical Contract ("Watson's Pay Application 40")

174. Exhibit 21 is a true and accurate copy of Watson's Pay Application 40, dated 11/25/19.

175. CBRE Heery has failed to pay Watson for the amounts owed pursuant to Watson's Pay Application 40.

176. Upon proper request, CBRE Heery has repeatedly refused to compensate Watson for amounts duly owed under Watson's Pay Application 38, Watson's Pay Application 39, and Watson's Pay Application 40.

177. As of the date of this Complaint, Watson has completed the entire scope of Electrical Work and is therefore entitled to recover $173,950, which represents the unpaid base Electrical Contract amounts owed.

178. CBRE Heery's failure to make prompt payment according to NCGS § 22C-2, as compensation for Electrical Work duly performed in good faith in accordance with the Electrical Contract is a violation of North Carolina law.

179. Under North Carolina common law, certain actions by a contracting party involved in construction have been found to be misrepresentations constituting unfair trade practices, including obtaining funds to pay a subcontractor and then failing to pay it.

180. Upon information and belief, CBRE Heery has failed to pay Watson certain funds that CBRE Heery has obtained from the USACE as a result of Electrical Work performed by Watson in good faith and in accordance with the terms of the Electrical Contract (the "CBRE Heery Unfair Payment Withholding Acts").

181.     As a direct and proximate cause of CBRE Heery's failure to make prompt payment to NCGS § 22C-2, Watson has been damaged in the amount of at least $173,950, together with interest at the maximum legal rates from dates according to proof thereof, and attorneys' fees and costs.

## SIXTH CLAIM FOR RELIEF

(Breach of Contract – CBRE Heery Failed to Pay Electrical Contract Changes)

(*Watson v. CBRE Heery et. al.*)

182.     The Plaintiffs reallege and incorporate by reference Paragraph 1 through Paragraph 181 as if fully set forth herein.

183.     CBRE Heery breached the Electrical Contract by, among other things, changing the design and performance specifications for the Project and directing certain other Electrical Contract changes.

184.     Under Article 7.3, "Changes," the Electrical Contract states:

> "If an agreement as to a monetary allowance, or other term in the change order, cannot be reached, Construction Manager, may direct Subcontractor in writing to perform the work under a reservation that the final adjustment in price will be reserved until final completion of the Project."

185.     During the course of the Project, CBRE Heery directed Watson to perform additional, extra, or changed work that Watson had no control over, and which Watson duly performed, and which resulted in additional costs that remain uncompensated.

186.     Under Chapter 22C "Payments to Subcontractors," § 22C-2, "Performance by subcontractor," the North Carolina General Statute states:

> "Performance by a subcontractor in accordance with the provisions of its contract shall entitle it to payment from the party with whom it contracts. Payment by the owner to a contractor is not a condition precedent for payment to a subcontractor and payment by a contractor to a subcontractor is not a condition precedent for payment to any other subcontractor, and an agreement to the contrary is unenforceable. (1987 (Reg. Sess., 1988), c. 946; 1991, c. 620.)"

187.     Pursuant to NCGS § 22C-2, CBRE Heery had an obligation to compensate Watson for Electrical Work duly performed in good faith in accordance with the Electrical Contract, including Electrical Contract changes.

188.     On May 18, 2017, Watson duly submitted to CBRE Heery Change Order Request 17, which requested $18,886 in compensation for furnishing additional labor, equipment, materials, services, or supplies related to additional "telecommunication outlets," which resulted from a design-criteria change ("Watson CCN #17").

189.     Exhibit 22 is a true and accurate copy of Watson CCN #17, dated 05/18/17.

190.     CBRE Heery has failed and refused to pay Watson for the additional costs incurred to complete the Electrical Work related to Watson CCN #17.

191.     On May 18, 2017, Watson duly submitted to CBRE Heery Change Order Request 18, which requested $32,056 in compensation for furnishing additional labor, equipment, materials, services, or supplies related to changes to the fire alarm system changes, which resulted from CBRE Heery's "Architect's Supplementary Instruction #5" ("Watson CCN #18").

192.     Exhibit 23 is a true and accurate copy of Watson CCN #18, dated 05/18/17.

193.     CBRE Heery has failed and refused to pay Watson for the additional costs incurred to complete the Electrical Work related to Watson CCN #18.

194.     On May 18, 2017, Watson duly submitted to CBRE Heery Change Order Request 19, which requested $848 in compensation for furnishing additional labor, equipment, materials, services, or supplies related to changes to the fire alarm system changes, which resulted from CBRE Heery's "Architect's Supplementary Instruction #7" ("Watson CCN #19").

195.     Exhibit 24 is a true and accurate copy of Watson CCN #19, dated 05/18/17.

196.     CBRE Heery has failed and refused to pay Watson for the additional costs incurred to complete the Electrical Work related to Watson CCN #19.

197.     On November 19, 2017, Watson duly submitted to CBRE Heery Change Order Request 16, which requested $19,261 in compensation for furnishing additional labor, equipment, materials,

services, or supplies related to changes to the Building's room numbers resulting from changes to the "Interior Model" dated November 3, 2016 ("Watson CCN #16").

198.     Exhibit 25 is a true and accurate copy of Watson CCN #16, dated 11/19/17.

199.     CBRE Heery has failed and refused to pay Watson for the additional costs incurred to complete the Electrical Work related to Watson CCN #16.

200.     On October 4, 2017, Watson duly submitted to CBRE Heery Change Order Request 24, which requested $24,436 in compensation for furnishing additional labor, equipment, materials, services, or supplies related to CBRE Heery's direction to provide "smoke seals" at certain wall penetrations in the Building, which was extra work in terms of the Electrical Contract ("Watson CCN #24").

201.     Exhibit 26 is a true and accurate copy of Watson CCN #24, dated 10/04/17.

202.     CBRE Heery has failed and refused to pay Watson for the additional costs incurred to complete the Electrical Work related to Watson CCN #24.

203.     On February 21, 2018, Watson duly submitted to CBRE Heery Change Order Request 29, which requested $7,675 in compensation for furnishing additional labor, equipment, materials, services, or supplies related to CBRE Heery's direction to replace certain data cables in the Building's Laboratory, which resulted changes to the Project's "casework" ("Watson CCN #29").

204.     Exhibit 27 is a true and accurate copy of Watson CCN #29, dated 02/21/18.

205.     CBRE Heery has failed and refused to pay Watson for the additional costs incurred to complete the Electrical Work related to Watson CCN #29.

206.     On June 11, 2018, Watson duly submitted to CBRE Heery Change Order Request 30, which requested $1,127 in compensation for furnishing additional labor, equipment, materials, services, or supplies related to CBRE Heery's direction to add "blank plates" and "ground pigtails" to outlets related to CBRE Heery's other Project subcontractor's (Cazador's) work at the Building's Pharmacy ("Watson CCN #30").

207.     Exhibit 28 is a true and accurate copy of Watson CCN #30, dated 06/11/18.

208.     CBRE Heery has failed and refused to pay Watson for the additional costs incurred to complete the Electrical Work related to Watson CCN #30.

209.     On July 25, 2018, Watson duly submitted to CBRE Heery Change Order Request 31, which requested $494 in compensation for furnishing additional labor, equipment, materials, services, or supplies related to CBRE Heery's direction to revise certain "treadmill outlets" from 120V to 208V ("Watson CCN #31").

210.     Exhibit 29 is a true and accurate copy of Watson CCN #31, dated 07/25/18.

211.     CBRE Heery has failed and refused to pay Watson for the additional costs incurred to complete the Electrical Work related to Watson CCN #31.

212.     On July 25, 2018, Watson duly submitted to CBRE Heery Change Order Request 32, which requested $336 in compensation for furnishing additional labor, equipment, materials, services, or supplies related to CBRE Heery's direction to rewire certain "counter shutters" in the Building's Pharmacy ("Watson CCN #32").

213.     Exhibit 30 is a true and accurate copy of Watson CCN #32, dated 07/25/18.

214.     CBRE Heery has failed and refused to pay Watson for the additional costs incurred to complete the Electrical Work related to Watson CCN #32.

215.     Upon proper request, CBRE Heery has failed and refused to compensate Watson for furnishing additional labor, equipment, materials, services, or supplies in the amount of $105,119 related to the additional Electrical Work described in Watson CCN #17, Watson CCN #18, Watson CCN #19, Watson CCN #16, Watson CCN #24, Watson CCN #29, Watson CCN #30, Watson CCN #31, and Watson CCN #32 (the "Unpaid Electrical Contract Changes").

216.     CBRE Heery's failure to make prompt payment pursuant to NCGS § 22C-2 as compensation for Electrical Work duly performed in good faith in accordance with the Electrical Contract is a violation of North Carolina law.

217.     Under North Carolina common law, certain actions by a contracting party involved in construction have been found to be misrepresentations constituting unfair trade practices, including obtaining funds to pay a subcontractor and then failing to pay it.

218.     Upon information and belief, CBRE Heery has failed to pay Watson certain funds that CBRE Heery has obtained from the USACE as a result of changes to the Electrical Work performed by Watson in good faith (the "CBRE Heery Unfair Payment Withholding Acts").

219.     As a direct and proximate cause of CBRE Heery's failure and refusal to compensate Watson for the additional costs incurred as a result of the Unpaid Electrical Contract Changes, Watson has been damaged in the amount of at least $105,119, together with interest at the maximum legal rates from dates according to proof thereof, and attorneys' fees and costs.

## SEVENTH CLAIM FOR RELIEF

### (CBRE Heery Breached its Fiduciary Duties & Committed Insurance Fraud)

#### *(SPC v. CBRE Heery)*

220.     The Plaintiffs reallege and incorporate by reference Paragraph 1 through Paragraph 219 as if fully set forth herein.

221.     Under North Carolina common law, a party if liable for conversion if: (1) the plaintiff is the proper owner of the property at issue; and, (2) the property has been wrongfully possessed and converted by the defendant.

222.     On June 30, 2017, an unforeseeable event that occurred during the course of construction at the Project Site, which was beyond SPC's control, caused flying rocks and debris to impact and damage SPC during its fire pump testing operation (the "Insurable Event").

223.     On June 25, 2018, Mr. Frank Kemp, CBRE Heery's Senior Project Manager, notified SPC that it was entitled to compensation as a result of the Insurable Event:

> "Please direct all future correspondence to Ken Cheatwood. The pump loss change request was approved by the [CBRE Heery] builders risk policy (minus the deductible amount). We will forward a change order for this as soon as the check is issued by the Builders Risk policy."

224.     Exhibit 31 is a true and accurate copy of the CBRE Heery Email to SPC, dated 06/25/18, in which CBRE Heery acknowledged that SPC had a right to the funds related to the damages that formed the basis for the Insurable Event.

225.     On July 31, 2018, CBRE Heery notified SPC's Project Executive, Mr. Adam Carrouth, that it had received compensation as a result of the Insurable Event:

> "As stated to Styron, [CBRE Heery] agreed to release $20,985 for the pump insurance claim payment by Chubb (SPC Change Order #10). Please submit a pay application for this amount."

226.     Exhibit 32 is a true and accurate copy of the CBRE Heery Email to SPC, dated 07/31/18, in which CBRE Heery acknowledges that it had received compensation from Chubb (the "Insurer") related to the damages that formed the basis for the Insurable Event.

227.     On August 10, 2018, SPC duly submitted to CBRE Heery "SPC's Change Order Request 10," which was a request for payment as a result of the cost impacts caused by the Insurable Event.

228.     Exhibit 33 is a true and accurate copy of SPC's Change Order Request 10 (Pay Application 35), dated 08/09/18.

229.     CBRE Heery has failed and refused to pay SPC any amounts that CBRE Heery received from the Insurer as a result of the Insurable Event.

230.     CBRE Heery has wrongfully possessed and converted the funds received by CBRE Heery from the Insurer, through a Builder's Risk Insurance loss claim made by SPC, through CBRE Heery, as a result of the Insurable Event.

231.     CBRE Heery's acceptance of payment from the Insurer and then subsequent failure to administer and pay the insurance claim proceeds to SPC is a fundamental breach of CBRE Heery's fiduciary duties.

232.     Under North Carolina common law, certain actions by a contracting party involved in construction have been found to be misrepresentations constituting unfair trade practices, including obtaining funds to pay a subcontractor and then failing to pay it.

233.     CBRE Heery has failed to pay SPC certain funds that CBRE Heery has obtained from the Insurer as a result of the Insurable Event (the "CBRE Heery Insurance Fraud Act").

234.     As a direct and proximate cause of CBRE Heery's breach of its fiduciary duties, SPC has been damaged in the amount of at least $20,985.00, together with interest at the maximum legal rates from dates according to proof thereof, and attorneys' fees and costs.

## EIGHTH CLAIM FOR RELIEF

(Breach of Contract)

(*Plaintiffs v. CBRE Heery et. al.*)

235.     The Plaintiffs reallege and incorporate by reference Paragraph 1 through Paragraph 234 as if fully set forth herein.

236.     Pursuant to the Severin Doctrine, a prime contractor cannot make a claim against the government for damages incurred by a subcontractor unless the prime contractor is itself liable to the subcontractor for those same damages. [See Severin v. United States Court of Claims, 99 Ct. Cl. 435, 443 (1943), cert. denied, 322 U.S. 733 (1944)]

237.     CBRE Heery breached the Mechanical Contract and the Electrical Contract by, among other things, changing the performance specifications for the Project, directing Watson, SPC, and Schneider, through SPC, to perform work under those changed conditions, and then failing to pay following the good faith completion of work related to those changed conditions.

238.     Under Article 7.3, "Changes," the Mechanical Contract and the Electrical Contract states:

> "If an agreement as to a monetary allowance, or other term in the change order, cannot be reached, Construction Manager, may direct Subcontractor in writing to perform the work under a reservation that the final adjustment in price will be reserved until final completion of the Project."

239.     In general, in terms of the Prime Contract, CBRE Heery had a duty to design and install a Direct Digital Control system (the "DDC System") that had one workstation located in the Facility, which allowed the USACE to effect the numerous controllers throughout the Facility and that would allow for peer communication back to the Base-wide system through a wireless ethernet radio system with antenna.

240.     Under Attachment A, Project Description, Paragraph 15.18 HVAC System Controls, the DBIO RFP describes the requirement for the DDC System:

> "Direct Digital Control (DDC) shall be indicated for all mechanical equipment. The system shall be equipped with Lonworks protocol. Individual equipment controllers shall be Schneider StruxureWare I/A series interconnected to the local wireless Ethernet radio system. Contractor shall install a wireless Ethernet radio and antenna for wireless communication back to the existing UMCS base-wide system. Coordinate location of radio and antenna with Seymour Johnson EMCS personnel. Each controller shall have stand-alone capability with the respective equipment in each system served from a dedicated control panel. Surge protection shall also be provided at each DDC controller."

241.     Under Attachment A, Paragraph 15.18, the DBIO RFP further states:

"The DDC system shall be configured to receive a connection to the Base-wide Schneider StruxureWare EMCS communication system allowing interrogation of the system from remote locations. All software required to program or configure controllers used on this project shall be viewed, modified, overridden, uploaded, downloaded and displayed graphically from the remote location."

242.     On February 7, 2013, in response to the DBIO RFP, CBRE Heery's Technical Proposal states the following regarding the Building Management System (the "BMS System"):

"Building Automation System: All control and monitoring points will be connected through a single complete building automation system (BAS) suitable for direct digital control (DDC) of all HVAC system components. The control system within the building shall utilize an open protocol implementation of LonWorks technology utilizing the LonMark Standard and will utilize ANSI/CEA 709.1C as the communication protocol between DDC hardware devices. All utility meters shall employ the LonWorks protocol for output to the building DDC system. The DDC system will have the ability to limit the operating hours of any air handler or VAV box, as well as perform setback functions when areas of the building are unoccupied. Each mechanical room shall be provided with a local display panel for monitoring and program changes. The BAS shall include wireless integration of the LonWorks system into an existing post wide supervisory Energy Monitoring and Control System (EMCS) by Schneider StruxureWare I/A."

243.     Under Section 1.3 System Description, of Section 23 09 23 (Page 6), the Prime Contract states:

"The Direct Digital Control (DDC) system shall be a complete system suitable for the control of the heating, ventilating and air conditioning (HVAC) and other building-level systems as specified and shown. The system shall provide a graphical, web-based, operator interface that allows for instant access to any system through a standard browser. The base has an existing Structure Ware Enterprise Server that all automation servers and unitary controllers that are part of this project must tie into."

244.     Several different terms including Utility Monitoring and Control System ("UMCS"), Building Management System ("BMS"), and Energy Monitoring and Control System ("EMCS") are used interchangeably throughout the Prime Contract.

245. In December 2013, at the 35% design review conference, the parties discussed whether to use wireless radio or Virtual Local Area Network (VLAN) for the DDC System, and the comments published from that conference state:

"Ask [Mr. Jeff Roseman] at [Crenshaw]."

246. Schneider managed the Base-wide Schneider StruxureWare EMCS communication system on the Seymour Johnson Air Force Base, which utilized VLAN connections to other buildings (the "Base-wide EMCS").

247. During the 65% design review, Crenshaw's designer, Mr. Mike McMahon, indicated that the design was using VLAN:

"[P]er 35% design review conference."

248. On December 2, 2014, during CBRE Heery's 100% design review, the USACE's Contracting Officer Representative (the "COR") and Project Engineer, Mr. Terry Brooks, posted Design Review Comment 5877097 which states:

"DDC control (sic) drawings need to show the basic control architecture of the control system. Architecture needs to show how all devices, cabinets, equipment controllers . . . will be connected/inter-connected. Needs to show how the system will be connected to the base network to report back the energy manager and should show the building workstation computer. Needs to show power and comm connections required. RFP requires a wireless ethernet radio system but the base has converted to a V Lan drop which is a (sic) easier and cheaper solution. Cordinate (sic) with Comm."

249. On December 9, 2014, Crenshaw responded to Design Review Comment 5877097:

"See sketch for Sheet 1M702 is attached that has some general information for the location of the head end computer, main control panels and V-0Lan drop. A complete system riser will be provided, but that is submittal level detail. There is space set aside in each Mechanical Room for control panels, see Sheet 1M401 through 1M404. A Lan drop has been provided in the main Mechanical Room 1982, next to the head control panel, for tie-in to the base Lan system." (the "Control System Sketch")

250. The Control System Sketch, included on Sheet 1M702, showed a Main Control Panel in Mechanical Room 1982, connections to other Mechanical Rooms and the workstation computer in the Facility Manager's Office.

251. The Control System Sketch indicated one external V-Lan connection from the Main Control Panel to the Base-wide EMCS.

252. On January 22, 2015, Corrected Final Drawing 1M702 – MECHANICAL SCHEMATICS HOT WATER includes Detail 2 – Basic Control System Architecture, which was the Control System Sketch, detailed on December 9, 2014.

253. The Control System Sketch shows the basic architecture of the DDC System – a Main Control Panel connected to each of the Mechanical Rooms, VAV boxes, and a computer in the Facility Manager's Office.

254. The Control System Sketch shows that a single external V-LAN connection is designed to run from the Main Control Panel to the Base-wide EMCS.

255. Under Specification § 23 09 23, Lonworks Direct Digital Control for HVAC and Other Building Control Systems, ¶ 1.3.1.k System Requirements, the Prime Contract states:

> "The Automation Servers shall communicate with the Enterprise Server and other system Automation Servers via a Seymour Johnson Air Force Base CE VLAN (Virtual Local Area Network) connection. VLAN connection data drop shall be provided (by others) in close proximity to each StruxureWare Automation Server. Material and labor associated with VLAN connection data drop installation are not a part of this contractor's scope of work."

256. Subparagraph k of the above-referenced specification (FoF ¶ 20) is not included in the standard guide specification.

257. CBRE Heery added this paragraph describing multiple VLAN connections to the Base-wide EMCS "by others."

258. On March 6, 2015, Schneider, through SPC, delivered the DDC System design drawings submittal, date-stamped "received" by CBRE Heery on May 7, 2015, (the "DDC System Design").

259. The DDC System Design satisfied the Prime Contract requirements.

260. On April 30, 2015, Crenshaw completed its review and "Approved As-Noted" the DDC System Design.

261. Exhibit 34 is a true and accurate copy of Crenshaw's DDC System Design Approval, dated 04/30/15.

262. On May 28, 2015, CBRE Heery conducted a DDC System Design meeting, attended by the USACE, CBRE Heery, and Crenshaw, in which CBRE Heery agreed that the DDC System Design satisfied the Prime Contract requirements.

263. On June 5, 2015, CBRE Heery and the USACE approved the DDC System Design, requesting only that Schneider, through SPC, address certain minor comments ("Transmittal No. 23 09 23-1").

264. Exhibit 35 is a true and accurate copy of CBRE Heery and the USACE's DDC System Design Approval, dated 06/05/15.

265. On June 15, 2015, having addressed the USACE's minor comments, Schneider, through SPC, resubmitted the DDC System Design, date-stamped "received" by CBRE Heery on December 7, 2015 (the "DDC System Design Resubmittal").

266. Exhibit 36 is a true and accurate copy of Schneider's DDC System Design Resubmittal, dated 06/15/15.

267. On November 16, 2015, Crenshaw approved the DDC System Design Resubmittal.

268. On November 18, 2015, CBRE Heery received Crenshaw's approval of the DDC System Design Resubmittal.

269. Exhibit 37 is a true and accurate copy of Crenshaw's DDC System Design Resubmittal Approval, dated 11/16/15.

270. On December 7, 2015, CBRE Heery submitted Transmittal 23 09 23-1.1, which included DDC System Design Drawings and Manufacturer's Catalog Data, to the USACE ("Transmittal 23").

271.     Transmittal 23 included the DDC Network Architecture Drawings, which included Sheets 4-10 of the drawings that show an Ethernet connection to Owner's Network (by Others) form the workstation (Sheet 4) and each of the Automation Servers (Sheets 5-10).

272.     On January 6, 2016, Mr. Terry Brooks, USACE, approved the DDC System Design Resubmittal.

273.     Exhibit 38 is a true and accurate copy of USACE DDC System Design Reapproval, dated 01/06/16.

274.     On January 5, 2017, Schneider, through SPC, issued RFI 16 to CBRE Heery, which requested the USACE provide Ethernet drops at Automation Servers at the following locations: (1) AS1 in Mechanical Room 1982; (2) AS2 in Mechanical Room 1986; (3) AS3 in Electrical Room 1954; (4) AS4 in Electrical Room 1956; (5) AS5 in Mechanical Room 2602; (6) AS6 in Mechanical Room 2612; (7) Operators Workstation Tech Area 1905C.

275.     CBRE Heery did not provide a response to RFI 16.

276.     On March 17, 2017, Mr. Derrick Goff, SPC's Project Superintendent, followed up with CBRE Heery to request a response from CBRE Heery to RFI 16.

277.     On March 17, 2017, Mr. Frank Quinn, CBRE Heery, emailed Mr. Derrick Goff, SPC, stating:

> "In speaking with Roy Tevepaugh, of Schneider Electric, and Bill Powell, yesterday, it was revealed to me that we need an additional 6 or 7 network drops and IP address for SJAFB New Clinic. Roy explained that an email was sent several months ago."

278.     On March 17, 2017, Mr. Charles McPherson, CBRE Heery, emailed Mr. Derrick Goff, SPC, and Mr. Frank Quinn, CBRE Heery, stating:

> "[…] it appears that Crenshaw has a gap in the design documents that they are aware of internally. Crenshaw needs to issue an update to their documents."

279.     On March 17, 2017, Mr. Frank Kemp, CBRE Heery, emailed Mr. Jeff Roseman, Crenshaw, stating:

"This is a two fold problem: 1) The drops are not on the drawings which simply means (to me) that not all of the coordination required has been completed. Since Crenshaw is a sub to both Watson and SPC [...] I would assume your responsibility would end by getting the required information on the drawings. When will this be done? 2) The cost of this work belongs either to Watson or SPC [...]"

280.    On April 4, 2017, Mr. Jeff Roseman, Crenshaw, sent the needed information regarding the DDC System Design to Mr. Frank Kemp, CBRE Heery.

281.    On April 6, 2017, Mr. Derrick Goff, SPC, emailed Mr. Jeff Roseman, Crenshaw, and Mr. Kevin Holcomb, with Strategic Communications, Watson's cabling subcontractor, stating:

"Below is a quote from an email from Schneider. Does anyone know if this is the case? If so than (sic) we need to get with the government and find out their requirements. 'The base doesn't allow any switches to be utilized since they are not able to see behind the switches. It's a security concern since anyone with a laptop these days can just plug in and jump on the network. [...] Every AS on site [...] will require an Ethernet drop and there is also a desktop PC that is going to be used on site [...].'"

282.    On September 15, 2017, the USACE requested a meeting on Site to discuss RFI 16, BMS Connectivity, and the DDC System Design.

283.    On September 21, 2017, Mr. Terry Brooks, USACE, and Quality Assurance Representative Mr. Larry Filion, USACE, met with representatives from CBRE Heery and SPC to discuss the DDC System Design (the "DDC System Design Criteria Meeting").

284.    On September 25, 2017, the USACE emailed CBRE Heery and confirmed the DDC System design criteria discussed at the DDC System Design Criteria Meeting:

"Per our discussion last week on DDC. We want the system to be able to be able to operate on it's on (sic) as a standalone system. All computing, data storage, trending and the like are to be housed in the new facility. The system should be tied to the base (building 3300) for monitoring, status and technical support. In short, if the data line between the new facility and building 3300 gets cut it will have absolutely no effect on the facility. The facility shall be able to operate completely independent of building 3300." (the "DDC System Criteria Change")

285.    Exhibit 39 is a true and accurate copy of DDC System Criteria Change, dated 09/25/17.

286.     In September 2017, the USACE stated that the DDC System Design must have the ability to operate as a completely and absolutely "standalone system" (the "Absolute Standalone Issue").

287.     At no place in the Prime Contract does it state that DDC System shall be "completely and absolutely" a standalone system.

288.     On October 6, 2017, Mr. Terry Brooks, USACE, emailed Mr. Frank Kemp, CBRE Heery, stating in part:

> "The Government does not owe any device(s) (switches/servers/routers or the like) to support the internal communication(s) of the DDC system in the building itself. [...] The DDC system must be able to operate the building completely on its own reliance to commission the building. After that is accomplished, we can then connect the DDC system to the base network."

289.     On October 13, 2017, Schneider emailed CBRE Heery to verify the USACE's understanding of the Absolute Standalone Issue and the DDC System Criteria Change, stating in part:

> "[...] Based on our conversation the modified design will now incorporate [...] Please confirm that I am understanding the direction above correctly. Once I get confirmed that this is the direction desired I will have our engineer modify the original submittal design to reflect new third party switches and design. We will then request approval by both the engineer and the government before moving forward with design changes. Once approved, Schneider will require direction and approval [...]"

290.     On October 17, 2017, in response to Schneider's request to confirm the DDC System Design Criteria Change, CBRE Heery, through the USACE, stated: "That sounds good. Have Schneider submit drawings."

291.     On October 23, 2017, Schneider submitted a revised DDC System Design, and SPC submitted network design modification submittal with a Change Order Request (the "Revised DDC System Design").

292.     On October 26, 2017, CBRE Heery directed Watson and SPC to proceed with the changes related to the Revised DDC System Design Change:

> "USACE has directed [CBRE Heery] to revise the BMS system for the medical clinic per the attached drawing. We have informed the USACE that this is a

change to the documents and are expecting a change for this revised work . . . Watson is herein directed to immediately proceed with installing new CAT 6 cable per attached drawing. Furthermore, the currently installed CAT 6 cable from existing AS panels is to be identified and removed from the patch panels in order for it to be connected to new switches being supplied by Schneider. Please provide your proposal for this work for inclusion into the REA." (the "DDC System Design Change Directive")

293.     Exhibit 40 is a true and accurate copy of the DDC System Design Change Directive, dated 10/26/17.

294.     On October 26, 2017, CBRE Heery provided the USACE with notice that the Revised DDC System Design Change is a change to the Prime Contract and that it intends to seek, among other things, duration-related damages:

"Attached please find the revised submittal for the BMS system as directed in our onsite meetings. As previously discussed, [CBRE Heery] believes this is a change to the contract documents and will be submitting an REA for this revised work including requests for additional time and extended overhead."

295.     Exhibit 41 is a true and accurate copy of the CBRE Heery Email to USACE, dated 10/26/17.

296.     Pursuant to CBRE Heery's DDC System Design Change Directive, SPC, Watson, and Schneider furnished additional labor, equipment, materials, services, and supplies to address the Absolute Standalone Issue and satisfy the DDC System Design Change Directive.

297.     On October 31, 2017, CBRE Heery further directed SPC to proceed with the DDC System Design Change Directive:

"The proposed installation architecture is approved. The change order will be submitted as an REA to the Government. When approved by them, we will write the CO to SPC."

298.     Exhibit 42 is a true and accurate copy of the CBRE Heery Email to SPC, dated 10/31/17.

299.     By accepting the USACE's request for an absolute and completely standalone system and by directing Watson, SPC, and Schneider to proceed with furnishing additional labor, equipment,

materials, services, and supplies related to the Revised DDC System Design, CBRE Heery assumed the responsibility for the resulting cost and time impacts incurred by Watson, SPC and Schneider.

300.     On November 2, 2017, in response to SPC's request for a duly executed change order for the DDC System Design Change, CBRE Heery further directed SPC to proceed immediately with all work related to the DDC System Design Change Directive:

> "Liquidated damages are accruing at +$1,500/day. [CBRE Heery] fully intends to charge SPC for all damages incurred including extended overhead for SPC's failure to meet project requirements. I highly suggest SPC immediately proceed with this work in order to minimize costs."

301.     On November 8, 2017, CBRE Heery submitted the Revised DDC System Design to the USACE through "Transmittal 23 09 23-2."

302.     The Revised DDC System Design shows the addition of six network switches (one at each Automation Server), which connects them to a switch at the Main Server that is connected to the workstation.

303.     The Revised DDC System Design shows that a separate line from the Main Server to the UMCS Network is provided by Others, and that an Enterprise Server was also added to the Workstation Computer.

304.     On November 19, 2017, Watson submitted Change Order Request 28 related to the additional cables needed to satisfy the DDC System Design Change Directive, pursuant to which Watson reserved its rights to request further cost impacts:

> "[T]his quote covers direct costs only and we reserve the right to claim for impact and consequential costs." ("Watson CCN #28")

305.     On December 7, 2017, Watson completed the additional Ethernet Network cabling to all Automation Server panels and communication rooms in satisfaction of the DDC System Design Change Directive, and then CBRE Heery directed SPC to proceed with the remainder of the changed work:

> "Strategic has reported that all the cabling has been completed for the BMS. Please proceed immediately with completion of the system."

306.     Exhibit 43 is a true and accurate copy of CBRE Heery Email to SPC, dated 12/07/17.

307.     On December 14, 2017, despite acknowledging and accepting that Watson had completed all work in accordance with CBRE Heery's DDC System Design Change Directive, CBRE Heery rejected Watson CCN #28.

308.     On July 31, 2018, Mr. Ken Cheatwood, CBRE Heery, emailed Mr. Adam Carrouth and Mr. Styron Wood, SPC, stating:

> "[CBRE Heery] believed SPC's original design was per the contract documents and that SPC & [CBRE Heery] have the right to pursue additional time and cost associated with this redesign change."

309.     In its email dated July 31, 2018, CBRE Heery admitted that SPC is entitled to pursue duration-related damages as a result of the DDC System Design Change Directive.

310.     On August 24, 2018, CBRE Heery, through Linda Smith, notified SPC that the DDC System Design Change Directive resulted in significant duration-related damages:

> "At issue is the 3-month delay associated with the DDC controls. That delay is worth $136,080 in LD's not to mention another 3 months of general conditions […] The cost of the work may not be significant, but the delay certainly is […]."

311.     Exhibit 44 is a true and accurate copy of the CBRE Heery Email to SPC, dated 08/24/18.

312.     In its email dated August 24, 2018, CBRE Heery represented that the DDC System Design Change Directive "is worth" direct costs, as well as duration-related damages, totaling at least $136,080.

313.     On September 12, 2018, the "Milestone Group," CBRE Heery's schedule expert, completed its forensic schedule delay analysis of the impacts related to the DDC System Design Change Criteria, stating in part:

> "The impact of the delay fragnet drove transition completion in the August 2017 update from 01/05/18 to 04/21/18. The BMS network delay caused a schedule impact of 106 calendar days. Reviewing the attached overall critical path would indicate the overall completion date also slipped 106 calendar days from 06/18/18 to 10/02/18." ("CBRE Heery's DDC System Design Change Delay Analysis")

314.     Exhibit 45 is a true and accurate copy of CBRE Heery's DDC System Design Change Delay Analysis, dated 09/12/18.

315.     On October 11, 2018, CBRE Heery submitted a Request for Equitable Adjustment to the USACE seeking $21,490.93 and a non-compensable time extension of 106 days related to the DDC System Design Change Directive ("CBRE Heery's DDC REA").

316.     On December 10, 2018, USACE issued CBRE Heery letter 08-56-155, which denied CBRE Heery's DDC REA, dated October 11, 2018, for "lack of documentation or justification," but allowed CBRE Heery the opportunity to resubmit the DDC REA.

317.     Exhibit 46 is a true and accurate copy of the USACE Letter to CBRE Heery, dated 12/10/18.

318.     On April 19, 2019, SPC issued CBRE Heery a letter, which states in part:

"By accepting the USACE's request, [CBRE Heery] assumed the responsibility for this change directive and should be able to recover the additional time and cost from the USACE. [CBRE Heery] previously agreed with these facts, which is the reason why on July 31, 2018, [CBRE Heery] stated: '[CBRE Heery] believed SPC's original design was per the contract documents and SPC & [CBRE Heery] have the right to pursue additional time and cost associated with the redesign change.' [CBRE Heery] rightly knows that SPC is entitled to additional time and cost associated with [CBRE Heery's] DDC System REA, which [CBRE Heery] has stated resulted in a 92-day Project delay. The issues claimed in [CBRE Heery's] DDC Systems REA are based upon an acknowledged change to the Mechanical Design & Performance Criteria [...]"

319.     Exhibit 47 is a true and accurate copy of SPC Letter to CBRE Heery, dated 04/19/19.

320.     On August 21, 2019, CBRE Heery directed Watson and SPC to quantify the cost impacts resulting from the DDC System Design Change Directive, which included CBRE Heery's DDC System Design Change Delay Analysis.

321.     Subsequently, based upon CBRE Heery DDC System Design Change Delay Analysis, Watson, SPC, and Schneider added 106 calendar days of duration-related damages resulting from the DDC System Design Change Directive to their calculation of cost impacts, as well as other direct costs

43

such as the: "Eco Structure Enterprise" server software and "7 Netgear" switches for the "nes BAS" subnetwork."

322. On August 23, 2019, Watson issued CBRE Heery a letter titled "WATSON'S SUPPORTING INFORMATION and DOCUMENTS RE: CBRE HEERY'S DDC CHANGE DIRECTIVE APPEAL," which, among other things states:

> "Watson provides this letter and its attachments in support of the time and cost impacts caused by the DDC Change Directive per your August 21, 2019 request."

323. Exhibit 48 is a true and accurate copy of Watson Letter to CBRE Heery, dated 08/23/19.

324. On September 16, 2019, CBRE Heery submitted its revised DDC REA, which the USACE received on October 15, 2019, and which provided additional information and increased CBRE Heery's request to $555,608 and 106 calendar days ("CBRE Heery's Revised DDC REA").

325. Exhibit 49 is a true and accurate copy of CBRE Heery's Revised DDC REA, dated 09/16/19.

326. In CBRE Heery's Revised DDC REA, CBRE Heery states:

> "We are in receipt of your serial letter 08-56-155 in response to the above referenced REA. The letter stated that if we have 'additional documentation that will support your request, you may resubmit an updated REA. We are now in receipt of that documentation and offer the following: SPC's subcontractor Schneider established a design path based on utilizing the existing Ecostruxure BMS Enterprise Server located at Civil Engineering Office. The specifications state that the system must be connected to the Enterprise Server as part of the base wide network through the government Virtual Lan (VLan). The specifications also state that all Ethernet cabling, network devices, switches, etc. shall be by the government. The original REA doesn't match what was installed. The original REA was to connect BMS through the radio system back to base engineering. With the emergence of the government VLan for the BMS, the radio system has been de-commissioned on many buildings. The VLan has been the connectivity path moving forward to the base Enterprise Server in Building 3300. There have been many references to the requirement of a 'standalone system' as part of the discussions and was compelling reason for the changes made to the BMS network. Schneider has attempted to clarify the following without much success: (1) Due to the size of the facility, one Automation Server was not practical for the installation. (2) The Automation Servers and field controllers are

for the most practical extent 'stand alone' for system operation. (3) As described in the specifications. There were separate IP drops required from each Automation Server to the (BPOC VLan connection) While there are six different wiring connections, they are connected to the same VLan) A separate BMS Subnetwork requirement was never discussed in the design process or throughout the project until the project meeting on 9/21/2017. All government comm. rooms, network equipment, and network operability were to be up and online (per the project schedule) long before the meeting date of 9/21/2017. Therefore, there were no red flags for Schneider to know there was an issue with the original design. On January 5, 2017, RFI 16 was issued by Schneider. This requested IP ethernet drops be installed at all AS locations as well as IP Addresses assigned for the government VLan connection. It took until September 21, 2017, for this to be addressed. In past installations for the base BMS, the base comm. group has not allowed unmanaged third-party network switches to be connected physically to the government network. It was never a design consideration due to this mandate. As a standard, Schneider had always included a non-managed switch in all of the Automation Server panels installed on base. This was for technician connection with a laptop. Several years ago, Schneider was asked to remove all third-party switches from these panels in existing buildings . . . Per the attached breakdown [CBRE Heery] is requesting $555,608 for the above additional work most of which is the result of the 106-day delay associated with this Government directed revision. A detailed schedule analysis has also been attached for your review."

327. On September 18, 2019, SPC issued CBRE Heery a letter titled "CBRE HEERY'S DDC-BMS CHANGE DIRECTIVE APPEAL," which certified that SPC's calculation of cost impacts related to CBRE Heery's DDC System Design Change Directive were made in good faith.

328. Exhibit 50 is a true and accurate copy of the SPC Letter to CBRE Heery, dated 09/18/19.

329. On September 18, 2019, Watson issued CBRE Heery a letter titled "CBRE HEERY'S DDC-BMS CHANGE DIRECTIVE APPEAL," which certified that Watson's calculation of cost impacts related to CBRE Heery's DDC System Design Change Directive were made in good faith.

330. Exhibit 51 is a true and accurate copy of the Watson Letter to CBRE Heery, dated 09/18/19.

331. On December 12, 2019, the USACE issued Letter 08-56-175, which denied CBRE Heery's Revised DDC REA.

332. On December 12, 2019, CBRE Heery submitted its "Request for Contracting Officer's Final Decision" seeking compensation in the amount of $555,608 and 106 days of delay arising from DDC System Design Change Directive ("CBRE Heery's DDC Claim").

333. CBRE Heery has admitted that the DDC System Design, as originally design by Schneider, complied with the Prime Contract.

334. CBRE Heery has claimed that the USACE required CBRE Heery to redesign the USACE's network and provide cabling, network devices, and switches for which it is due additional compensation.

335. On January 10, 2020, the USACE issued CBRE Heery a letter, which requested that CBRE Heery certify its pending claim in accordance with FAR 52.233-1 Disputes and clarify the sum certain requested.

336. On January 13, 2020, CBRE Heery certified CBRE Heery's DDC Claim.

337. On April 23, 2020, the Office of Counsel for the USACE issued CBRE Heery the "Contracting Officer's Final Decision."

338. Exhibit 52 is a true and accurate copy of the Contracting Officer's Final Decision, dated 04/23/20.

339. In the Contracting Officer's Final Decision, the USACE states, in part:

(1)     "[CBRE Heery] makes two primary allegations: (1) [CBRE Heery] contends that the VLAN system that the USACE required [CBRE Heery] to install does not meet the RFP requirement for a radio system; and, (2) [CBRE Heery] contends that Schneider was required to change its design path for the DDC System Design."

(2)      "For the first allegation, [CBRE Heery] states: With the emergence of the government VLan for the BMS, the radio system has been de-commissioned on many buildings. The VLan has been the connectivity path move forward to the base Enterprise Server in [Civil Engineering] Building 3300."

(3)      "For the second allegation that the design path was changed, [CBRE Heery] claims: SPC's subcontractor Schneider established a design path based on utilizing the existing Ecostruxure BMS Enterprise Server

46

located [at the] Civil Engineering [Building]. The specifications state that the system <u>must</u> be connected to the Enterprise Server as part of the base wide network through the government Virtual Lan (VLan). The specifications also state that all Ethernet cabling, network devices, switches, etc. shall be by the government."

(4)     "[CBRE Heery] argues the following in support of its claim: (1) discussion about a 'standalone system' was a reason for the changes made to the BMS network; (2) the Automation servers and field controllers are 'stand alone' for system operations as described in the specifications; (3) one Automation Server was not practical for the installation due to the size of the facility; (4) on January 5, 2017, Schneider issued internal RFI-16 to SPC which requested Ethernet drops to be installed at all AS locations as well as IP addresses assigned for the government VLAN connection, but the RFI was not addressed until September 21, 2017. If it had been addressed in a reasonable amount of time, this could have been dealt with long before the commissioning date of the facility; (5) A separate BMS subnetwork requirement was never discussed in the design process or throughout the project until the project meeting on 9/21/2017; (6) All government communication rooms, network equipment, and network operability were to be scheduled to be up and online long before the meeting date of 9/21/2017. Therefore, there were no red flags for Schneider to know there was an issue with the original design."

(5)     "Generally, [CBRE Heery] contends the contract allowed it to provide numerous controllers which communicated directly to the base-wide system rather than be routed to the Main Control Panel within the Medical Clinic. Additionally, [CBRE Heery] contends that the Government was to provide equipment (switches, wire) that enabled the controllers to communicate with the basewide EMCS and each other."

(6)     "The Government asserts that the contract required [CBRE Heery] to design and install a DDC system that had a Main Control Panel with one work-station (stand alone computer) located in the Medical Clinic which allowed control of the numerous controllers throughout the building and which would communicate back the base-wide system. Additionally, the contract required [CBRE Heery] to install the complete system that allowed for peer communication between controllers."

(7)     "Finally, [CBRE Heery] claims that this issue delayed the project's critical path from 21 September 2017 to 21 December 2017."

(8)  "[CBRE Heery] contends that the Government required it to revise its design and provide equipment (switches, cable) for the DDC system which exceeded the contract requirements."

(9)  "The Government is not responsible for any delays arising from how [CBRE Heery] handled this matter."

(10)  "I have reviewed [CBRE Heery's DDC Claim] and the project records and have found no merit in your claim […]."

340.    On April 24, 2020, Linda Smith, CBRE Heery, emailed SPC and Watson, and stated as follows:

"Attached is the Government's response to our request for Contracting Officer's Decision on the DDC Revisions. It is our intent to appeal this decision and we will keep you apprised of the next steps." ("CBRE Heery's Intent to Appeal")

341.    Exhibit 53 is a true and accurate copy of CBRE Heery's Intent to Appeal, dated 04/23/20.

342.    As of the date of this Complaint, CBRE Heery has not provided the Plaintiffs with any information regarding CBRE Heery's Intent to Appeal.

343.    CBRE Heery has admitted that Watson, SPC, and Schneider are entitled to recover time and cost impacts caused by CBRE Heery's DDC System Design Change Directive.

344.    At all times, Watson, SPC, and Schneider performed the Electrical Work, the Mechanical Work, and the Controls Work in accordance with CBRE Heery's directions.

345.    Pursuant to the Severin Doctrine, by stating its intent to submit a claim to the Armed Services Board of Contract Appeals (the "ASBCA"), CBRE Heery has admitted that it suffered actual damages and is liable to Watson, SPC, and Schneider as a result of the impacts related to CBRE Heery's DDC System Design Change Directive.

346.    As a direct and proximate cause of the impacts caused by the DDC System Design Change Directive, SPC has been damaged in the amount of at least $245,715, together with interest at the maximum legal rates from dates according to proof, and attorneys' fees and costs.

347. As a direct and proximate cause of the impacts caused by the DDC System Design Change Directive, Schneider has been damaged in the amount of at least $42,146, together with interest at the maximum legal rates from dates according to proof, and attorneys' fees and costs.

348. As a direct and proximate cause of the impacts caused by the DDC System Design Change Directive, Watson has been damaged in the amount of at least $209,456, together with interest at the maximum legal rates from dates according to proof, and attorneys' fees and costs.

## NINTH CLAIM FOR RELIEF

(Breach of Contract – CBRE Heery Failed to Provide a Realistic Schedule)

(*SPC & Watson v. CBRE Heery et. al.*)

349. The Plaintiffs reallege and incorporate by reference Paragraph 1 through Paragraph 348 as if fully set forth herein.

350. Under Section IV. Project Schedule, Part B. Schedule Requirements, 1. Level of Detail Required and General Requirements, the Prime Contract states:

> "The Project Schedule shall be in accordance with UFGS 01 32 01.00 Project Schedule or UFGS 01 32 16.00 Construction Progress Documentation and Contract Clause 52.236-15 Schedules for Construction Contract."

351. Under FAR § 52.236-15 Schedules for Construction Contracts (APR 1984), under Subsection (b), the Federal Acquisition Regulation states:

> "Solicitations shall, except when clearly unnecessary, inform bidders or offerors of the basis on which their bids or proposals will be evaluated with respect to time of delivery or performance."

352. Pursuant to the Electrical Contract and the Mechanical Contract, which incorporated the Prime Contract by reference, CBRE Heery had a duty to inform SPC and Watson with respect to the time of performance for the Project.

353. Under Subpart 11.4, "Delivery or Performance Schedules," Subsection 11.401 General. Subsection (a), the Federal Acquisition Regulation states:

"The time of delivery or performance is an essential contract element and shall be clearly stated in solicitations. Contracting officers shall ensure that delivery or performance schedules are realistic and meet the requirements of the acquisition. Schedules that are unnecessarily short or difficult to attain . . . [a]re inconsistent with small business policies, and . . . [m]ay result in higher contract prices."

354.    Pursuant to the Electrical Contract and the Mechanical Contract, which incorporated the Prime Contract by reference, the time of performance is an essential contract element.

355.    Pursuant to the Electrical Contract and the Mechanical Contract, which incorporated the Prime Contract by reference, CBRE Heery had a duty to ensure that the Contract Schedule submitted to the USACE as part of CBRE Heery's Prime Contract requirements was realistic.

356.    Under Article 2. DURATION, on Page 20 of 85, the Prime Contract states:

"1095 Calendar days . . . total contract performance time not to exceed 1095 calendar days from the date of issuance of Notice to Proceed." (the "Expected Performance Time")

357.    Pursuant to the Prime Contract, CBRE Heery had an obligation to design and construct the Project in a total of 1,095 calendar days from the Notice to Proceed.

358.    Under Section 01 32 01.00 10 Project Schedule, Subsection 3.3.14 "Original Durations," the Prime Contract states:

"Activity Original Durations (OD) must be reasonable to perform the work item. OD changes are prohibited unless justification is provided and approved by the Contracting Officer."

359.    Pursuant to the Electrical Contract and the Mechanical Contract, which incorporated the Prime Contract by reference, CBRE Heery represented that the "activity original durations" were reasonable to perform the Electrical Work and the Mechanical Work.

360.    On October 24, 2013, the USACE issued and CBRE Heery acknowledged the USACE's Notice to Proceed with the Project (the "Project NTP").

361.    In accordance with Article 2 of the Prime Contract and based upon the Project NTP, CBRE Heery's Project Schedule represented a final Project completion date of October 20, 2016 (the "Contract-Defined Completion Date").

362. On February 28, 2014, the USACE issued CBRE Heery a letter titled "Project Schedule," which states in part:

> "An electronic copy of the Project Schedule was received today by FedEx. A hard copy of the schedule was also received in the 35% review package. Just to be clear and to avoid confusion about how the Project Schedule gets officially received and approved, I want to take the opportunity to explain the process. The Project Schedule must be submitted in accordance with specification section 01 32 01.00 10 (Project Schedule)."

363. Exhibit 54 is a true and accurate copy of USACE Letter to CBRE Heery, dated 02/28/14.

364. Under Section 4.1, "Time," of Article 4, "Progress, Performance and Schedule of Work," the Mechanical Contract and the Electrical Contract states:

> "Time is of the essence for all work specified or required by the Contract. Subcontractor agrees that the performance of all work required by the Contract will be completed within the time specified with the schedules of work which are furnished by [CBRE Heery]."

365. The Electrical Contract and the Mechanical Contract represented that the Contract-Defined Completion Date was reasonable, achievable, and realistic.

366. The Electrical Contract and the Mechanical Contract represented that the "Beneficial Occupancy" date of May 3, 2016 (the "Contract-Defined Substantial Completion Date") was reasonable, achievable, and realistic.

367. On October 31, 2014, the USACE issued CBRE Heery a letter titled "Sitework NTP," which states in part:

> "This office received your revised Early Site Package dated October 21, 2014 and electronic revision ASI #1 dated October 29, 2014. The Early Site Package has a few open review comments. These concerns are generally minor in nature, and correcting or closing these comments should not impact the Phase 1 and Phase 2 construction activities. Let this letter serve as your Phase 1 and Phase 2 sitework Notice to Proceed." (the "Construction Start Date")

368. Exhibit 55 is a true and accurate copy of the Construction Start Date, dated 10/31/14.

369. On June 18, 2018, CBRE Heery notified certain Project participants, including SPC and Watson, that CBRE Heery had achieved Substantial Completion in an email that states, in part:

51

"All, Please provide your warranties for the medical clinic. Review the specific requirements in the specifications for length and types of warranty and for any special requirements. This information is required immediately. The substantial completion date is June 18, 2018. Some warranties have been provided previously, however either the term or substantial completion date is wrong." (the "Actual Substantial Completion Date")

370.    Exhibit 56 is a true and accurate copy of the Actual Substantial Completion Date, dated 06/18/18.

371.    Based upon the Actual Substantial Completion Date, and the Contract-Defined Substantial Completion Date, the Project encountered a 25.5-month delay to Substantial Completion (the "Unforeseeable Substantial Completion Delay").

372.    On November 4, 2019, the USACE issued CBRE Heery "DD 1354," the Project's "Partial Turnover Document" (the "Partial Completion Date").

373.    As of June 10, 2020, the USACE had not issued CBRE Heery the Certificate of Final Completion (the "Actual Performance Time").

374.    Based upon the Expected Performance Time, and the Actual Performance Time, that Project encountered a 43.7-month gross delay to the Contract-Defined Completion Date (the "Unforeseeable Total Delay").

375.    Based upon the Unforeseeable Substantial Completion Delay, and the Unforeseeable Total Delay, the Contract Schedule was not reasonable, achievable, or realistic.

376.    CBRE Heery's failure to provide SPC and Watson with a reasonable, achievable, and realistic Expected Performance Time is a material breach of the Federal Acquisition Regulation, the Electrical Contract, and the Mechanical Contract.

377.    On January 6, 2014, the date that SPC entered into the Mechanical Contract, which incorporated the Contract Schedule, it was unreasonable for SPC to foresee that the Project would encounter a 25.5-month delay to Substantial Completion or a 43.7-month delay to Project Completion.

378.     On May 9, 2014, at the time that Watson entered into the Electrical Contract, which incorporated the Contract Schedule, it was unreasonable for SPC to foresee that the Project would encounter a 25.5-month delay to Substantial Completion or a 43.7-month delay to Project Completion.

379.     As a direct and proximate cause of CBRE Heery's failure to provide a reasonable, achievable, and realistic expected time for performance pursuant to the Federal Acquisition Regulation, SPC has been damaged in an amount to be proven at trial, together with interest at the maximum legal rates from dates according to proof thereof, and attorneys' fees and costs.

380.     As a direct and proximate cause of CBRE Heery's failure to provide a reasonable, achievable, and realistic expected time for performance pursuant to the Federal Acquisition Regulation, Watson has been damaged in an amount to be proven at trial, together with interest at the maximum legal rates from dates according to proof thereof, and attorneys' fees and costs.

## **TENTH CLAIM FOR RELIEF**

(Breach of Contract – CBRE Heery Failed to Properly Manage the Project Schedule)

(*SPC & Watson v. CBRE Heery et. al.*)

381.    The Plaintiffs reallege and incorporate by reference Paragraph 1 through Paragraph 380 as if fully set forth herein.

382.    Under North Carolina common law, certain actions by a contracting party involved in construction have been found to be misrepresentations constituting unfair trade practices, including providing misleading information about the status of construction and the expected date of completion.

383.    Under FAR § 552.236-15, "Schedules for Construction Contracts," Subsection (a) Purpose, the Federal Acquisition Regulation states:

> "The project schedule shall be a rational, reasonable, and realistic plan for completing the work, and conform to the requirements specified in this clause and elsewhere in the contract. The Contractor understands and acknowledges that the preparation and proper management of the project schedule is a material component of the contract."

384.    Under FAR § 52.236-15, "Schedules for Construction Contracts." Subsection (a), the Federal Acquisition Regulation states:

> "The Contractor shall, within five days after the work commences on the contract or another period of time determined by the Contracting Officer, prepare and submit to the Contracting Officer for approval three copies of a practicable schedule showing the order in which the Contractor proposes to perform the work, and the dates on which the Contractor contemplates starting and completing the several salient features of the work (including acquiring materials, plant, and equipment). The schedule shall be in the form of a progress chart of suitable scale to indicate appropriately the percentage of work scheduled for completion by any given date during the period. If the Contractor fails to submit a schedule within the time prescribed, the Contracting Officer may withhold approval of progress payments until the Contractor submits the required schedule."

385.    Pursuant to the Electrical Contract and the Mechanical Contract CBRE Heery had a duty to properly manage the Contract Schedule over the course of the Project, which included accurately

representing actual Project progress, and providing reasonable, achievable, and realistic expected completion dates.

386. Under Section 01 32 01.00 10 Project Schedule, Subsection 3.3.14 "Original Durations," the Prime Contract states:

> "Activity Original Durations (OD) must be reasonable to perform the work item. OD changes are prohibited unless justification is provided and approved by the Contracting Officer."

387. The Electrical Contract and the Mechanical Contract represented that the original activity durations represented by the Contract Schedule were reasonable to perform the Mechanical Work and the Electrical Work.

388. Under Section 3.9 FAILURE TO ACHIEVE PROGRESS, Subsection 3.9.1 "Artificially Improving Progress," the Prime Contract states:

> "Artificially improving progress by means such as, but not limited to, revising the schedule logic, modifying or adding constraints, shortening activity durations, or changing calendars in the project schedule is prohibited. Indicate assumptions made and the basis for any logic, constraint, duration and calendar changes used in the creation of the recovery plan. Any additional resources, manpower, or daily and weekly work hour changes proposed in the recovery plan must be evident at the work site and documented in the daily report along with the Schedule."

389. The Electrical Contract and the Mechanical Contract, which incorporated the Prime Contract by reference, prohibited CBRE Heery from revising the schedule logic, modifying or adding constraints, shortening activity durations, or otherwise artificially improving Project progress.

390. In December 2014, CBRE Heery issued a Project Schedule update titled "Revised Baseline," dated December 31, 2014, which represented an October 20, 2016 Project Completion Date ("CBRE Heery's Revised Baseline Schedule").

391. Exhibit 57 is a true and accurate copy of CBRE Heery's Revised Baseline Schedule, dated 12/31/14.

392.    In January 2015, CBRE Heery issued a Project Schedule update titled "SJ01 01-31-15 January 2015 Schedule Update," with a Data Date of 01-30-15, which extended the Project completion date from October 20, 2016 to December 9, 2016 ("CBRE Heery Schedule Update 1").

393.    Exhibit 58 is a true and accurate copy of CBRE Heery Schedule Update 1, dated 01/31/15.

394.    In February 2015, CBRE Heery issued a Project Schedule update titled "SJ02 02-27-15 February 2015 Schedule Update," with a Data Date of 02-27-15, which extended the Project completion date from December 9, 2016 to December 29, 2016 ("CBRE Heery Schedule Update 2").

395.    Exhibit 59 is a true and accurate copy of CBRE Heery Schedule Update 2, dated 02/27/15.

396.    In March 2015, CBRE Heery issued a Project Schedule update titled "SJ03 03-30-15 March 2015 Schedule Update," with a Data Date of 03-30-15, which accelerated the Project completion date from December 29, 2016 to December 9, 2016 ("CBRE Heery Schedule Update 3").

397.    Exhibit 60 is a true and accurate copy of CBRE Heery Schedule Update 3, dated 03/30/15.

398.    In April 2015, CBRE Heery issued a Project Schedule update titled "SJ04 04-28-15 April 2015 Schedule Update," with a Data Date of 04-28-15, which extended the Project completion date from December 9, 2016 to December 15, 2016 ("CBRE Heery Schedule Update 4").

399.    Exhibit 61 is a true and accurate copy of CBRE Heery Schedule Update 4, dated 04/28/15.

400.    In May 2015, CBRE Heery issued a Project Schedule update titled "SJ05 05-29-15 May 2015 Schedule Update," with a Data Date of 05-30-15, which extended the Project completion date from December 15, 2016 to December 19, 2016 ("CBRE Heery Schedule Update 5").

401.    Exhibit 62 is a true and accurate copy of CBRE Heery Schedule Update 5, dated 05/30/15.

402. In June 2015, CBRE Heery issued a Project Schedule update titled "SJ06 06-22-15 June 2015 Schedule Update," with a Data Date of 06-30-15, which extended the Project completion date from December 19, 2016 to December 20, 2016 ("CBRE Heery Schedule Update 6").

403. Exhibit 63 is a true and accurate copy of CBRE Heery Schedule Update 6, dated 06/30/15.

404. In July 2015, CBRE Heery issued a Project Schedule update titled "SJ07 07-28-15 July 2015 Schedule Update," with a Data Date of 07-29-15, which extended the Project completion date from December 20, 2016 to January 13, 2017 ("CBRE Heery Schedule Update 7").

405. Exhibit 64 is a true and accurate copy of CBRE Heery Schedule Update 7, dated 07/29/15.

406. In August 2015, CBRE Heery created a Project Schedule update titled "SJ08 08-27-15 August 2015 Schedule Update," with a Data Date of 08-27-15, which maintained the Project completion date at January 13, 2017 ("CBRE Heery Schedule Update 8").

407. Exhibit 65 is a true and accurate copy of CBRE Heery Schedule Update 8, dated 08/27/15.

408. In September 2015, CBRE Heery created a Project Schedule update titled "SJ09 09-22-15 September 2015 Schedule Update," with a Data Date of 09-22-15, which accelerated the Project completion date from January 13, 2017 to January 9, 2017 ("CBRE Heery Schedule Update 9").

409. Exhibit 66 is a true and accurate copy of CBRE Heery Schedule Update 9, dated 09/22/15.

410. In November 2015, CBRE Heery created a Project Schedule update titled "SJ10 11-19-15 November 2015 Schedule Update," with a Data Date of 11-20-15, which extended the Project completion date from January 9, 2017 to January 31, 2017 ("CBRE Heery Schedule Update 10").

411. Exhibit 67 is a true and accurate copy of CBRE Heery Schedule Update 10, dated 11/20/15.

412. In December 2015, CBRE Heery created a Project Schedule update titled "SJ12 12-21-15 December 2015 Schedule Update," with a Data Date of 12-21-15, which extended the Project completion date from January 31, 2017 to February 16, 2017 ("CBRE Heery Schedule Update 12").

413. Exhibit 68 is a true and accurate copy of CBRE Heery Schedule Update 12, dated 12/21/15.

414. In January 2016, CBRE Heery created a Project Schedule update titled "SJ13 01-22-16 January 2016 Schedule Update," with a Data Date of 01-22-16, which maintained the Project completion date at February 16, 2017 ("CBRE Heery Schedule Update 13").

415. Exhibit 69 is a true and accurate copy of CBRE Heery Schedule Update 13, dated 01/22/16.

416. In February 2016, CBRE Heery created a Project Schedule update titled "SJ14 02-26-16 February 2016 Schedule Update," with a Data Date of 02-26-16, which extended the Project completion date from February 16, 2017 to March 22, 2017 ("CBRE Heery Schedule Update 14").

417. Exhibit 70 is a true and accurate copy of CBRE Heery Schedule Update 14, dated 02/26/16.

418. In March 2016, CBRE Heery created a Project Schedule update titled "SJ15 03-30-16 March 2016 Schedule Update," with a Data Date of 03-30-16, which extended the Project completion date from March 22, 2017 to April 19, 2017 ("CBRE Heery Schedule Update 15").

419. Exhibit 71 is a true and accurate copy of CBRE Heery Schedule Update 15, dated 03/30/16.

420. In April 2016, CBRE Heery created a Project Schedule update titled "SJ16 04-28-16 April 2016 Schedule Update," with a Data Date of 04-28-16, which extended the Project completion date from April 19, 2017 to May 8, 2017 ("CBRE Heery Schedule Update 16").

421. Exhibit 72 is a true and accurate copy of CBRE Heery Schedule Update 16, dated 04/28/16.

422. On May 24, 2016, the USACE issued CBRE Heery a letter, which states, in part:

"Dear Ms. Smith: After a thorough review and analysis of last month's project schedule, this office is extremely concerned about your company's ability to maintain schedule and your ability to complete the project by the contractually agreed upon completion date. Monthly progress earnings over the last several billing cycles have fallen short of the expected earnings curve that was generated by your company's initial project schedule. The 4th Medical Group was previously promised a September move in date by your company and it is now obvious that will not happen. A 'Lack of Progress' letter was sent to your attention on February 29, 2016 regarding our concerns over progress and schedule. A response letter was received in this office on March 18, 2016 from Mr. Frank Kemp. Mr. Frank Kemp stated the following: (1) [CBRE Heery] has diligently worked all available hours with key subcontractors in an effort to maximize project progress, including extended hours during the work week and Saturdays and Sundays. (2) Continue to work extended hours during the week and Saturdays and Sundays with key critical path subcontractor's including masonry, glass/glazing and masonry subcontractor crew. According to the daily reports, a small increase in production has been observed with Glass/Glazing and Masonry crews on weekdays and weekends. Some work has occurred on Saturdays but work on Sundays has been minimal. The increase in production hours during the week and weekends is small in comparison to the amount of work that would need to be accomplished to get the project back on schedule [...] From this point forward, this office will withhold retainage, up to 10%, on progress payments for unsatisfactory progress. [...] Timely project completion is one of the major evaluation components of your final evaluation. Please discuss timely project completion and schedule with your Project Delivery Team/Staff. Please provide a written response and recovery schedule back to this office no later than June 3, 2016 that describes your method to complete this project on time."

423.    Exhibit 73 is a true and accurate copy of USACE Letter to Heery, dated 05/24/16.

424.    In May 2016, CBRE Heery created a Project Schedule update titled "SJ17 05-27-16 May 2016 Schedule Update," with a Data Date of 05-27-16, which extended the Project completion date from May 8, 2017 to May 15, 2017 ("CBRE Heery Schedule Update 17").

425.    Exhibit 74 is a true and accurate copy of CBRE Heery Schedule Update 17, dated 05/27/16.

426.    In June 2016, CBRE Heery created a Project Schedule update titled "SJ17 06-30-16 June 2016 Schedule Update," with a Data Date of 06-30-16, which extended the Project completion date from May 15, 2017 to June 1, 2017 ("CBRE Heery Schedule Update 18").

427.     Exhibit 75 is a true and accurate copy of CBRE Heery Schedule Update 18, dated 06/30/16.

428.     On July 28, 2016, CBRE Heery executed a Prime Contract Change, titled "REA – Bio Environmental Building 2810," which states, among other things:

> "The contract completion date shall be extended by 60 calendar days by reason of this modification."

429.     Exhibit 76 is a true and accurate copy of REA – Bio Environmental Building 2810, dated 07/28/16.

430.     In July 2016, CBRE Heery created a Project Schedule update titled "SJ19 07-29-16 July 2016 Schedule Update," with a Data Date of 07-29-16, which extended the Project completion date from June 1, 2017 to July 21, 2017 ("CBRE Heery Schedule Update 18").

431.     Exhibit 77 is a true and accurate copy of CBRE Heery Schedule Update 19, dated 07/29/16.

432.     In August 2016, CBRE Heery created a Project Schedule update titled "SJ20 08-26-16 August 2016 Schedule Update," with a Data Date of 08-26-16, which maintained the Project completion date of July 21, 2017 ("CBRE Heery Schedule Update 20").

433.     Exhibit 78 is a true and accurate copy of CBRE Heery Schedule Update 20, dated 08/26/16.

434.     In September 2016, CBRE Heery created a Project Schedule update titled "SJ21 09-30-16 September 2016 Schedule Update," with a Data Date of 09-30-16, which extended the Project completion date from July 21, 2017 to August 30, 2017 ("CBRE Heery Schedule Update 21").

435.     Exhibit 79 is a true and accurate copy of CBRE Heery Schedule Update 21, dated 09/30/16.

436.     On October 26, 2016, Mr. Alex Brink, Watson's Project Manager, notified CBRE Heery that ongoing delays and disruptions were substantially impacting the Electrical Work:

"Please see attached notice of delay from our subcontractor, SimplexGrinnell. As noted in our schedule letter dated 8/12/16 we share the same concern that the schedule is not accurate on when the building will be ready for beneficial occupancy. We have not seen a copy of the September or October schedule so our concern is based on the August schedule." ("Watson's October 2016 Delay & Disruption Notice")

437.    Exhibit 80 is a true and accurate copy of Watson's Delay & Disruption Notice, dated 10/26/16.

438.    Watson's October 2016 Delay & Disruption Notice states, in part:

"On October 3rd 2016 SimplexGrinnell received a revised project schedule (SJ20-08-26-16), issued by [CBRE Heery], sent by Watson Electrical via email. SimplexGrinnell's contractual scope of work and schedule remains negatively influenced as a result of continued delays towards the completion of necessary predecessor requirements. As previously identified, these construction delays include unfinished walls, ceilings, spaces and as a result incomplete conduit—all which continue to hinder the start of cable and device installation of the inclusive Fire/Mass notification, Nurse Call and Public Address system. According to the initially published project schedule (SJ16 04-28-16), SimplexGrinnell was to mobilize in May 2016 and achieve system certification during the month of November 2016 allowing us six months to complete our installation activities. The scheduled (sic) released on August 2016 indicates a final testing on December 6, 2016 however we are yet to start the project due to construction delays. SimplexGrinnell will require six months from installation start date to complete our installation activities as previously forecasted in the original schedule."

439.    In October 2016, CBRE Heery created a Project Schedule update titled "SJ22 10-27-16 October 2016 Schedule Update," with a Data Date of 10-28-16, which extended the Project completion date from August 30, 2017 to September 26, 2017 ("CBRE Heery Schedule Update 22").

440.    Exhibit 81 is a true and accurate copy of CBRE Heery Schedule Update 22, dated 10/27/16.

441.    In November 2016, CBRE Heery created a Project Schedule update titled "SJ23 11-23-16 November 2016 Schedule Update," with a Data Date of 11-24-16, which extended the Project completion date from September 26, 2017 to October 5, 2017 ("CBRE Heery Schedule Update 23").

442.     Exhibit 82 is a true and accurate copy of CBRE Heery Schedule Update 23, dated 11/24/16.

443.     In December 2016, CBRE Heery created a Project Schedule update titled "SJ24 12-29-16 December 2016 Schedule Update," with a Data Date of 12-30-16, which extended the Project completion date from October 5, 2017 to October 25, 2017 ("CBRE Heery Schedule Update 24").

444.     Exhibit 83 is a true and accurate copy of CBRE Heery Schedule Update 24, dated 12/30/16.

445.     In January 2017, CBRE Heery created a Project Schedule update titled "SJ25 01-25-17 January 2017 Schedule Update," with a Data Date of 01-26-17, which extended the Project completion date from October 25, 2017 to November 9, 2017 ("CBRE Heery Schedule Update 25").

446.     Exhibit 84 is a true and accurate copy of CBRE Heery Schedule Update 25, dated 01/26/17.

447.     In February 2017, CBRE Heery created a Project Schedule update titled "SJ26 02-23-17 February 2017 Schedule Update," with a Data Date of 02-24-17, which extended the Project completion date from November 9, 2017 to December 28, 2017 ("CBRE Heery Schedule Update 26").

448.     Exhibit 85 is a true and accurate copy of CBRE Heery Schedule Update 26, dated 02/24/17.

449.     In March 2017, CBRE Heery created a Project Schedule update titled "SJ27 03-28-17 March 2017 Schedule Update," with a Data Date of 04-03-17, which extended the Project completion date from December 28, 2017 to January 23, 2018 ("CBRE Heery Schedule Update 27").

450.     Exhibit 86 is a true and accurate copy of CBRE Heery Schedule Update 27, dated 04/03/17.

451.     On April 14, 2017, the USACE issued CBRE Heery a letter titled "Payment Estimate Number 32 Returned," which states in part:

> "Dear Ms. Smith: Reference is made to your Pay Estimate 32 and updated schedule received in this office on April 10, 2017. Review of your updated

schedule has found twelve critical or near critical activities with reduced original durations from your previous schedule update. Reducing original durations has not been approved. No explanation or reasoning for duration reductions was given in the schedule narrative. Since the project is significantly behind schedule, it is unreasonable to justify reduced durations on critical activities without proof of increased resources and manpower, neither of which has been displayed. . . Please correct your schedule update to include the original un-revised durations for the twelve critical or near-critical activities. All future schedule updates must have pre-approval from this office for any logic revisions. All future schedule updates must have pre-approved logic or duration revisions will be returned, unprocessed."

452.    Exhibit 87 is a true and accurate copy of USACE Letter to CBRE Heery, dated 04/14/17.

453.    CBRE Heery artificially improved the Project's progress by reducing original activity durations in violation of the Federal Acquisition Regulation, which is a material breach of the Mechanical Contract and the Electrical Contract.

454.    In May 2017, CBRE Heery created a Project Schedule update titled "SJ29 05-31-17 May 2017 Schedule Update," with a Data Date of 05-31-17, which extended the Project completion date from January 23, 2018 to February 12, 2018 ("CBRE Heery Schedule Update 29").

455.    Exhibit 88 is a true and accurate copy of CBRE Heery Schedule Update 29, dated 05/31/17.

456.    On June 28, 2017, the USACE issued CBRE Heery a letter titled "Furniture Installation/Project Scheduling," which states:

> "Dear Ms. Smith: My project field staff has informed me that a large shipment of furniture/equipment is expected to arrive on site July 10. If this information is correct, [CBRE Heery] will not be following the requirements of the RFP, nor will it be following the approved Project Schedule. The RFP clearly describes the inspection process and the proper Government notification period for inspections. Inspections are required by the RFP as mandatory schedule activities. Your current schedule shows pre-final inspections prior to furniture installation […] It is [CBRE Heery's] responsibility to schedule inspections and it is [CBRE Heery's] responsibility to schedule shipments when spaces are ready. USACE will not compromise quality for a lack of planning/scheduling on [CBRE Heery's] part. If a large shipment of furniture or equipment is received and the schedule or the inspection process is ignored, you will not be paid for the shipment nor will you be paid for stored materials. My staff will work with your

63

staff in any way possible to keep the project moving in an expeditious manner but requirements will not be ignored or waived because [CBRE Heery] is behind schedule."

457.     Exhibit 89 is a true and accurate copy of the USACE Letter to CBRE Heery, dated 06/28/17.

458.     CBRE Heery failed to follow the requirements established by the approved Project schedule in violation of the Federal Acquisition Regelation, which is a material breach of the Mechanical Contract and the Electrical Contract.

459.     Over the course of the Project, CBRE Heery compromised quality through a lack of planning and scheduling, by among other things, ignoring the schedule and inspection process required by the USACE.

460.     In June 2017, CBRE Heery created a Project Schedule update titled "SJ30 06-29-17 June 2017 Schedule Update," with a Data Date of 06-29-17, which extended the Project completion date from February 12, 2018 to March 7, 2018 ("CBRE Heery Schedule Update 30").

461.     Exhibit 90 is a true and accurate copy of CBRE Heery Schedule Update 30, dated 06/29/17.

462.     On July 14, 2017, the USACE issued CBRE Heery a letter titled "Pay App 35 Project Schedule Update," which states in part:

"Dear Ms. Smith: I have reviewed Pay App 35 and the Project Schedule/Narrative. Please review and correct the logic associated with the 60-calendar day window in which the New Clinic is occupied with the existing Clinic still in operation. The schedule shows that the 60-calendar day window starting on 8-15-17 with an open for business date on 10-3-17. The schedule needs to show that the 60-day period starts at Beneficial Occupancy per contract requirements. USACE has no intention of requiring no work to occur in the 60-day period. As stated in various project meetings, USACE intends on allowing work to occur in the 60-day period if it does not affect existing Clinic operations (Asbestos, Lead abatement and similar activities). Also, the schedule shows a Beneficial Occupancy date of 10-03-17 and final I/O inspections on 10-24-17. Please review the logic in Phase three (3) of your schedule and correct as necessary. The schedule also needs to show a realistic completion date. Based on a recent walk thorough inspection, a substantial amount of work still needs to be

64

performed in all areas of the facility. At the current time, I cannot estimate or predict when the new facility will be ready for use. A considerable amount of work has to be performed by the Air Force, on separate contracts, before the New Clinic can be occupied. I need you to provide a realistic date so my customers can plan accordingly. Show a realistic completion date on the schedule and work towards that date. If these issues are not fixed on the next Pay App, that Pay App will not be accepted."

463.     Exhibit 91 is a true and accurate copy of USACE Letter to CBRE Heery, dated 07/14/17.

464.     Over the course of construction, CBRE Heery repeatedly failed to follow proper logic or provide realistic Project Schedule updates in violation of the Federal Acquisition Regulation, which is a material breach of the Mechanical Contract and the Electrical Contract.

465.     In July 2017, CBRE Heery created a Project Schedule update titled "SJ31 07-28-17 July 2017 Schedule Update," with a Data Date of 07-28-17, which extended the Project completion date from March 7, 2018 to May 18, 2018 ("CBRE Heery Schedule Update 31").

466.     Exhibit 92 is a true and accurate copy of CBRE Heery Schedule Update 31, dated 07/28/17.

467.     In August 2017, CBRE Heery created a Project Schedule update titled "SJ32 08-29-17 August 2017 Schedule Update," with a Data Date of 08-29-17, which extended the Project completion date from May 18, 2018 to June 18, 2018 ("CBRE Heery Schedule Update 32").

468.     Exhibit 93 is a true and accurate copy of CBRE Heery Schedule Update 32, dated 08/29/17.

469.     In September 2017, CBRE Heery issued a Project Schedule update titled "SJ33 09-28-17 September 2017 Schedule Update," with a Data Date of 09-28-17, which accelerated the Project completion date from June 18, 2018 to June 12, 2018 ("CBRE Heery Schedule Update 33").

470.     Exhibit 94 is a true and accurate copy of CBRE Heery Schedule Update 33, dated 09/28/17.

471.     On October 2, 2017, Watson notified Linda Smith, CBRE Heery, that it intended to submit a request for an equitable adjustment to the Electrical Contract:

"I am writing to request a meeting with you to discuss several important issues affecting Watson's performance on the project. We remain committed to working with [CBRE Heery] to diligently complete the project as rapidly as is reasonably possible under the current circumstances. However, I wanted to inform you that Watson intends to submit a request for an equitable adjustment to the contract as a result of the effects caused by numerous significant project issues, including most recently, the twelfth change or delay to the project completion date. These project issues have caused Watson to suffer substantial financial losses." ("Watson's October 2017 Delay & Disruption Notice").

472. Exhibit 95 is a true and accurate copy of Watson's 10/17 Delay & Disruption Notice, dated 10/02/17.

473. On October 23, 2017, the USACE issued CBRE Heery a letter titled "Liquidated Damages," which states, in part:

"Dear Ms. Smith: Your current contract completion date is October 12, 2017. Currently, the project is not complete and is not expected to be complete for at least six more months. In accordance with FAR Clause 52.211-12 LIQUIDATED DAMAGES – CONSTRUCTION, please be advised that your company will be assessed liquidated damages in the amount of $1,512.00 per calendar day for each day after October 12, 2017, until the project is complete and accepted. This includes all project phases including the last phase. Furthermore, Timely Performance is a rating element for the Performance Evaluation, which will be completed upon final acceptance of the work. This report will be available to all DOD Contracting Officers for their future use in determining Contractor responsibility."

474. Exhibit 96 is a true and accurate copy of USACE Letter to CBRE Heery, dated 10/23/17.

475. In October 2017, CBRE Heery issued a Project Schedule update titled "SJ34 10-26-17 October 2017 Schedule Update," with a Data Date of 10-26-17, which extended the Project completion date from June 12, 2018 to July 13, 2018 ("CBRE Heery Schedule Update 34").

476. Exhibit 97 is a true and accurate copy of CBRE Heery Schedule Update 34, dated 10/26/17.

477. In November 2017, CBRE Heery created a Project Schedule update titled "SJ35 11-30-17 November 2017 Schedule Update," with a Data Date of 11-30-17, which extended the Project completion date from July 13, 2018 to September 5, 2018 ("CBRE Heery Schedule Update 35").

478.    Exhibit 98 is a true and accurate copy of CBRE Heery Schedule Update 35, dated 11/30/17.

479.    In December 2017, CBRE Heery created a Project Schedule update titled "SJ36 12-31-17 December 2017 Schedule Update," with a Data Date of 12-31-17, which extended the Project completion date from September 5, 2018 to October 3, 2018 ("CBRE Heery Schedule Update 36").

480.    Exhibit 99 is a true and accurate copy of CBRE Heery Schedule Update 36, dated 12/31/17.

481.    On January 22, 2018, the USACE issued CBRE Heery a letter titled "Facility Completion and Move Date," which states, in part:

> "Dear Ms. Smith: I am very concerned with the amount of remaining work to be completed in the Medical Clinic. I, nor my field staff, see how the New Facility could possibly be ready for a move starting on March 2, 2018. Numerous unfinished items were identified in Serial Letter 08-56-123. To date, Government Architectural Room Inspections have not started and no User Training dates have been officially provided/scheduled. Milestone dates established in Red Zone Meetings have been missed. My field staff is ready for Inspections and will proceed with them as soon as you have completed your Internal Quality Control checks/verification. Due to the amount of remaining work to be accomplished, USACE has notified the Air Force that the move date of March 2, 2018 has been postponed until further notice. Considerable planning and scheduling will be required by the Air Force and various Government Agencies to support the move from the Old Clinic to the New Clinic. At the present time USACE cannot tell the Air Force with any degree of confidence when the facility will be ready for permanent occupancy. USACE will not accept a facility that is not ready nor will it accept a facility with a sizeable punch list. USACE takes great pride in providing our customers with World Class Facilities that are complete and ready for use. My Staff will work closely with your staff and the Air Force to re-establish a realistic move date. I want to remind you that Liquidated Damages are being assessed on a daily basis and will continue to be assessed on a daily basis until project completion. I would highly encourage you to manage/push your subcontractors in every way possible to complete open/punch list items in a timely manner. I expect a written response to this letter no later than January 31, 2018."

482.    Exhibit 100 is a true and accurate copy of USACE Letter to CBRE Heery, dated 01/22/18.

483.    In January 2018, CBRE Heery created a Project Schedule update titled "SJ37 02-03-18 January 2018 Schedule Update," with a Data Date of 02-03-18, which extended the Project completion date from October 3, 2018 to November 28, 2018 ("CBRE Heery Schedule Update 37").

484.    Exhibit 101 is a true and accurate copy of CBRE Heery Schedule Update 37, dated 02/03/18.

485.    In February 2018, CBRE Heery created a Project Schedule update titled "SJ38 03-01-18 February 2018 Schedule Update," with a Data Date of 03-01-18, which maintained the previously extended Project completion date of November 28, 2018 ("CBRE Heery Schedule Update 38").

486.    Exhibit 102 is a true and accurate copy of CBRE Heery Schedule Update 38, dated 03/01/18.

487.    On June 18, 2018, CBRE Heery notified Watson and SPC that the Project had achieved Substantial Completion.

488.    In June 2018, CBRE Heery created a Project Schedule update titled "SJ40 06-22-18 June 2018 Schedule Update," with a Data Date of 06-22-18, which extended the Project completion date from November 28, 2018 to December 12, 2018 ("CBRE Heery Schedule Update 40").

489.    Exhibit 103 is a true and accurate copy of CBRE Heery Schedule Update 40, dated 06/22/18.

490.    In August 2018, CBRE Heery created a Project Schedule update titled "SJ41 08-27-18 August 2018 Schedule," with a Data Date of 08-27-18, which extended the Project completion date from December 12, 2018 to March 13, 2019 ("CBRE Heery Schedule Update 41").

491.    Exhibit 104 is a true and accurate copy of CBRE Heery Schedule Update 41, dated 08/27/18.

492.    On September 26, 2018, the USACE issued CBRE Heery a letter titled "Abatement and Demolition Progress," which states, in part:

> "Dear Ms. Smith: I am concerned with your company's progress with demolition of the old clinic and construction of remaining site improvements. The old clinic

was transferred to [CBRE Heery] on July 23, 2018, over nine weeks ago. Your original accepted schedule indicates a four-week duration for asbestos abatement of the old clinic and a four-week duration for demolition of the old clinic. Your most recent updated schedule, with a data date of June 18, 2018, shows a three-week duration for asbestos abatement and two-week duration for demolition of the old clinic. To date, the Bio-Environmental has been demolished and asbestos abatement in the old clinic continues. Exceeding your original durations considerably. My office recognizes weather delays associated with Hurricane Florence that impacted the base and surrounding area. A weather modification will be forthcoming for those delays. However, it is obvious that completion of the remaining contractual work will not be done within the four-month timeframe indicated per your original schedule. I'm requesting you provide my office with a realistic schedule for completion of your remaining work by October 5, 2018. You are reminded Liquidated Damages will continue to be withheld until all work is completed."

493. Exhibit 105 is a true and accurate copy of USACE Letter to CBRE Heery, dated 09/26/18.

494. CBRE Heery's repeated failure to provide SPC and Watson with realistic Project Schedule updates made it impossible to optimize its ongoing mitigation efforts.

495. In September 2018, CBRE Heery terminated its Senior Project Manager, Mr. Frank Kemp, and replaced him with Mr. Ken Cheatwood (the "CBRE Heery Kemp Termination").

496. On September 26, 2018, the USACE issued CBRE Heery an email with the Subject: "Clinic Demolition Progress," and which states, in part:

"Linda, Abatement is going considerably slower than I anticipated. I'm having concerns with the amount of time it will take [CBRE Heery] to complete the remainder of the project […] Ken seems to be a good change from Frank. Need effort to get your utility subs and materials back on site."

497. Exhibit 106 is a true and accurate copy of the USACE Email to CBRE Heery, dated 09/26/18.

498. On September 26, 2018, CBRE Heery replied to the USACE email stating:

"I'll get with Ken and have him address the issues. I know he has had numerous conversations with the demo sub and that they are on notice."

499.    Exhibit 107 is a true and accurate copy of CBRE Heery Email to USACE, dated 09/26/18.

500.    CBRE Heery repeatedly failed to progress CBRE Heery's other Project subcontractors according to the times, order, and priority sequence represented by the Contract Schedule.

501.    On November 16, 2018, Watson issued CBRE Heery a letter titled "Seymour Johnson AFB – Letter on Completion Schedule" that states, in part:

> "On May 9, 2014, Watson and [CBRE Heery] entered into an agreement, under which Watson relied upon [CBRE Heery] to strictly enforce the Contract Schedule. Watson's Contract Price was based upon [CBRE Heery's] assurance that it would enforce an on time Project delivery. […] Unfortunately, [CBRE Heery] did not commence, prosecute, or progress the Work according to [CBRE Heery's] Contract Schedule. For reasons completely outside of Watson's control, the nature of the Project and the conditions on Site significantly differed from those represented and warranted by the Contract, and [CBRE Heery] abandoned the Contract Schedule. Watson could not possibly have contemplated a more than two-year delay, and a near doubling of the schedule at the time that Watson and [CBRE Heery] entered into the Contract. At our meeting on October 16, 2018, you said that [CBRE Heery] has been working on a schedule with certain other Project subcontractors for the remaining scope of work. Watson would greatly appreciate the opportunity (and believe that this opportunity is contemplated by the Contract) to contribute to this process, especially considering that Watson is relying upon this information to complete the Site lighting work, which, in the end, will likely encounter more than a 30 month delay. At the writing of this letter, all poles and pole lights have been delivered to the Site. However, Watson cannot complete its plan and be ready to execute the three or four activities associated with Site lighting, unless it has essential information from and dates related to all predecessor activities, such as the demolition subcontractor and grading subcontractor. To be prepared, Watson needs to provide its excavation subcontractor with as much notice as possible so that it can accommodate this impacted plan. Notwithstanding the above, Watson remains committed to diligently working in good faith to help [CBRE Heery] complete the Project as expeditiously as possible for the Corps, with the expectation that [CBRE Heery] will treat Watson fairly for its good faith efforts. Please forward [CBRE Heery's] schedule as soon as possible so that we can review it and plan our work accordingly."

502.    Exhibit 108 is a true and accurate copy of CBRE Heery Email to USACE, dated 11/16/18.

503. On March 6, 2019, CBRE Heery issued a Project Schedule update titled "Remaining Work Schedule," which extended the Project completion date from March 13, 2019 to July 2, 2019 (the "CBRE Heery Completion Schedule").

504. Exhibit 109 is a true and accurate copy of the CBRE Heery Completion Schedule, dated 03/06/19.

505. On June 10, 2020, the USACE had not yet issued CBRE Heery the Certificate of Final Completion, which means that the Expected Performance Time has extended by over 43 months.

506. CBRE Heery materially failed to properly manage the Project Schedule in violation of the Federal Acquisition Regulation, which is a material breach of the Mechanical Contract and the Electrical Contract.

507. From the Contract Schedule publish date of November 25, 2013 to the date of this Complaint, 80 months have elapsed.

508. In the 80 months since CBRE Heery published the Contract Schedule, CBRE Heery created approximately 39 Project Schedule updates, and only published approximately 14 Project Schedule updates to Watson and SPC.

509. In each and every one of the approximately 39 Project Schedule updates, CBRE Heery materially misrepresented the actual Project status and the duration of actual remaining work.

510. CBRE Heery repeatedly provided misleading information about the status of construction and in each and every Project Schedule update—without exception—misrepresented the expected date of completion (the "CBRE Heery Deceptive Representation of Status Practice").

511. As a direct and proximate cause of CBRE Heery's failure to properly manage the Project Schedule, SPC has been damaged in an amount to be proven at trial, together with interest at the maximum legal rates from dates according to proof thereof, and attorneys' fees and costs.

512. As a direct and proximate cause of CBRE Heery's failure to properly manage the Project Schedule, Watson has been damaged in an amount to be proven at trial, together with interest at the maximum legal rates from dates according to proof thereof, and attorneys' fees and costs.

## ELEVENTH CLAIM FOR RELIEF

(Breach of Contract – CBRE Heery Materially Hindered & Delayed Performance)

(*SPC & Watson v. CBRE Heery et. al.*)

513.    The Plaintiffs reallege and incorporate by reference Paragraph 1 through Paragraph 512 as if fully set forth herein.

514.    CBRE Heery had an implied duty to not hinder or delay the Mechanical Work or the Electrical Work.

515.    Under Section 4.1, "Time," of Article 4, "Progress, Performance and Schedule of Work," the Mechanical Contract and the Electrical Contract states:

> "Time is of the essence for all work specified or required by the Contract. Subcontractor agrees that the performance of all work required by the Contract will be completed within the time specified with the schedules of work which are furnished by [CBRE Heery]."

516.    Pursuant to the Electrical Contract and the Mechanical Contract, CBRE Heery had an obligation to prosecute all work, including critical predecessor work within the times, order, and priority sequence specified by the Contract Schedule.

517.    Under § 552.236-15 "Schedules for Construction Contracts," Subsection (c), the Federal Acquisition Regulation states:

> "Failure of the Contractor to comply with the requirements of the Contracting Officer under this clause shall be grounds for a determination by the Contracting Officer that the Contractor is not prosecuting the work with sufficient diligence to ensure completion within the time specified in the contract. Upon making this determination, the Contracting Officer may terminate the Contractor's right to proceed with the work, or any separable part of it, in accordance with the default terms of this contract."

518.    Acting as Construction Manager At-Risk, CBRE Heery assumed the risk related to the performance of all its Project subcontractors on the Project, and to the extent that a particular subcontractor failed to perform, CBRE Heery had a responsibility to either terminate and replace that

subcontractor or supplement that subcontractor to ensure that all that particular subcontractors work progressed according to the Contract Schedule.

519.     CBRE Heery breached the Mechanical Contract and the Electrical Contract by, among other things, breaching the implied duty to not hinder and delay SPC and Watson's performance.

520.     On January 27, 2015, in the "Contractor's Daily Report," in response to "Any delays encountered," Watson states:

> "Need to have Storm Drain ahead of our work."

521.     Exhibit 110 is a true and accurate copy of Watson's Daily Report, dated 01/27/15.

522.     In January 2015, CBRE Heery hindered and delayed SPC and Watson's performance by, among other things, failing to complete critical predecessor work, including storm drain work.

523.     On February 11, 2015, in the "Contractor's Daily Report," in response to "Any delays encountered," Watson states:

> "Waiting on CWC to install storm drain."

524.     Exhibit 111 is a true and accurate copy of Watson's Daily Report, dated 02/11/15.

525.     On February 11, 2015, CBRE Heery issued the USACE an explanation of what happened in the most recent Pay Period, and admitted:

> "In summary, the critical path is: Storm System 100% - West Park . . . 02/06/15 .
> . . Stone Placed and compacted on . . . 02/11/15."

526.     Exhibit 112 is a true and accurate copy of CBRE Heery's Schedule Narrative 1, dated 02/11/15.

527.     In February 2015, CBRE Heery hindered and delayed SPC and Watson's performance by, among other things, failing to complete critical predecessor work, including storm drain work.

528.     On March 4, 2015, CBRE Heery issued the USACE an explanation of what happened in the most recent Pay Period, and admitted:

> "In summary, the critical path is: Storm System 100% - West Park . . . 03/24/15 .
> . . Stone Placed and compacted on . . . 03/30/15."

529. Exhibit 113 is a true and accurate copy of CBRE Heery's Schedule Narrative 2, dated 03/04/15.

530. In March 2015, CBRE Heery's failure to complete critical predecessor activities, including the Storm Drainage activities, hindered or delayed SPC and Watson's performance (the "Storm Drain Work Delays").

531. On April 1, 2015, CBRE Heery issued the USACE an explanation of what happened in the most recent Pay Period, and admitted:

> "In summary, the critical path is: Govt. Release work @ Ex. Parking . . . 04/07/15 . . . Add. Fence & Eros. Cntrl. 100% . . . 04/15/15."

532. Exhibit 114 is a true and accurate copy of CBRE Heery's Schedule Narrative 3, dated 04/01/15.

533. In April 2015, events completely outside of SPC and Watson's control hindered and delayed SPC and Watson's performance, such as delayed foundation and structural steel dependent predecessor work.

534. On May 6, 2015, CBRE Heery issued the USACE an explanation of what happened in the most recent Pay Period, and admitted:

> "In summary, the critical path is: Water line impact resolved @ Ex. Parking . . . 04/27/15 . . . Borrow, Cut, Fill @ D Pad 100% . . . 05/19/15."

535. Exhibit 115 is a true and accurate copy of CBRE Heery's Schedule Narrative 4, dated 05/06/15.

536. In May 2015, events completely outside of SPC and Watson's control hindered and delayed SPC and Watson's performance, such as delayed foundation and structural steel dependent predecessor work.

537. On June 4, 2015, CBRE Heery issued the USACE an explanation of what happened in the most recent Pay Period, and admitted:

> "In summary, the critical path is: Foundations at Area C 100% . . . 06/10/15 . . .
> Structural steel erection begins . . . 06/15/15."

538.    Exhibit 116 is a true and accurate copy of CBRE Heery's Schedule Narrative 5, dated 06/04/15.

539.    In June 2015, CBRE Heery's failure to complete critical predecessor activities, including certain foundation-related activities, hindered or delayed SPC and Watson's performance (the "Foundation Work Delays").

540.    On June 30, 2015, CBRE Heery issued the USACE an explanation of what happened in the most recent Pay Period, and admitted:

> "In summary, the critical path is: Structural steel erection "A" 100% . . . 07/23/15
> . . . Structural steel erection "D" 100% . . . 08/04/15."

541.    Exhibit 117 is a true and accurate copy of CBRE Heery's Schedule Narrative 6, dated 06/30/15.

542.    In July 2015, CBRE Heery's failure to complete critical predecessor activities, including certain structural steel-related activities, hindered or delayed SPC and Watson's performance (the "Structural Work Delays").

543.    On July 27, 2015, in the "Contractor's Daily Report," in response to "Any delays encountered," Watson states:

> "[U]nable to work in Area A SOG."

544.    Exhibit 118 is a true and accurate copy of Watson's Daily Report, Delay Notice, dated 07/27/15.

545.    On August 6, 2015, CBRE Heery issued the USACE an explanation of what happened in the most recent Pay Period, and admitted:

> "Schedule slip this period was due to the approval of curtain wall frames and
> glazing, taking longer than expected. [CBRE Heery] was expected to approve
> curtain wall submittals on 7/7 and now the expected completion date is 8/4/15. A
> 60 day lead time follows approval which then drives curtain wall installation in
> the schedule [...] In summary, the critical path is: A/E review of C.W. frames &

75

glazing . . . 08/13/15 . . . Curtain wall frames & glazing delivered on . . . 11/09/15."

546.     Exhibit 119 is a true and accurate copy of CBRE Heery's Schedule Narrative 7, dated 08/06/15.

547.     In August 2015, CBRE Heery's failure to complete critical predecessor activities, including obtaining the necessary approvals, hindered or delayed SPC and Watson's performance ("CBRE Heery's Approval Delays").

548.     On September 2, 2015, CBRE Heery, through its scheduling consultant, the Milestone Group, issued USACE an explanation of what happened in the most recent Pay Period:

> "Approval, fabrication, and delivery of curtain wall frames and glazing, continue to drive dry-in, finishes, and building completion. [CBRE Heery] was expected to approve curtain wall submittals on 7/7 and now the expected completion date is 9/6/15. A 60 work day lead time was reduced to 46 work days to hold the start date for curtain wall installation in the schedule [...] In summary, the critical path is: A/E review of C.W. frames & glazing . . . 09/02/15 . . . Curtain wall frames & glazing delivered on . . . 11/09/15."

549.     Exhibit 120 is a true and accurate copy of CBRE Heery's Schedule Narrative 8, dated 09/02/15.

550.     On September 24, 2015, CBRE Heery, through its scheduling consultant, the Milestone Group, issued USACE an explanation of what happened in the most recent Pay Period:

> "Approval, fabrication, and delivery of curtain wall frames and glazing, continue to drive dry-in, finishes, and building completion. [CBRE Heery] was expected to release curtain wall on 9/3 and now the expected release date is 9/23/15. Last month, a 60 work day lead time was reduced to 46 work days to hold the start date for curtain wall installation in the schedule. Curtain wall frames are scheduled to arrive on-site 11/30/15. [...] To further mitigate the impact of curtainwall fabrication and in-turn building dry-in; temporary dry-in activities were added to enclose the openings in Areas A, B, C, and D. [...] In summary, the critical path is: Curtain wall frames & glazing delivered on . . . 11/30/15 . . . "C" West elevation frames 100% . . . 12/10/15."

551.     Exhibit 121 is a true and accurate copy of CBRE Heery's Schedule Narrative 9, dated 09/24/15.

552.    In September 2015, CBRE Heery's failure to complete critical predecessor activities, including the Curtain Wall activities, hindered or delayed SPC and Watson's performance (the "Curtain Wall Work Delays").

553.    On October 9, 2015, in the "Contractor's Daily Report," in response to "Any delays encountered," Watson states:

"WE NEED WALLS PLACED AHEAD OF US."

554.    Exhibit 122 is a true and accurate copy of Contractor's Daily Report, dated 10/09/15.

555.    On October 12, 2015, in the Contractor's Daily Report, in response to "Any delays encountered," Watson states:

"STEEL ERECTORS & CONCRETE PLACEMENT ARE BEHIND SCHEDULE."

556.    Exhibit 123 is a true and accurate copy of Watson's Daily Report, Delay Notice, dated 10/12/15.

557.    In October 2015, CBRE Heery's failure to complete critical predecessor activities, including the Interior Wall activities, hindered or delayed SPC and Watson's performance (the "Interior Wall Work Delays").

558.    On November 18, 2015, CBRE Heery published Meeting Minutes following the "Weekly PDT Tele-Conference Call Meeting # 061," in which CBRE Heery admitted:

"CURRENT MILESTONE OR SIGNIFICANT ACTIVITIES: Start BirdAir roof 12/1/15 Start precast architectural walls 12/15/15" ("CBRE Heery's Meeting Minutes, 11/18/15").

559.    Exhibit 124 is a true and accurate copy of CBRE Heery's Meeting Minutes, dated 11/18/15.

560.    In November 2015, CBRE Heery's failure to start critical predecessor activities according to the Contract Schedule, including certain building enclosure activities, hindered or delayed SPC and Watson's performance (the "Building Enclosure Work Delays").

561.     On December 7, 2015, in the Contractor's Daily Report, in response to "Any delays encountered," Watson states:

>  "RAIN/WEATHER – WE NEED ROOF."

562.     Exhibit 125 is a true and accurate copy of Watson's Daily Report, dated 12/07/15.

563.     In December 2015, CBRE Heery's failure to complete critical predecessor activities, including the Roof Work activities, hindered or delayed SPC and Watson's performance (the "Roof Work Delays").

564.     On January 12, 2016, CBRE Heery issued SPC a letter, which stated that SPC had performed to the highest standards on the Project:

>  "SPC Mechanical has performed to the highest standards on the SJAFB Medical Clinic Project. They expedited coordination drawings with other trades, submitted shop drawings in advance to ensure equipment was available for installation, their work has exceeded quality requirements and they have performed per the project schedule. I would not hesitate to issue them another subcontract and would recommend them for any upcoming project that you may have."

565.     Exhibit 126 is a true and accurate copy of CBRE Heery's Letter of Recommendation for SPC, dated 01/12/16.

566.     On January 13, 2016, CBRE Heery published Meeting Minutes following the "Weekly PDT Tele-Conference Call Meeting # 063," in which CBRE Heery admitted:

>  "CURRENT MILESTONE OR SIGNIFICANT ACTIVITIES: Start precast architectural walls 02/15/16" ("CBRE Heery's Meeting Minutes, 01/13/16").

567.     Exhibit 127 is a true and accurate copy of CBRE Heery's Meeting Minutes, dated 01/13/16.

568.     In January 2016, CBRE Heery's failure to start critical predecessor activities according to the Contract Schedule, including certain building enclosure activities, hindered or delayed SPC and Watson's performance (the "Building Enclosure Work Delays").

569. On February 10, 2016, CBRE Heery issued the USACE an explanation of what happened in the most recent Pay Period, and admitted:

> "Similar to last month, the critical path to completion continues through exterior skin work. […] The original and planned flow of exterior work was to start at Area C and work to Area D, then Area A, and then Area B. Precast delivery is driving completion of exterior work along the South elevations of Area C & D. Therefore the exterior skin sequence was changed to flow from West elevation of C and then clockwise to Area A, then Area B, and finishing in Area D and C along the South elevation. This work flow is on the critical path such that air barrier and masonry flow around the building and eventually drives curtainwall installation on the South elevation […] In summary, the critical path is: Area A Air Barrier North 100% . . . 02/01/16 . . . Area A Brick Masonry West 100% . . . 02/01/16. […] Potential Problem Areas or Impacts: Areas of risk related to completing critical path activities include […] Temporary dry-in measures are insufficient to start drywall effort […] Schedule Recovery / Mitigation: No recovery actions are planned in the schedule other than improving the projected completion dates. [CBRE Heery] has indicated that a planned recovery effort could begin once curtainwall begins and areas are "dried-in" and available for finishes."

570. Exhibit 128 is a true and accurate copy of CBRE Heery's Schedule Narrative 13, dated 02/10/16.

571. On February 29, 2016, the USACE issued CBRE Heery a letter titled "Lack of Progress," which states, in part:

> "Dear Ms. Smith: Based on last month's progress earnings and the projected progress earnings currently under review for this month, this office is very concerned about your company's ability to maintain schedule . . . The first downturn in production was noticed last month and the projected earnings for this month do not meet expectations with the project earnings curve . . . The 4th Medical Group is planning a September move in date based upon your approved schedule and we need to do everything possible to prevent further schedule slippage."

572. Exhibit 129 is a true and accurate copy of USACE Letter to CBRE Heery, dated 02/29/16.

573.    In February 2016, CBRE Heery's failure to complete critical predecessor activities, including the exterior skin, curtain wall, precast deliveries, air barrier, roof, and masonry activities, hindered or delayed SPC and Watson's performance (the "Building Enclosure Work Delays").

574.    On March 7, 2016, CBRE Heery issued the USACE an explanation of what happened in the most recent Pay Period, and admitted:

> "Last month's critical path leading to project completion began with air barrier and masonry work in Area A. This critical activity continued around the building from Area A, to Area B, finishing in Area D and C along the South elevation. Masonry work would eventually drives curtainwall installation on the South elevation. Curtainwall installation was critical due to the installation sequence leading to dry-in in the Medical Mall area of the building. [...] One potential schedule risk to the current critical path, specifically the start of drywall, is that building dry-in has not been established. Area C and Area D currently have no windows to achieve substantial dry-in. Curtainwall and window procurement became critical in July 2015. As the curtainwall and window procurement process continued to slip a revision was made to the schedule, in September 2015, to make provisions for temporary dry-in enclosures. This provision would allow for drywall to begin in advance of windows and curtainwall. [...] However, area dry-in remains a large factor in whether or not the drywall efforts will begin. Other than roof ice and water shield, no temporary dry-in measures are in place. [...] Potential Problem Areas or Impacts: Areas of risk related to completing critical path activities include; [...] Temporary dry-in measures are insufficient to start drywall effort [...] [CBRE Heery] has indicated that a planned recovery effort could begin once curtainwall begins and areas are "dried-in" and available for finishes."

575.    Exhibit 130 is a true and accurate copy of CBRE Heery's Schedule Narrative 14, dated 03/07/16.

576.    In March 2016, Building Enclosure Delays, including air barrier, masonry, and curtainwall activities, which SPC and Watson could not possibly have anticipated or controlled, continued to hinder and delay SPC and Watson's performance.

577.    On April 7, 2016, CBRE Heery issued the USACE an explanation of what happened in the most recent Pay Period and admitted:

> "[T]he progress of curtainwall installation is falling further behind and this area of activity is once again impacting the critical path. The "Next Most Critical

Path", which is seven days off of the critical path (Total Float = -62), involves the framing, sheathing, air barrier, and brick activities along the South elevation of the building. Completing these activities is required for curtainwall to finish in Areas C & D. […] At this point Area C dry-in is one month more critical than in-wall rough-ins and inspection. […] In summary, the critical path is: Curtain wall frames & glazing delivered on . . . 04/01/16 . . . "C" # 2 L.W. Curtainwall Frames 100% . . . 04/12/16. […] Potential Problem Areas or Impacts: Areas of risk related to completing critical path activities include; […] Temporary dry-in measures are insufficient to start drywall effort […] In the immediate time frame, the recovery plan is to improve the curtainwall and window glazing completion dates and thus improve the critical path completion date for the building."

578.    Exhibit 131 is a true and accurate copy of CBRE Heery's Schedule Narrative 15, dated 04/07/16.

579.    In April 2016, Building Enclosure Delays, including framing, sheathing, air barrier, and brick activities, which SPC and Watson could not possibly have anticipated or controlled, continued to hinder and delay SPC and Watson's performance.

580.    On May 5, 2016, CBRE Heery issued the USACE an explanation of what happened in the most recent Pay Period and admitted:

"The observed progress for curtainwall installation was behind relative to the March schedule update. This area of activity continues to impact the critical path. The longest path begins in Area C and requires glazing at all elevations before moving into Area D to complete frames and glazing. Dry-in of Area D drives finishes in this area which drives the overall completion of the building. The "Next Most Critical Path", which is 17 days off of the critical path (Total Float = -69), involves the brick activities along the South elevation of the building. Completing these activities is required for curtainwall to begin along the South elevation of Areas C & D. An additional next most critical path begins at Total Float -62. This path requires completion of the green roof by 5/24 such that terrace pavers can begin and finish by 6/8/16. Terrace pavers release curtain wall along the North elevation of the Medical Mall area. […] At this point Area C dry-in is one and half months more critical than in-wall rough-ins and inspections. […] Potential Problem Areas or Impacts: Areas of risk related to completing critical path activities include; […] Temporary dry-in measures are insufficient to start drywall effort […] Schedule Recovery/Mitigation: In the immediate timeframe, the recovery plan is to improve the curtainwall and window glazing completion dates and thus improve the critical path completion date for the building."

581. Exhibit 132 is a true and accurate copy of CBRE Heery's Schedule Narrative 16, dated 05/05/16.

582. On May 24, 2016, Linda Smith, CBRE Heery, in response to the USACE's letter entitled

"Letter of Concern," stated, in part: "We understand and appreciate your concern. […] Please know that this project is also a top priority for [CBRE Heery] and we have been meeting with the appropriate subcontractors as well as issuing the associated notices as we mentioned in our meeting las week."

583. Exhibit 133 is a true and accurate copy of CBRE Heery Email to USACE, dated 05/24/16.

584. Prior to May 24, 2016, the date that CBRE Heery represented to the USACE that it had issued notices of default to "appropriate subcontractors," CBRE Heery had not issued any notices of default to either SPC, Watson, or Schneider regarding the Project's progress.

585. In May 2016, Building Enclosure Delays, including framing, sheathing, air barrier, and brick activities, which SPC and Watson could not possibly have anticipated or controlled, continued to hinder and delay SPC and Watson's performance.

586. On June 2, 2016, CBRE Heery issued the USACE an explanation of what happened in the most recent Pay Period, and admitted:

"Curtainwall installations indicated no schedule slip and the schedule maintained relative to the April schedule update. This area of activity remains on the critical path. The longest path begins in Area D and requires frames and glazing at all elevations for dry-in of Area D. Complete dry-in of Area D on 7/19/16, drives drywall and finishes in this area which drives the overall completion of the building to 12/23/16 […] In summary, the critical path is: "D" L.W. Curtainwall Frames 100% . . . 06/15/16 . . . "D" South, East Curtainwall Frames 100% . . . 06/27/16. Potential Problem Areas or Impacts: Areas of risk related to completing critical path activities include […] Temporary dry-in measures are insufficient to start drywall effort […] Schedule Recovery/Mitigation: In the immediate timeframe, the recovery plan is to improve the curtainwall and window glazing completion dates and thus improve the critical path completion date for the building."

587. Exhibit 134 is a true and accurate copy of CBRE Heery's Schedule Narrative 17, dated 06/02/16.

588. On June 2, 2016, CBRE Heery issued the USACE a letter titled "Letter of Concern," which states, in part:

> "In response to your letter dated May 24, 2016, Letter of Concern […] we have been meeting with the appropriate subcontractors as well as issuing the associated notices […] At this time we are contemplating installation of the drywall utilizing two shifts as soon as the glass and glazing installation is completed to a point to ensure dry-in of the building. We believe MEP rough-ins have already progressed to support the two shift operation. Continue to expedite the PTFE fabric roof, exterior masonry, sitework/roads/pavement and windows/curtain wall […] As discussed in our meeting, progress was significantly impacted in the early portion of the Project due to the poor soil conditions that were encountered. This required additional excavation to remove these soils and additional backfill with clean, suitable material. Unfortunately this lost time could not be recovered in the following construction activities despite our best efforts. Additionally, time has been lost due to delays in ordering permanent medical equipment and furniture due to the numerous changes that have been incurred. These changes include additional sensaphones, revised equipment from new (recently purchased) to relocated, and tie-in of the Tricare Building with paging and security access. Details of these delays are currently being assembled and will be forwarded for your review. We believe they substantiate the reason for the BOD date noted below. [CBRE Heery] has reviewed the anticipated building occupancy date for the new medical clinic building. We are highly cognizant of the importance of this date for planning purposes. This date must be a realistic date that all parties are confident that can be achieved while minimizing the final completion date of the Project. At this time the schedule completion (BOD) date for the building is December 19, 2016."

589. Exhibit 135 is a true and accurate copy of CBRE Heery Letter to USACE, dated 06/02/16.

590. On June 2, 2016, CBRE Heery issued the USACE a letter titled "Demolition of Bioenvironmental Building and existing utilities," which states, in part:

> "It is now apparent that major cost and schedule impacts will be realized by [CBRE Heery] due to postponing demolition of the Bioenvironmental Building. Schedule delays will be encountered after the New Medical Clinic is constructed due to construction of the drop off circle and retractable bollards, removal of existing utilities and demolition of the Bioenvironmental Building. Cost impacts will be encountered due to extended overhead for subcontractor and [CBRE Heery] staff […] All work that was underway to install the new utilities for the New Medical Clinic has been discontinued at this time […]"

591.     Exhibit 136 is a true and accurate copy of CBRE Heery Letter to USACE, dated 06/02/16.

592.     In June 2016, CBRE Heery admitted that Building Enclosure Delays, which SPC and Watson could not possibly have anticipated or controlled, continued to hinder and delay SPC and Watson's performance.

593.     On July 12, 2016, in the "Contractor's Daily Report," in response to "Any delays encountered," Watson states:

> "Building not dried in water standing on the floors. Walls missing all over the building."

594.     Exhibit 137 is a true and accurate copy of Watson's Daily Report, dated 07/12/16.

595.     On July 12, 2016, CBRE Heery issued the USACE an explanation of what happened in the most recent Pay Period, and admitted:

> "Review of the curtainwall installation indicated schedule slip in Area D. Last month's schedule update indicated Area D, curtain wall elevations 9, 10, 1 (South and East elevations), were to start on 6/16/16. Based on the start of on-site frame fabrication the actual recorded start date was 6/25/16. This delay impacts Area D dry-in […] Potential Problem Areas or Impacts: Areas of risk related to completing critical path activities include; […] Temporary dry-in measures are insufficient to start drywall effort […] Schedule Recovery / Mitigation: In the immediate time frame, the recovery plan is to improve the curtainwall and window glazing completion dates and thus improve the critical path completion date for the building."

596.     Exhibit 138 is a true and accurate copy of CBRE Heery's Schedule Narrative 18, dated 07/12/16.

597.     In July 2016, Building Enclosure Delays and Interior Wall Delays, which SPC and Watson could not possibly have anticipated or controlled, continued to hinder and delay SPC and Watson's performance.

598.     On August 4, 2016, in the "Contractor's Daily Report," in response to "Any delays encountered," Watson states:

"Building not dried in, Ripping out door frames and cutting are [sic] pipe, Sprinkler riser room not done, walls not built."

599. Exhibit 139 is a true and accurate copy of Watson's Daily Report, dated 08/04/16.

600. On August 9, 2016, CBRE Heery issued the USACE an explanation of what happened in the most recent Pay Period, and admitted:

"In summary, the critical path is: D2 Hang Drywall 100% . . . 08/18/16 . . . C2 Hang Drywall 100% . . . 08/18/16 . . . C1 Hang Drywall 100% . . . 09/09/16 . . . D1 Hang Drywall 100% . . . 09/09/16. […] Potential Problem Areas or Impacts: Areas of risk related to completing critical path activities include […] Temporary dry-in measures are insufficient to start drywall effort […] Schedule Recovery / Mitigation: In the immediate time frame, the recovery plan is to improve the curtainwall and window glazing completion dates and thus improve the critical path completion date for the building […] Added duration to the site work activities which increased the overall duration for construction after building turnover from 72 to 141 calendar days […] Logic changes to correct out-of-sequence progress."

601. Exhibit 140 is a true and accurate copy of CBRE Heery Schedule Narrative 19, dated 08/09/16.

602. In CBRE Heery Schedule Narrative 19, CBRE Heery admitted that:

"Added duration to the site work activities which increased the overall duration for construction after building turnover from 72 to 141 calendar days" delayed Project completion.

603. On August 10, 2016, in the "Contractor's Daily Report," in response to "Any delays encountered," Watson states:

"Building not dried in, Walls and ceilings not Built, Sprinkler riser room not finished."

604. Exhibit 141 is a true and accurate copy of Watson's Daily Report, dated 08/10/16.

605. In August 2016, CBRE Heery admitted that Building Enclosure Delays and Interior Wall Delays, which SPC and Watson could not possibly have anticipated or controlled, continued to hinder and delay SPC and Watson's performance.

606.     On September 28, 2016, CBRE Heery published Meeting Minutes following the "Weekly PDT Tele-Conference Call Meeting #080," in which CBRE Heery admitted:

> "CURRENT MILESTONE OR SIGNIFICANT ACTIVITIES: Significant Activities: Drywall, Glass & Glazing, Wright Brothers Intersection Upgrade." ("CBRE Heery's Meeting Minutes, 09/28/16").

607.     Exhibit 142 is a true and accurate copy of CBRE Heery's Meeting Minutes, dated 09/28/16.

608.     In September 2016, CBRE Heery's failure to complete critical predecessor activities according to the Contract Schedule, including interior wall work and glass & glazing work, hindered or delayed SPC and Watson's performance.

609.     On October 20, 2016, CBRE Heery issued the USACE an explanation of what happened in the most recent Pay Period and admitted:

> "Last month's schedule indicated drywall work was critical. Drywall work is occurring in Areas C2 and D2 and continues to be critical. Finishing of drywall is occurring in Area C2. Area B drywall and finish dates have slipped further and are now on the critical path. Production has slipped based on projected completion dates indicated in last month's update. Review of the curtainwall installation indicates three to four weeks of schedule slip from last month's schedule dates. This is primarily due to production rates and time to fabricate and install additional steel required to support the curtainwall system […] In summary, the critical path is: 'B' Wall Framing (Punch) 100% . . . 10/03/16 . . . 'B' Hang Drywall 100% . . . 10/20/16 . . . 'B' Tape & Finish drywall 100% . . . 11/10/16 . . . 'B' Prime & 1st coat of paint 100% . . . 11/22/16. Potential Problem Areas or Impacts: Areas of risk related to completing critical path activities include […] Temporary dry-in measures are insufficient to start or progress drywall work in an efficient manner […] Schedule Recovery / Mitigation: No recovery plan exists other than to improve the current critical path completion dates for the building."

610.     Exhibit 143 is a true and accurate copy of CBRE Heery Schedule Narrative 21, dated 10/20/16.

611.     In October 2016, CBRE Heery admitted that Building Enclosure Delays and Interior Wall Delays, which SPC and Watson could not possibly have anticipated or controlled, continued to hinder and delay SPC and Watson's performance.

612.    On November 3, 2016, CBRE Heery issued the USACE an explanation of what happened in the most recent Pay Period and admitted:

> "Last month's schedule indicated that Area B drywall work was critical for releasing Area B finishes which in turn lead to building occupancy. Other areas of the building are within a few days of being just as critical to building completion. Drywall work continues or remains in Areas C2, D2, C1, and D1. Drywall cannot finish in any of these areas due to a variety of issues. Taping and bedding of drywall is occurring in Area C1 and wall board hanging is occurring in Area D1. Area B drywall finish dates have slipped further and continue to reside on the critical path. After the requested schedule recovery effort, the schedule required all area's finishes, beginning with drywall, to work concurrently. Due to issues with in-wall rough-in, framing inspections, 100% area dry-in, weather impact, and insufficient manpower, the recovery schedule is not being maintained. In addition to Area B, the Medical Mall area is also on the critical path due to the projected completion dates for curtainwall framing and glazing […] In summary, the critical path is: 'B' Wall Framing (Punch) 100% … 10/31/16 . . . 'B' Hang Drywall 100% . . . 11/17/16 . . . 'B' Tape & Finish drywall 100% . . . 12/12/16 . . . 'B' Prime & 1st coat of paint 100% . . . 12/22/16 . . . 'B' Ceiling grid 100% . . . 01/19/17 […] Concurrent Critical Path: Area D East C.W. frames & glazing 100% . . . 11/21/16 . . . Area C West C.W. frames & glazing 100% . . . 12/27/16 . . . Complete Dry-In Medical Mall on . . . 12/28/16 . . . Drywall Finished 100% − Medical Mall . . . 02/06/17 […] Potential Problem Areas or Impacts: Areas of risk related to completing critical path activities include […] Temporary dry-in measures are insufficient to start or progress of finish drywall work in an efficient manner […] Schedule Recovery / Mitigation: No recovery plan exists other than to improve the current critical path completion dates for the building."

613.    Exhibit 144 is a true and accurate copy of CBRE Heery Schedule Narrative 22, dated 11/03/16.

614.    In November 2016, CBRE Heery admitted that Building Enclosure Delays and Drywall Delays, which SPC and Watson could not possibly have anticipated or controlled, continued to hinder and delay SPC and Watson's performance.

615.    On December 6, 2016, CBRE Heery issued the USACE an explanation of what happened in the most recent Pay Period and admitted:

> "The critical path to project completion begins with Area B drywall work. This effort is critical for releasing other Area B finishes and in turn, building occupancy. Area C and Area D are within a few days of being just as critical to

building completion. Drywall repair work remains in Area C2 and Area D2. Drywall work is nearing completion in Area C1. Area D1, drywall is bedded and being finish sanded. Hanging of drywall has started in Area A. Area B, drywall will follow Area A. Area B, finish dates have slipped further and continue to reside on the critical path […] In summary, the critical path is: 'B' Hang Drywall 100% 12/09/16 . . . 'B' Tape & Finish drywall 100% . . . 12/23/16 . . . 'B' Prime & 1st coat of paint 100% . . . 01/06/17 . . . 'B' Ceiling grid 100% . . . 01/20/17. "

616.     Exhibit 145 is a true and accurate copy of CBRE Heery Schedule Narrative 23, dated 12/06/16.

617.     On December 27, 2016, in the "Contractor's Daily Report," in response to "Any delays encountered," Watson states:

"Building not dried in, walls and ceilings not framed, Door frames not installed, telecom room floors not installed."

618.     Exhibit 146 is a true and accurate copy of Watson's Daily Report, dated 12/27/16.

619.     In December 2016, CBRE Heery admitted Drywall Delays as well as other critical predecessor delays, which SPC and Watson could not possibly have anticipated or controlled, continued to hinder and delay SPC and Watson's performance.

620.     On January 9, 2017, CBRE Heery issued the USACE an explanation of what happened in the most recent Pay Period and admitted:

"The critical path to project completion begins with Area B drywall work. This effort is critical for releasing other Area B finishes and in turn, building occupancy. Area C and Area D are within a few days of being on the critical path. While a small amount of Drywall finishing remains in Area C2 and Area D2, ceiling grid and grid mounted device work is in-progress. Drywall finishing is also nearing completion in Area C1. Ceiling grid has started in Area C1 and is 20% completed. Drywall finishing is also nearing completion in Area D1. Area D1 Ceiling grid is scheduled to begin 1/23/17. Drywall hanging in Area A and Area B is 90-95% completed. Drywall finish dates have slipped about four weeks. Area B drywall walls are finished on 01/20/17. The Medical Mall area drywall effort began this period and wall board hanging is 60% completed. Drywall in the Medical Mall is scheduled to finish 2/10/17. Building dry-in is being maintained with temporary enclosures in areas where permanent enclosure has not been achieved. The heating hot water system is operational. Air handlers for Area C and Area D, are operational. […] In summary, the critical path is: 'B'"

Hang Drywall 100% … 01/03/17 … 'B' Tape & Finish drywall 100% … 01/20/17 … 'B' Prime paint 100% … 01/25/17 … 'B' Ceiling grid 100% … 02/08/17."

621.     Exhibit 147 is a true and accurate copy of CBRE Heery Schedule Narrative 24, dated 01/09/17.

622.     In January 2017, CBRE Heery admitted that Drywall Delays, which SPC and Watson could not possibly have anticipated or controlled, continued to hinder and delay SPC and Watson's performance.

623.     On February 14, 2017, CBRE Heery issued the USACE an explanation of what happened in the most recent Pay Period and admitted:

"Last month's critical path to project completion began with Area B drywall work. This effort is critical for releasing other Area B finishes and in turn, building occupancy. Area C and Area D are within a few days of being on the critical path. However, this month's critical path shifted to the projected delivery date of interior doors. […] While a small amount of Drywall finishing remains in Area C2 and Area D2, ceiling grid and grid mounted device work is in-progress. Drywall finishing is also nearing completion in Area C1 and Area D1. Area A & B drywall work is in-progress. Area B drywall and finishes are the next most critical path in the schedule. The Medical Mall area drywall effort continued this period and wall board hanging is 95% completed. Drywall in the Medical Mall is scheduled to finish 2/22/17. Building dry-in is being maintained with temporary enclosures in areas where permanent enclosure has not been achieved. The heating hot water system is operational. Air handlers for Area C and Area D, are operational. […] Critical Path […] Fabrication & Delivery of Int. Doors on . . . 03/01/17 . . . 'C2' Doors installed on . . . 03/15/17"

624.     Exhibit 148 is a true and accurate copy of CBRE Heery Schedule Narrative 25, Dated 02/14/17.

625.     In CBRE Heery Schedule Narrative 25, CBRE Heery admitted that interior finishes impacted the Project's time for performance when it admitted:

"[C]ritical path shifted to the projected delivery date of interior doors."

626.     In February 2017, CBRE Heery admitted that Interior Finishing Delays, which SPC and Watson could not possibly have anticipated or controlled, hindered and delayed SPC and Watson's performance.

627.     On March 10, 2017, CBRE Heery issued the USACE an explanation of what happened in the most recent Pay Period and admitted:

> "Last month's critical path to project completion began with the projected delivery and installation of interior doors. The installed doors drove the completion of HVAC testing, adjusting, and balancing (TAB). This path still exists but due to schedule logic changes, a new critical path now exists which is slightly more critical than last month's critical path. Based on current progress, the schedule initially indicated similar finishes occurring in 3-5 areas at the same time. It's unlikely that subcontractors will be able to have enough manpower to support more than two concurrent areas of installation. Therefore, several changes were made to reestablish crew flow for finish trades such as paint, millwork, ACT Tile, doors, and flooring. Crew flow in this case means contractors finishing in one area prior to moving to the next area. The initial schedule was built assuming crew flow however; the area to area relationships were removed during multiple schedule recovery efforts. In general, new schedule logic requires finish crews to work Level 2, Areas C & D, concurrently; then they will move to Level 1 to work Areas C & D concurrently. Following completion of both levels of Areas C & D the finish crews will then move to Areas A & B to finish working in the building. Finish items that now reside on the critical path include; paint, millwork, and flooring. The table below indicates a few of these activities and the order of magnitude in terms of date shifts. […] Critical Path Report & Total Float Report". Total Float = -185 . . . 'C2' Complete door frames on 02/24/17 . . . 'C2/D2' Tape & Finish drywall 100% . . . 02/28/17 . . . 'C2/D2' Prime paint 100% . . . 03/01/17 . . . 'C2/D2' 1st Coat of paint 100% 03/07/17."

628.     Exhibit 149 is a true and accurate copy of CBRE Heery Schedule Narrative 26, dated 03/10/17.

629.     In March 2017, CBRE Heery admitted that Interior Finishing Delays, which SPC and Watson could not possibly have anticipated or controlled, hindered and delayed SPC and Watson's performance.

630.     On June 9, 2017, CBRE Heery issued the USACE an explanation of what happened in the most recent Pay Period and admitted:

> "The critical path to project completion runs through Level 1 flooring and punch work. Punch list completion drives government pre-final inspections. Installation of equipment follows pre-final inspections and drives the clinical personnel relocations […] Critical Path Report & Total Float Report". Total Float = -136 Area D1 prime paint / wall prep 100% … 06/01/17 … 'C1/D1' Flooring 100% … 06/21/17 … 'A/B' Flooring 100% … 07/07/17 … 'A/B' Final Paint 100% … 07/11/17."

631. Exhibit 150 is a true and accurate copy of CBRE Heery Schedule Narrative 29, dated 06/09/17.

632. In June 2017, CBRE Heery admitted that Interior Finishing Delays, which SPC and Watson could not possibly have anticipated or controlled, hindered and delayed SPC and Watson's performance.

633. On August 4, 2017, CBRE Heery issued the USACE an explanation of what happened in the most recent Pay Period:

> "Schedule slip this period was due to logic changes which required the 60-day transition period to occur after building commissioning and final inspection. Personnel relocations begin 10/12/17. "

634. Exhibit 151 is a true and accurate copy of CBRE Heery Schedule Narrative 31, dated 08/04/17.

635. In CBRE Heery Schedule Narrative 31, CBRE Heery admitted that schedule logic changes caused "schedule slip" ("CBRE Heery's Logic Problems").

636. In August 2017, CBRE Heery admitted that CBRE Heery's Logic Problems, which SPC and Watson could not possibly have anticipated or controlled, hindered and delayed SPC and Watson's performance.

637. On September 9, 2017, CBRE Heery issued the USACE an explanation of what happened in the most recent Pay Period and admitted:

> "Schedule Recovery / Mitigation: No recovery plan exists other than to improve the current critical path completion dates for the building. Schedule Changes – Modification R00022 was added to the schedule (Activity ID BJ022). This modification added 60 calendar days to the contract completion date which is

91

now 10/10/17. The modification also deducted $90,194.67 from CLIN 0006. Minor logic changes were made to correct out- of-sequence progress. A detailed listing of changes can be found in the attached report titled "SJ32 08- 29-17 Schedule Changes."

638.     Exhibit 152 is a true and accurate copy of CBRE Heery Schedule Narrative 32, dated 09/09/17

639.     In September 2017, CBRE Heery admitted that "Contract Change BJ022," which SPC and Watson could not possibly have anticipated or controlled, hindered and delayed SPC and Watson's performance.

640.     On October 26, 2017, Mr. Frank Kemp, CBRE Heery, provided Mr. Terry Brooks, USACE, with notice that the Revised DDC System Design was an unanticipated Project change:

> "Attached please find the revised submittal for the BMS system as directed in our onsite meetings. As previously discussed, [CBRE Heery] believes this is a change to the contract documents and will be submitting an REA for this revised work including requests for additional time and extended overhead."

641.     On October 26, 2017, CBRE Heery directed Watson to proceed with the Revised DDC System Design, and requested Watson to provide a change order proposal, as follows:

> "USACE has directed [CBRE Heery] to revise the BMS system for the medical clinic per the attached drawing. We have informed the USACE that this is a change to the documents and are expecting a change for this revised work . . . Watson is herein directed to immediately proceed with installing new CAT 6 cable per attached drawing. Furthermore, the currently installed CAT 6 cable from existing AS panels is to be identified and removed from the patch panels in order for it to be connected to new switches being supplied by Schneider. Please provide your proposal for this work for inclusion into the REA."

642.     On December 7, 2017, CBRE Heery issued the USACE an explanation of what happened in the most recent Pay Period and admitted:

> "Schedule slip this period was due to revisions to the BMS controls network. USACE is requiring a stand-alone system therefore requiring an additional network and interlink systems between control panels. This is impacting controls testing and the completion of HVAC testing and balancing."

643. Exhibit 153 is a true and accurate copy of CBRE Heery Schedule Narrative 35, dated 12/07/07.

644. In December 2017, CBRE Heery admitted that CBRE Heery's BMS Change Directive, which SPC and Watson could not possibly have anticipated or controlled, hindered and delayed SPC and Watson's performance.

645. On January 10, 2018, CBRE Heery issued the USACE an explanation of what happened in the most recent Pay Period and admitted:

> "Schedule slip this period was in part due to a schedule constraint that placed Staff relocations beginning on 3/5/18. Eight days were allowed for the relocation thus placing Open-for-Business on 3/12/18 "

646. Exhibit 154 is a true and accurate copy of CBRE Heery Schedule Narrative 36, dated 01/10/18.

647. On January 12, 2018, the USACE issued CBRE Heery a letter titled "Existing Precast Buildings," which states, in part:

> "Dear Ms. Smith: A second letter was sent to my attention regarding the relocation of the Existing Precast Building's on January 11, 2018 from Mr. Frank Kemp. I have reviewed the letter and still maintain my previous position that relocation of the Existing Precast Buildings is within the scope of your contract. Relocation of the buildings was discussed/clarified on four separate Bidder Inquiries from December 7, 2012 – December 21, 2012. (Bidder Inquiry numbers 4938213, 4958934, 4959173 and 4960486) The Governments intent was clarified with the individual responses and was not considered to be a contractual change. Your company is hereby directed to relocate the existing buildings per the contract drawings and documents. Relocation of the buildings has become a time sensitive issue. The buildings must be relocated in the very near future so that final electrical connections can be made prior to the move and occupancy of the new facility. Relocation of the existing precast buildings is within the scope of your contract and a modification to move them is not justified. If you do not concur with the determination of this office, please refer to the terms and conditions of FAR 52.233-1 DISPUTES. I want to remind you that Liquidated Damages are being assessed on a daily basis and will continue to be assessed on a daily basis until project completion. I consider multiple letters on this issue to be counterproductive. I would highly encourage you and your company to concentrate all remaining efforts and resources on completing this project in an expeditious manner."

93

648. Exhibit 155 is a true and accurate copy of USACE Letter to CBRE Heery, dated 01/12/18.

649. In January 2018, CBRE Heery's failure to understand its base scope of work and to relocate the buildings according to the Prime Contract delayed and hindered Watson's ability to complete the final electrical connections prior to the move and occupancy of the new facility.

650. On January 16, 2018, the USACE issued CBRE Heery a letter titled "Pre-Final and Final Inspections," which states, in part:

> "Dear Ms. Smith: A letter was sent to my attention regarding Pre-Final and Final Inspections from Mr. Frank Kemp on December 14, 2017. Upon receipt of the letter, my field staff made appropriate preparations and planned for Pre-Final Inspections on January 3, 2018 as requested. To date, no inspections have occurred due to the fact that the building is not ready for inspections. It is my understanding that Internal Quality Control Inspections are still ongoing and no date has been re-established for Pre-Final Inspections with the Government. It has also been brought to my attention that this letter was also intended to serve as the required 21 calendar day notification for the Furniture, Fixture and Equipment (FFE) inspections. The following items are not ready/complete for inspection [...] My staff is ready for Inspections and will proceed with them as soon as you have completed your Internal Quality Control checks/verification. The FFE inspections will require an additional level of inspections from the Air Force Medical Support Agency (AFMSA). Proper notification (21 days) is essential for scheduling and travel arrangements. I want to remind you that Liquidated Damages are being assessed on a daily basis and will continue to be assessed on a daily basis until project completion. I would highly encourage you to manage/push your subcontractors in every way possible to complete open/punch list items in a timely manner."

651. Exhibit 156 is a true and accurate copy of USACE Letter to CBRE Heery, dated 01/16/18

652. CBRE Heery's failure to prepare the Facility for Pre-Final and Final Inspections with sufficient diligence and according to the times specified in the Contract Schedule hindered and delayed SPC and Watson's performance.

653. On April 9, 2018, the USACE issued CBRE Heery a letter titled "Pre-Final Inspection 2nd Floor," which states in part:

"Dear Ms. Smith: In accordance with Attachment "Q" (Acceptance & Closeout Requirements of the RFP) my staff has conducted a Pre-Final inspection of a portion of the 2nd floor. The inspections were conducted at the request of Mr. Frank Kemp. Mr. Kemp informed my staff that the spaces were ready for a Government Pre-Final inspection. The Following were in attendance: Terry Brooks – USACE […] Larry Filion – USACE […] Sean Walker – USACE […] [CBRE Heery] – No Representation […] Inspections were primarily focused on various offices, hallways and multiuse areas. Inspections did not include ceilings or ceiling grid systems. Ceilings and ceiling grid systems were excluded because of ongoing work and building envelope testing."

654. Exhibit 157 is a true and accurate copy of USACE Letter to CBRE Heery, dated 04/09/18.

655. In April 2018, "Ceiling Grid Delays," which SPC and Watson could not possibly have anticipated or controlled, hindered and delayed SPC and Watson's performance.

656. On September 26, 2018, the USACE issued CBRE Heery an email with the Subject: "Clinic Demolition Progress," and which states, in part:

"Linda, Abatement is going considerably slower than I anticipated. I'm having concerns with the amount of time it will take [CBRE Heery] to complete the remainder of the project […] Ken seems to be a good change from Frank. Need effort to get your utility subs and materials back on site."

657. On September 26, 2018, CBRE Heery replied to the USACE email stating:

"I'll get with Ken and have him address the issues. I know he has had numerous conversations with the demo sub and that they are on notice."

658. In September 2018, CBRE Heery admitted that "Demolition and Abatement Delays," which SPC and Watson could not possibly have anticipated or controlled, hindered and delayed SPC and Watson's performance.

659. On April 23, 2019, CBRE Heery issued the USACE a letter, which states in part:

"In 2017 Southern Glass and their bonding company were notified that the contract was in default and they would be subject to Article 11 of our subcontract agreement which permits supplementation of labor as well as recover of damages. [CBRE Heery] has notified Southern Glass of over $670,000 in backcharges which range from recovery of extended general conditions to extensive remedial work on metal trim throughout the building and temporary

95

covering at window openings to allow work to proceed […] [CBRE Heery] does not consider the claim finalized due to outstanding claims from follow on subcontractors and withholding of LDs by the USACE."

660. Exhibit 158 is a true and accurate copy of the CBRE Heery Letter to USACE, dated 04/23/19.

661. On June 10, 2019, the USACE issued CBRE Heery a letter, which states in part:

"Review of your most recent schedule provided to my office in early April 2019 shows [CBRE Heery] and it's subcontractors falling behind in your effort to meet your projected August 1, 2019 completion."

662. Exhibit 159 is a true and accurate copy of the USACE Letter to CBRE Heery, dated 06/10/19.

663. On October 17, 2019, CBRE Heery created a "PHASE 6 & 7 PUNCH LIST" that includes incomplete work by 10 of CBRE Heery's subcontractors, including IQ, Barnhill, CWC, Duplin, Scott Fence, APCO Sign, TyWater, Watson, Jim Blanchard Surveying, and Building and Earth Sciences (the "CBRE Heery Phase 6 & 7 Punch List").

664. Exhibit 160 is a true and accurate copy of the CBRE Heery Phase 6 & Phase 7 Punch List, dated 10/17/19.

665. On January 7, 2020, CBRE Heery issued Watson a letter, which states in part:

"[CBRE Heery] via this letter is directing Watson Electric to begin the necessary work to get design installation of work to bring street lights on Jabara Street back into service as soon as possible. Also, as Watson has previously stated they do not believe to be part of their Scope of Work please prepare a pass-through Request for Equitable Adjustment (REA) for design and construction for this task. [CBRE Heery] will be available to help Watson Electric with the REA going forward."

666. Exhibit 161 is a true and accurate copy of the CBRE Heery Letter to Watson, dated 01/07/20.

667. On February 10, 2020, the USACE issued CBRE Heery a letter titled "Review of Final As-Built Drawings," which states in part:

"Dear Ms. Smith: A review of your company's As-Built drawing submission has been performed by my office. The drawings/files are not in contract compliance for the following reason […]."

668.    Exhibit 162 is a true and accurate copy of USACE Letter to CBRE Heery, dated 02/10/20.

669.    CBRE Heery breached the Mechanical Contract and the Electrical Contract by, among other things, materially hindering and delaying SPC and Watson's performance, failing to prosecute critical predecessor work with sufficient diligence and according to the times, order, and priority sequence specified in the Contract Schedule, and failing to perform in a good and workmanlike manner scopes of work related to and necessarily required for SPC and Watson's timely performance.

670.    As a direct and proximate cause of CBRE Heery's material breach of the implied duty to not hinder or delay, SPC has been damaged in an amount to be proven at trial, together with interest at the maximum legal rates from dates according to proof, and attorneys' fees and costs.

671.    As a direct and proximate cause of CBRE Heery's material breach of the implied duty to not hinder or delay, Watson has been damaged in an amount to be proven at trial, together with interest at the maximum legal rates from dates according to proof, and attorneys' fees and costs.

## TWELFTH CLAIM FOR RELIEF

(Breach of Contract – Implied Warranties Not Met)

*(SPC & Watson v. CBRE Heery et. al.)*

672.    The Plaintiffs reallege and incorporate by reference Paragraph 1 through Paragraph 671 above as if fully set forth herein.

673.    Under Section I, of Exhibit B, "Project Special Conditions," the Electrical Contract states:

"Due to limited space at the site, subcontractor is hereby notified that temporary storage of materials will be limited and strictly controlled by [CBRE Heery's] superintendent."

674.    As Construction Manager At-Risk, CBRE Heery had a duty to strictly control the Site.

675.    Under Section 4.2, "Duty to be Bound," of Article 4, "Progress, Performance and Schedule of Work," the Electrical Contract states:

> "Construction Manager and Subcontractor will be bound by the Schedule of Work."

676.    Under Section 4.1, "Time," of Article 4, "Progress, Performance and Schedule of Work," the Mechanical Contract and the Electrical Contract states:

> "Time is of the essence for all work specified or required by the Contract. Subcontractor agrees that the performance of all work required by the Contract will be completed within the time specified with the schedules of work which are furnished by [CBRE Heery]."

677.    Under Paragraph 55, of Article A, "Scope of Work," the Mechanical Contract and the Electrical Contract states:

> "To promote overall general progress, the Work shall be planned, commenced, prosecuted, and performed in a prompt, diligent manner, in a sensible and agreed sequence, at such times and in such manner calculated to meet the schedules for the completion of each of the various phases as required by [CBRE Heery's] Project Schedule."

678.    CBRE Heery, acting as Construction Manager At-Risk, had an implied duty to enforce the performance of the other Project subcontractors, including the subcontractors responsible for enclosing and making weather-tight (i.e. "drying in") the Facility according to the times represented by the Contract Schedule.

679.    The Contract Schedule represented that CBRE Heery would secure the Facility from interruption caused by exterior elements by, among other things, enclosing the Facility and completing the "Building Enclosure" activity starting on May 19, 2015 and ending on February 5, 2016.

680.    CBRE Heery breached the Mechanical Contract and the Electrical Contract by, among other things, failing to enclose and secure the Facility from interruption caused by exterior elements timely.

681.    On September 24, 2015, CBRE Heery issued the USACE an explanation of what happened in the most recent Pay Period and admitted:

"Approval, fabrication, and delivery of curtain wall frames and glazing, continue to drive dry-in, finishes, and building completion. [CBRE Heery] was expected to release curtain wall on 9/3 and now the expected release date is 9/23/15. Last month, a 60 work day lead time was reduced to 46 work days to hold the start date for curtain wall installation in the schedule. Curtain wall frames are scheduled to arrive on-site 11/30/15. [...] To further mitigate the impact of curtainwall fabrication and in-turn building dry-in; temporary dry-in activities were added to enclose the openings in Areas A, B, C, and D. [...] In summary, the critical path is: Curtain wall frames & glazing delivered on . . . 11/30/15 . . . 'C' West elevation frames 100% . . . 12/10/15."

682. In September 2015, CBRE Heery's failure to enclose the Facility according to the times, order, and priority sequence established by the Contract Schedule impacted SPC and Watson's performance.

683. On December 4, 2015, in the "Contractor's Daily Report," in response to "Any delays encountered," Watson states:

"NO ROOF ON BUILDING!"

684. Exhibit 176 is a true and accurate copy of Watson's Daily Report, dated 12/04/15.

685. On December 30, 2015, in the "Contractor's Daily Report," in response to "Safety Issues," Watson states:

"WET FLOORS (RAIN)."

686. Exhibit 177 is a true and accurate copy of Watson's Daily Report, Ongoing Enclosure Delays, dated 12/30/15.

687. In December 2015, CBRE Heery's failure to enclose the Facility according to the times, order, and priority sequence established by the Contract Schedule impacted SPC and Watson's performance.

688. On February 10, 2016, CBRE Heery issued the USACE an explanation of what happened in the most recent Pay Period:

"Similar to last month, the critical path to completion continues through exterior skin work. [...] Precast delivery is driving completion of exterior work along the South elevations of Area C & D. Therefore the exterior skin sequence was

changed to flow from West elevation of C and then clockwise to Area A, then Area B, and finishing in Area D and C along the South elevation. This work flow is on the critical path such that air barrier and masonry flow around the building and eventually drives curtainwall installation on the South elevation. […] In summary, the critical path is: Area A Air Barrier North 100% . . . 02/01/16 . . . Area A Brick Masonry West 100% . . . 02/01/16."

689. In February 2016, CBRE Heery's failure to enclose the Facility according to the times, order, and priority sequence established by the Contract Schedule impacted SPC and Watson's performance.

690. On March 7, 2016, CBRE Heery issued the USACE an explanation of what happened in the most recent Pay Period:

"Last month's critical path leading to project completion began with air barrier and masonry work in Area A. This critical activity continued around the building from Area A, to Area B, finishing in Area D and C along the South elevation. Masonry work would eventually drives curtainwall installation on the South elevation. Curtainwall installation was critical due to the installation sequence leading to dry-in in the Medical Mall area of the building. […] Masonry work continues to flow in the direction described above however it should be noted that this effort is two weeks behind the projected completion date in last month's schedule. […] One potential schedule risk to the current critical path, specifically the start of drywall, is that building dry-in has not been established. Area C and Area D currently have no windows to achieve substantial dry-in. Curtainwall and window procurement became critical in July 2015. As the curtainwall and window procurement process continued to slip a revision was made to the schedule, in September 2015, to make provisions for temporary dry-in enclosures. This provision would allow for drywall to begin in advance of windows and curtainwall. […] area dry-in remains a large factor in whether or not the drywall efforts will begin."

691. On March 18, 2016, CBRE Heery issued the USACE a letter titled "Project Progress," which states, in part:

"Dear Mr. Blanchard: In response to your letter dated February 29, 2016 concerning lack of progress on the project, please be advised of the following […] [CBRE Heery] has diligently worked all available hours with key subcontractors in an effort to maximize project progress […] In the past three weeks significant progress has been obtained on the PTFE fabric roof, architectural precast walls, air barrier, exterior masonry and windows/curtain wall. All materials to fully enclose the building are currently on site. […] We

have continued to install MEP rough-ins and at this time believe these systems are completed to a stage where-in, when the building is enclosed, the entire building will become available for interior finish work. […] [CBRE Heery] will continue and/or implement the following actions to recover lost progress: Continue to work extended hours during the week and Saturdays and Sundays with key critical path subcontractors including masonry, glass and glazing and metal wall studs/drywall. […] Increased scheduled manpower on the drywall, glass/glazing and masonry subcontractor crews."

692.     Exhibit 165 is a true and accurate copy of CBRE Heery Letter to USACE, dated 03/18/16.

693.     In March 2016, CBRE Heery's failure to enclose the Facility according to the times, order, and priority sequence established by the Contract Schedule impacted SPC and Watson's performance.

694.     On April 7, 2016, CBRE Heery issued the USACE an explanation of what happened in the most recent Pay Period and admitted:

"[T]he progress of curtainwall installation is falling further behind and this area of activity is once again impacting the critical path. The "Next Most Critical Path", which is seven days off of the critical path (Total Float = -62), involves the framing, sheathing, air barrier, and brick activities along the South elevation of the building. Completing these activities is required for curtainwall to finish in Areas C & D. […] At this point Area C dry-in is one month more critical than in-wall rough-ins and inspection. […] In summary, the critical path is: Curtain wall frames & glazing delivered on . . . 04/01/16 . . . "C" # 2 L.W. Curtainwall Frames 100% . . . 04/12/16. […] Potential Problem Areas or Impacts: Areas of risk related to completing critical path activities include; […] Temporary dry-in measures are insufficient to start drywall effort […] the plan is to increase labor and hours for activities occurring after building dry-in. The schedule should allow for improvement if this plan is implemented in the field. In the immediate time frame, the recovery plan is to improve the curtainwall and window glazing completion dates and thus improve the critical path completion date for the building."

695.     In April 2016, CBRE Heery's failure to enclose the Facility according to the times, order, and priority sequence established by the Contract Schedule impacted SPC and Watson's performance.

696.     On May 15, 2016, CBRE Heery issued the USACE an explanation of what happened in the most recent Pay Period and admitted:

"The observed progress for curtainwall installation was behind relative to the March schedule update. This area of activity continues to impact the critical path. The longest path begins in Area C and requires glazing at all elevations before moving into Area D to complete frames and glazing. Dry-in of Area D drives finishes in this area which drives the overall completion of the building. The "Next Most Critical Path", which is 17 days off of the critical path (Total Float = -69), involves the brick activities along the South elevation of the building. Completing these activities is required for curtainwall to begin along the South elevation of Areas C & D. An additional next most critical path begins at Total Float -62. This path requires completion of the green roof by 5/24 such that terrace pavers can begin and finish by 6/8/16. Terrace pavers release curtain wall along the North elevation of the Medical Mall area. […] At this point Area C dry-in is one and half months more critical than in-wall rough-ins and inspections. […] Potential Problem Areas or Impacts: Areas of risk related to completing critical path activities include; […] Temporary dry-in measures are insufficient to start drywall effort […] Schedule Recovery/Mitigation: In the immediate timeframe, the recovery plan is to improve the curtainwall and window glazing completion dates and thus improve the critical path completion date for the building."

697.    On May 27, 2016, CBRE Heery issued the USACE an explanation of what happened in the most recent Pay Period and admitted:

"Curtainwall installations indicated no schedule slip and the schedule maintained relative to the April schedule update. This area of activity remains on the critical path. The longest path begins in Area D and requires frames and glazing at all elevations for dry-in of Area D. Complete dry-in of Area D on 7/19/16, drives drywall and finishes in this area which drives the overall completion of the building to 12/23/16. […] Area C2 drywall begins 6/16/16. […] In summary, the critical path is: 'D' L.W. Curtainwall Frames 100% . . . 06/15/16 . . . 'D' South, East Curtainwall Frames 100% . . .06/27/16. Potential Problem Areas or Impacts: Areas of risk related to completing critical path activities include […] Temporary dry-in measures are insufficient to start drywall effort […] Schedule Recovery/Mitigation: In the immediate timeframe, the recovery plan is to improve the curtainwall and window glazing completion dates and thus improve the critical path completion date for the building. […] Schedule Changes […] Logic changes that allow storefront windows to install in advance of curtainwall installations. This reflects the actual occurrences in the field."

698.    In May 2016, CBRE Heery's failure to enclose the Facility according to the times, order, and priority sequence established by the Contract Schedule impacted SPC and Watson's performance.

699.     On June 2, 2016, CBRE Heery issued the USACE a letter titled "Letter of Concern," which states, in part:

> "In response to your letter dated May 24, 2016, Letter of Concern […] we have been meeting with the appropriate subcontractors as well as issuing the associated notices […] At this time we are contemplating installation of the drywall utilizing two shifts as soon as the glass and glazing installation is completed to a point to ensure dry-in of the building. We believe MEP rough-ins have already progressed to support the two shift operation. Continue to expedite the PTFE fabric roof, exterior masonry, sitework/roads/pavement and windows/curtain wall […]"

700.     On June 16, 2016, in the "Contractor's Daily Report," in response to "Any delays encountered," Watson states:

> "Building not dried in."

701.     Exhibit 166 is a true and accurate copy of Watson's Daily Report, dated 06/16/16.

702.     On June 17, 2016, in the "Contractor's Daily Report," in response to "Any delays encountered," Watson states:

> "Building not dried in."

703.     Exhibit 167 is a true and accurate copy of Watson's Daily Report, Ongoing Enclosure Delays, dated 06/17/16.

704.     In June 2016, CBRE Heery's failure to enclose the Facility according to the times, order, and priority sequence established by the Contract Schedule impacted SPC and Watson's performance.

705.     On July 5, 2016, the Facility was not completely enclosed or secure from interruption caused by exterior elements.

706.     Exhibit 168 is a true and accurate copy of Plaintiffs Photograph, dated 07/05/16.

707.     On July 11, 2016, in the "Contractor's Daily Report," in response to "Any delays encountered," Watson states:

> "Building not dried in and walls not built."

708.     Exhibit 169 is a true and accurate copy of Watson's Daily Report, dated 07/11/16.

709. On July 12, 2016, CBRE Heery issued the USACE an explanation of what happened in the most recent Pay Period and admitted:

> "Review of the curtainwall installation indicated schedule slip in Area D. Last month's schedule update indicated Area D, curtain wall elevations 9, 10, 1 (South and East elevations), were to start on 6/16/16. Based on the start of on-site frame fabrication the actual recorded start date was 6/25/16. This delay impacts Area D dry-in […] Potential Problem Areas or Impacts: Areas of risk related to completing critical path activities include […] Temporary dry-in measures are insufficient to start drywall effort […] Schedule Recovery / Mitigation: In the immediate time frame, the recovery plan is to improve the curtainwall and window glazing completion dates and thus improve the critical path completion date for the building."

710. In July 2016, CBRE Heery's failure to enclose the Facility according to the times, order, and priority sequence established by the Contract Schedule impacted SPC and Watson's performance.

711. On August 1, 2016, in the "Contractor's Daily Report," in response to "Any delays encountered," Watson states:

> "Building not dried in and walls still missing."

712. Exhibit 170 is a true and accurate copy of Watson's Daily Report, Ongoing Enclosure Delays, dated 08/01/16.

713. On August 8, 2016, in the "Contractor's Daily Report," in response to "Any delays encountered," Watson states:

> "Walls not built, Building not dried in, Sprinkler riser room not done."

714. Exhibit 171 is a true and accurate copy of Watson's Daily Report, dated 08/08/16.

715. On August 9, 2016, CBRE Heery issued the USACE an explanation of what happened in the most recent Pay Period and admitted:

> "Review of the curtainwall installation indicates no schedule slip from last month's schedule dates for curtainwall […] Potential Problem Areas or Impacts: Areas of risk related to completing critical path activities include […] Temporary dry-in measures are insufficient to start drywall effort […] Schedule Recovery / Mitigation: In the immediate time frame, the recovery plan is to improve the curtainwall and window glazing completion dates and thus improve the critical path completion date for the building […]"

716.     On August 18, 2016, the Facility was not completely enclosed or secure from interruption caused by exterior elements.

717.     Exhibit 172 is a true and accurate copy of Plaintiffs Photograph, dated 08/18/16.

718.     In August 2016, CBRE Heery's failure to enclose the Facility according to the times, order, and priority sequence established by the Contract Schedule impacted SPC and Watson's performance.

719.     On October 20, 2016, CBRE Heery issued the USACE an explanation of what happened in the most recent Pay Period:

> "Review of the curtainwall installation indicates three to four weeks of schedule slip from last month's schedule dates. This is primarily due to production rates and time to fabricate and install additional steel required to support the curtainwall system […] Potential Problem Areas or Impacts: Areas of risk related to completing critical path activities include […] Temporary dry-in measures are insufficient to start or progress drywall work in an efficient manner […]"

720.     In October 2016, CBRE Heery's failure to enclose the Facility according to the times, order, and priority sequence established by the Contract Schedule impacted SPC and Watson's performance.

721.     On November 3, 2016, CBRE Heery issued the USACE an explanation of what happened in the most recent Pay Period and admitted:

> "In addition to Area B, the Medical Mall area is also on the critical path due to the projected completion dates for curtainwall framing and glazing. […] Critical Path – The complete critical path work sequence below can be found on the attached total float bar chart titled 'SJ22 10-27-16 Critical Path Report & Total Float Report". In summary, the critical path is: 'B' Wall Framing (Punch) 100% … 10/31/16 […] Concurrent Critical Path:  Area D East C.W. frames & glazing 100% . . . 11/21/16 . . . Area C West C.W. frames & glazing 100% . . . 12/27/16 . . . Complete Dry-In Medical Mall on . . . 12/28/16 […] Potential Problem Areas or Impacts: Areas of risk related to completing critical path activities include […] Temporary dry-in measures are insufficient to start or progress of finish drywall work in an efficient manner […]"

722. On November 30, 2016, in the "Contractor's Daily Report," in response to "Any delays encountered," Watson states:

> "Building not dried in, walls not framed, missing door frames, telecom floors not installed."

723. Exhibit 173 is a true and accurate copy of Watson's Daily Report, dated 11/30/16.

724. In November 2016, CBRE Heery's failure to enclose the Facility according to the times, order, and priority sequence established by the Contract Schedule impacted SPC and Watson's performance.

725. On December 7, 2016, in the "Contractor's Daily Report," in response to "Any delays encountered," Watson states:

> "Building not dried in, missing framed walls & ceilings, Telecomm rooms not installed, Door frames not installed."

726. Exhibit 174 is a true and accurate copy of Watson's Daily Report, dated 12/07/16.

727. In December 2016, CBRE Heery's failure to enclose the Facility according to the times, order, and priority sequence established by the Contract Schedule impacted SPC and Watson's performance.

728. On January 9, 2017, CBRE Heery issued the USACE an explanation of what happened in the most recent Pay Period and admitted:

> "Building dry-in is being maintained with temporary enclosures in areas where permanent enclosure has not been achieved."

729. In January 2017, CBRE Heery's failure to enclose the Facility according to the times, order, and priority sequence established by the Contract Schedule impacted SPC and Watson's performance.

730. On February 14, 2017, CBRE Heery issued the USACE an explanation of what happened in the most recent Pay Period and admitted:

> "Building dry-in is being maintained with temporary enclosures in areas where permanent enclosure has not been achieved."

731.    In February 2017, CBRE Heery's failure to enclose the Facility according to the times, order, and priority sequence established by the Contract Schedule impacted SPC and Watson's performance.

732.    On April 20, 2017, Watson issued CBRE Heery a letter, which states in part:

> "Dear Mr. Kemp: This letter is to inform you again that we are concerned with the progress of the above-referenced project and we do not believe it will be complete on time. The latest schedule we have received (dated 1/25/17) shows a Beneficial Occupancy date of 6/01/17. Based on our walk through the building on 4/17, there are too many items such as flooring, painting, woodwork, and other finished [sic] left to do to meet this date. The apparent cause of the delay still appears to be the inability to get the building dried in enough to install sheetrock and wood at all locations. We are waiting on Vestibules 1928 and 1962 to be framed so we can complete our fire alarm conduit rough in (see attached photo). This is preventing our fire alarm subcontractor from completing the installation of his cabling which prevents him from megging out his circuits and installing his devices on the first floor. You asked us to meet with you on 1/31/17 because you were concerned with our progress and didn't think we had enough manpower on site because there were areas available for our work, but we didn't have any men working in them. We disagreed because the areas were not fully ready and our manpower was adequate for the work available. However, per your request, we sent additional manpower to the site the following week. As we expected, we completed the areas available and had to wait on ceiling grid to be installed (see attached photo) and we were installing lights and devices in unfinished areas. Please note that we are not responsible for cleaning light lenses covered with construction dust or replacing/straightening device plates that were removed by the painter. We have now had to pull the additional manpower from the job due to the lack of work available."

733.    Exhibit 175 is a true and accurate copy of Watson Letter to CBRE Heery, dated 04/20/17.

734.    In April 2017, CBRE Heery's failure to enclose the Facility according to the times, order, and priority sequence established by the Contract Schedule impacted SPC and Watson's performance.

735.    CBRE Heery breached the Mechanical Contract and the Electrical Contract by, among other things, failing to secure the Site from exterior elements.

107

736.     Implied warranties related to the nature and conditions of the Site were not met, which includes CBRE Heery's failure to secure and make the Facility "weather-tight" during the course of performance and according to the times specified by the Contract Schedule.

737.     On April 23, 2019, CBRE Heery issued the USACE a letter, which states in part:

> "In 2017 Southern Glass and their bonding company were notified that the contract was in default and they would be subject to Article 11 of our subcontract agreement which permits supplementation of labor as well as recover of damages. [CBRE Heery] has notified Southern Glass of over $670,000 in backcharges which range from recovery of extended general conditions to extensive remedial work on metal trim throughout the building and temporary covering at window openings to allow work to proceed […] [CBRE Heery] does not consider the claim finalized due to outstanding claims from follow on subcontractors and withholding of LDs by the USACE."

738.     As a direct and proximate cause of CBRE Heery's failure to secure the Facility and the Site from exterior elements, SPC has been damaged in an amount to be proven at trial, together with interest at the maximum legal rates from dates according to proof, and attorneys' fees and costs.

739.     As a direct and proximate cause of CBRE Heery's failure to secure the Facility and the Site from exterior elements, Watson has been damaged in an amount to be proven at trial, together with interest at the maximum legal rates from dates according to proof, and attorneys' fees and costs.

## THIRTEENTH CLAIM FOR RELIEF

### (Breach of Contract – CBRE Heery Actively Interfered with Performance)

*(SPC & Watson v. CBRE Heery et. al.)*

740.     The Plaintiffs reallege and incorporate by reference Paragraph 1 through Paragraph 739 above as if fully set forth herein.

741.     CBRE Heery had an implied duty to not actively interfere with SPC and Watson's performance.

742.     Under Paragraph G., of Exhibit B, "Project Specific Conditions," the Mechanical Contract and the Electrical Contract states:

> "Subcontractors will be required to maintain a minimum of a five day – 8 hour per day work schedule. Normal work hours shall be an eight-hour period between 0700 to 1600 hours."

743.     The Mechanical Contract and the Electrical Contract represented that CBRE Heery would progress the Project according to a five-day, eight hour per day work schedule, with normal hours between 0700 and 1600 hours.

744.     Under Section 4.2, "Duty to be Bound," of Article 4, "Progress, Performance and Schedule of Work," the Mechanical Contract and the Electrical Contract states:

> "Construction Manager and Subcontractor will be bound by the Schedule of Work."

745.     Under Section 4.1, "Time," of Article 4, "Progress, Performance and Schedule of Work," the Mechanical Contract and the Electrical Contract states:

> "Time is of the essence for all work specified or required by the Contract. Subcontractor agrees that the performance of all work required by the Contract will be completed within the time specified with the schedules of work which are furnished by [CBRE Heery]."

746.     Under Paragraph 55, of Article A, "Scope of Work," the Mechanical Contract and the Electrical Contract states:

> "To promote overall general progress, the Work shall be planned, commenced, prosecuted, and performed in a prompt, diligent manner, in a sensible and agreed

sequence, at such times and in such manner calculated to meet the schedules for the completion of each of the various phases as required by [CBRE Heery's] Project Schedule."

747.    Under Paragraph 55, of Article A, "Scope of Work," the Mechanical Contract and Electrical Contract states:

"It is intended that the work be prosecuted without interruption and that this Subcontract shall not reduce its resources without the approval of [CBRE Heery] except as permitted by the [Contract Schedule]."

748.    Pursuant to the Mechanical Contract and the Electrical Contract CBRE Heery had a duty to prosecute the Project work according to the times, order, and priority sequence established by the Contract Schedule, and CBRE Heery had a duty to enforce the performance of all of its other Project subcontractors according to the Contract Schedule.

749.    Under SECTION 01 32 01.00 10 PROJECT SCHEDULE, Subsection 3.3.12 "Out-of-Sequence Progress," the Prime Contract states:

"Activities that have progressed before all preceding logic has been satisfied (Out-of-Sequence Progress) will be allowed only on a case-by-case basis subject to approval by the Contracting Officer . . . Propose logic corrections to eliminate out of sequence progress or justify not changing the sequencing for approval prior to submitting an updated project schedule. Address out of sequence progress or logic changes in the Narrative Report and in the periodic schedule update meetings."

750.    CBRE Heery had an obligation to progress the Contact Schedule in an orderly and logical in-sequence manner; out-of-sequence progress was strictly prohibited unless expressly approved by the USACE.

751.    Under Section 3.1, of Article 3, "Scope of Work," the Mechanical Contract and the Electrical Contract states:

"All work specified by the Contract will be performed under the direction of Construction Manager, and to the satisfaction of Construction Manager."

752.    Under Section 4.4, "Priority of Work," of Article 4, "Progress, Performance and Schedule of Work," the Mechanical Contract and the Electrical Contract states:

"Construction Manager will have the right to determine and decide the time, order, and priority in which the various portions of Subcontractor's Work will be performed, and all other matters relative to the timely performance and completion of Subcontractor's Work."

753. Under Section 4.6, "Performance of Work," of Article 4, "Progress, Performance and Schedule of Work," the Mechanical Contract and the Electrical Contract states:

"Subcontractor will perform this Contract at such times, in such order, and in such manner as the Construction Manger may direct."

754. CBRE Heery reserved the right to seize control of (and therefore assume the risk and responsibility for) any Project operations and to exercise dominion and direct changes to the time, order, and priority sequence established by the Contract Schedule.

755. To the extent that CBRE Heery did seize control, exercise dominion, and direct changes to the times, order, and priority sequence established by the Contract Schedule, CBRE Heery had the obligation to appropriately and justly compensate any contractors adversely impacted by such directives, dominion, and seizure of control.

756. On June 2, 2016, CBRE Heery issued the USACE a letter titled "Letter of Concern," which states, in part:

"In response to your letter dated May 24, 2016, Letter of Concern […] we have been meeting with the appropriate subcontractors as well as issuing the associated notices […] At this time we are contemplating installation of the drywall utilizing two shifts as soon as the glass and glazing installation is completed to a point to ensure dry-in of the building. We believe MEP rough-ins have already progressed to support the two shift operation. Continue to expedite the PTFE fabric roof, exterior masonry, sitework/roads/pavement and windows/curtain wall […] As discussed in our meeting, progress was significantly impacted in the early portion of the Project due to the poor soil conditions that were encountered. This required additional excavation to remove these soils and additional backfill with clean, suitable material. Unfortunately this lost time could not be recovered in the following construction activities despite our best efforts. Additionally, time has been lost due to delays in ordering permanent medical equipment and furniture due to the numerous changes that have been incurred. These changes include additional sensaphones, revised equipment from new (recently purchased) to relocated, and tie-in of the Tricare Building with paging and security access. Details of these delays are currently

being assembled and will be forwarded for your review. We believe they substantiate the reason for the BOD date noted below. [CBRE Heery] has reviewed the anticipated building occupancy date for the new medical clinic building. We are highly cognizant of the importance of this date for planning purposes. This date must be a realistic date that all parties are confident that can be achieved while minimizing the final completion date of the Project. At this time the schedule completion (BOD) date for the building is December 19, 2016."

757.    On June 3, 2016, CBRE Heery issued the USACE a letter titled "Delays to construction due to high water table," which states, in part:

"As previously discussed, [CBRE Heery] is requesting a modification for time expended to over excavate and replace saturate soils encountered during site preparation and building foundation excavation. In exchange for USACE's consideration of this request, [CBRE Heery] is requesting a time extension only. All direct costs (including labor, material and equipment) and extended overhead costs will not be pursued […] Originally [CBRE Heery] thought that these schedule impacts could be absorbed in the project schedule. It is now apparent that the schedule impacts will be realized by [CBRE Heery] […] [CBRE Heery] is requesting a 55 day time extension and $0.00 (zero) to the contract for time […]"

758.    Exhibit 176 is a true and accurate copy of CBRE Heery Letter to USACE, dated 06/03/16.

759.    In June 2016, CBRE Heery admitted that "progress was significantly impacted in the early portion of the Project" and that it "originally thought that these schedule impacts could be absorbed in the project schedule" but that "this lost time could not be recovered in the following construction activities despite our best efforts" ("CBRE Heery's Constructive Acceleration Actions").

760.    From the Project NTP until March 2016, CBRE Heery's willful and affirmative Constructive Acceleration Actions unreasonably interfered with and effectively usurped SPC and Watson's ability to control its own means, methods, strategy, and sequence of operations under the Mechanical Contract and the Electrical Contract and such actions constitute active interference.

761.    On April 13, 2016, under TAB-5 RISKS, in CBRE Heery's Weekly Report, CBRE Heery states:

"Current project schedule is showing -69 working days of total float. [CBRE Heery] is diligently working an accelerated schedule to minimize this delay [...] 'Plan to Minimize Risk' 'increase crew size, overtime and weekend work, work areas concurrently'" ("CBRE Heery's Express Acceleration Actions").

762.    Exhibit 177 is a true and accurate copy of CBRE Heery Weekly Report, dated 04/13/16.

763.    On August 12, 2016, Watson issued CBRE Heery a letter notifying CBRE Heery of its

concern with the constructability of the Project Schedule change:

"You asked us to meet with you on [Jan. 31, 2016] because you were concerned with [Watson's] progress and didn't think we had enough manpower on site . . . we disagreed because the areas were not fully ready and our manpower was adequate for the work available. However, per your request, we sent additional manpower to the site the following week. As we expected, we completed the areas available and had to wait on ceiling grid to be installed."

764.    Exhibit 178 is a true and accurate copy of Watson Letter to CBRE Heery, dated 08/12/16.

765.    On September 28, 2016, under TAB-5 RISKS, in CBRE Heery's Weekly Report, CBRE

Heery states:

"Current project schedule is showing -96 working days of total float. [CBRE Heery] is diligently working an accelerated schedule to minimize this delay [...] 'Plan to Minimize Risk' 'increase crew size, overtime and weekend work, work areas concurrently.'"

766.    Exhibit 179 is a true and accurate copy of CBRE Heery Weekly Report, dated 09/28/16.

767.    On October 26, 2016, under TAB-5 RISKS, in CBRE Heery's Weekly Report, CBRE

Heery states:

"Current project schedule is showing -96 working days of total float. [CBRE Heery] is diligently working an accelerated schedule to minimize this delay [...] 'Plan to Minimize Risk' 'increase crew size, overtime and weekend work, work areas concurrently."

768.    Exhibit 180 is a true and accurate copy of CBRE Heery Weekly Report, dated 10/26/16.

769.    On December 14, 2016, under TAB-5 RISKS, in CBRE Heery's Weekly Report, CBRE

Heery states:

113

> "Current project schedule is showing -96 working days of total float. [CBRE Heery] is diligently working an accelerated schedule to minimize this delay […] 'Plan to Minimize Risk' 'increase crew size, overtime and weekend work, work areas concurrently.'"

770. Exhibit 181 is a true and accurate copy of CBRE Heery Weekly Report, dated 12/14/16.

771. On January 11, 2017, under TAB-5 RISKS, in CBRE Heery's Weekly Report, CBRE Heery states:

> "Current project schedule is showing -96 working days of total float. [CBRE Heery] is diligently working an accelerated schedule to minimize this delay […] 'Plan to Minimize Risk' 'increase crew size, overtime and weekend work, work areas concurrently.'"

772. Exhibit 182 is a true and accurate copy of CBRE Heery Weekly Report, dated 01/11/17.

773. On February 22, 2017, under TAB-5 RISKS, in CBRE Heery's Weekly Report, CBRE Heery states:

> "Current project schedule is showing -96 working days of total float. [CBRE Heery] is diligently working an accelerated schedule to minimize this delay […] 'Plan to Minimize Risk' 'increase crew size, overtime and weekend work, work areas concurrently.'"

774. Exhibit 183 is a true and accurate copy of CBRE Heery Weekly Report, dated 02/22/17.

775. On April 12, 2017, under TAB-5 RISKS, in CBRE Heery's Weekly Report, CBRE Heery states:

> "Current project schedule is showing -69 working days of total float. [CBRE Heery] is diligently working an accelerated schedule to minimize this delay […] 'Plan to Minimize Risk' 'increase crew size, overtime and weekend work, work areas concurrently.'"

776. Exhibit 184 is a true and accurate copy of CBRE Heery Weekly Report, dated 04/12/17.

777. Between around March 2016 and around May 2017, CBRE Heery's willful and affirmative acts and ongoing seizure of control under CBRE Heery's Express Acceleration Actions unreasonably interfered with and effectively usurped SPC and Watson's authority to control its own

means, methods, strategy, and sequence of operations under the Mechanical Contract and the Electrical Contract and such actions constitute active interference.

778.     Over the course of construction, CBRE Heery repeatedly exercised (and abused) its authority to seize control and direct (and misdirect) work on the Project, including critical predecessor work necessary for SPC and Watson's performance, and including the usurping of the means, methods, strategy, and sequence of performance planned for the Mechanical Work and the Electrical Work.

779.     CBRE Heery has failed and repeatedly refused to assume responsibility for, and appropriately compensate SPC and Watson as a result of the cost impacts, caused by CBRE Heery's Constructive Acceleration Actions, CBRE Heery's Express Acceleration Actions, and such other actions that amounted to the usurping and seizing of control of the Mechanical Work and the Electrical Work.

780.     As a direct and proximate cause of CBRE Heery's active interference in the performance of the Mechanical Work, SPC has been damaged in an amount to be proven at trial, together with interest at the maximum legal rates from dates according to proof, and attorneys' fees and costs.

781.     As a direct and proximate cause of CBRE Heery's active interference in the performance of the Electrical Work, Watson has been damaged in an amount to be proven at trial, together with interest at the maximum legal rates from dates according to proof, and attorneys' fees and costs.

**FOURTEENTH CLAIM FOR RELIEF**

(Breach of Contract – CBRE Heery Abdicated its Duties)

(*SPC & Watson v. CBRE Heery et. al.*)

782.     The Plaintiffs reallege and incorporate by reference Paragraph 1 through Paragraph 781 as if fully set forth herein.

783.     Following the CBRE Heery-defined Substantial Completion Date of June 18, 2018, CBRE Heery abdicated certain fundamental duties owed to SPC and Watson under the Electrical Contract and the Mechanical Contract.

784. Under Chapter 22C "Payments to Subcontractors," § 22C-2, CBRE Heery had a duty to make prompt payment to SPC and Watson for Mechanical Work and Electrical Work duly performed under the Mechanical Contract and the Electrical Contract.

785. Under FAR § 552.236-15, and pursuant to the Prime Contract, CBRE Heery had a duty to create and publish rational, reasonable, and realistic Project Schedule updates.

786. Under FAR § 552.236-15, and pursuant to the Prime Contract, CBRE Heery had a duty to maintain the Project Schedule and to take steps necessary to improve the Project's progress in the event that CBRE Heery fell behind.

787. Prior to the CBRE Heery-defined Substantial Completion Date, SPC had properly submitted SPC Pay Application 32, SPC Pay Application 33, SPC Pay Application 34, and following the CBRE Heery-defined Substantial Completion Date, SPC submitted SPC Pay Application 35.

788. On July 24, 2018, Ms. Kristy Surles, SPC's Senior Construction Administrator, demanded that CBRE Heery make prompt payment of amounts duly owed in an email, which states:

> "All attempts made by SPC Mechanical for payment information, via countless emails, phone calls and messages, have gone unanswered. The account is well over 7 months past due. If you do not respond regarding payment by close of business Wednesday, July 25th, we will be forced to contact the bonding agency. Thank you in advance for your immediate attention to this urgent matter."

789. Following the CBRE Heery-defined Substantial Completion Date, Watson properly submitted Watson Pay Application 38, Watson Pay Application 39, and Watson Pay Application 40, and multiple Change Order Requests.

790. Since the CBRE Heery-defined Substantial Completion Date, CBRE Heery has failed and refused to make a single payment to SPC, and has failed and refused to pay Watson's Pay Application 38, 39, 40, as well as the Unpaid Electrical Contract Changes, which is a material abdication of CBRE Heery's duty to make prompt payment to SPC and Watson ("CBRE Heery's Abdication of Payment Duties").

116

791.     Following the CBRE Heery-defined Substantial Completion Date, CBRE Heery terminated its Senior Project Manager, Mr. Frank Kemp, reassigned its Project Executive, Linda Smith, and assigned Mr. Ken Cheatwood (who had no prior experience on the Project) to complete the post-Substantial Completion activities.

792.     CBRE Heery's decision to fire its Senior Project Manager, reassign its Project Executive, and assign an inexperienced person to complete the complex Project, which was then in full mitigation, was a gross abdication of CBRE Heery's duty to competently staff and manage the Project ("CBRE Heery's Abdication of Proper Management").

793.     On September 26, 2018, the USACE issued CBRE Heery a letter titled "Abatement and Demolition Progress," which states, in part:

> "Dear Ms. Smith: I am concerned with your company's progress with demolition of the old clinic and construction of remaining site improvements. The old clinic was transferred to [CBRE Heery] on July 23, 2018, over nine weeks ago. Your original accepted schedule indicates a four-week duration for asbestos abatement of the old clinic and a four-week duration for demolition of the old clinic. Your most recent updated schedule, with a data date of June 18, 2018, shows a three-week duration for asbestos abatement and two-week duration for demolition of the old clinic. To date, the Bio-Environmental has been demolished and asbestos abatement in the old clinic continues. Exceeding your original durations considerably. My office recognizes weather delays associated with Hurricane Florence that impacted the base and surrounding area. A weather modification will be forthcoming for those delays. However, it is obvious that completion of the remaining contractual work will not be done within the four-month timeframe indicated per your original schedule. I'm requesting you provide my office with a realistic schedule for completion of your remaining work by October 5, 2018. You are reminded Liquidated Damages will continue to be withheld until all work is completed."

794.     On June 10, 2019, the USACE issued CBRE Heery a letter, which states in part:

> "Review of your most recent schedule provided to my office in early April 2019 shows [CBRE Heery] and it's subcontractors falling behind in your effort to meet your projected August 1, 2019 completion."

795.     CBRE Heery's inability to progress the Project following the CBRE Heery-defined Substantial Completion Date is an abdication of CBRE Heery's duty to maintain the Project Schedule and to take steps necessary to improve the Project's progress ("CBRE Heery's Abdication of Diligence").

796.     On November 14, 2018, Watson issued CBRE Heery a letter, which states, in part:

> "Unfortunately, [CBRE Heery] did not commence, prosecute, or progress the Work according to [CBRE Heery's] Contract Schedule. For reasons completely outside of Watson's control, the nature of the Project and the conditions on Site significantly differed from those represented and warranted by the Contract, and [CBRE Heery] abandoned the Contract Schedule. Watson could not possibly have contemplated a more than two-year delay, and a near doubling of the schedule at the time that Watson and [CBRE Heery] entered into the Contract. At our meeting on October 16, 2018, you said that [CBRE Heery] has been working on a schedule with certain other Project subcontractors for the remaining scope of work. Watson would greatly appreciate the opportunity (and believe that this opportunity is contemplated by the Contract) to contribute to this process, especially considering that Watson is relying upon this information to complete the Site lighting work, which, in the end, will likely encounter a more than 30 month delay. As discussed in our meeting, all poles and pole lights have been delivered to the Site. However, Watson cannot complete its plan and be ready to execute the three or four activities associated with Site lighting, unless it has essential information from and dates related to all predecessor activities, such as the demolition subcontractor. To be prepared, Watson needs to provide its excavation subcontractor with as much notice as possible so that it can accommodate this impacted plan. Notwithstanding the above, Watson remains committed to diligently working in good faith to help [CBRE Heery] complete the Project as expeditiously as possible for the Corps, with the expectation that [CBRE Heery] will treat Watson fairly for its good faith efforts. Please forward [CBRE Heery's] schedule as soon as possible so that we can review it and plan our work accordingly."

797.     Exhibit 185 is a true and accurate copy of Watson Letter to CBRE Heery, dated 11/14/18.

798.     In the 24 months following the CBRE Heery-defined Substantial Completion Date, CBRE Heery issued only two Project Schedule updates, which is a material abdication of CBRE Heery's duties to create and publish rational, reasonable, and realistic Project Schedule updates ("CBRE Heery's Abdication of Scheduling Duties").

799.     On September 20, 2017, Watson issued CBRE Heery a letter titled "Notice of Intent to Submit a Request for Equitable Adjustment," which states in part:

"Dear Mr. Kemp, Watson remains committed to working with [CBRE Heery] to diligently complete the project as rapidly as is reasonably possible under the current circumstances. However, this letter is to notify you that Watson intends to submit a request for an equitable adjustment to the contract as a result of the effects caused by a multitude of project issues, including most recently, the tenth change or delay to the project completion date. These project issues have resulted in Watson suffering substantial financial losses. Accordingly, Watson will seek additional compensation for the costs resulting from these project issues that have been imposed upon us through no fault of our own."

800.    On November 11, 2018, Mr. Glenn Jardine, CBRE Heery's Executive Officer, emailed Mr. Tom Headlee, Watson's President, stating in part: "I'll make sure we address your concerns & get this resolved."

801.    On November 15, 2018, in reply to Watson's offer to meet to work towards an amicable resolution, Mr. Glenn Jardine, CBRE Heery's Executive Officer stated:

"Tom, I also like to get things done by year end and I also believe in long term relationships. I lead all of [CBRE Heery], and I am sure you would appreciate the fact we have levels of authority and management. I really need this issue to go through our chain of command before I get involved, otherwise it would be undermining the process. I will make sure our team addresses your concerns and we get this resolved."

802.    As of June 10, 2020, CBRE Heery has failed and refused to address any of the Plaintiffs' concerns or get the Plaintiffs REAs resolved ("CBRE Heery's Abdication of its Duty to Resolve").

803.    Following the CBRE Heery-defined Substantial Completion Date, CBRE Heery's Abdication of Payment Duties, CBRE Heery's Abdication of Scheduling Duties, CBRE Heery's Abdication of Proper Management, CBRE Heery's Abdication of Due Diligence, and CBRE Heery's Abdication of its Duty to Resolve, taken together and in totality constitutes a fundamental abandonment of the Mechanical Contract and the Electrical Contract ("CBRE Heery's Abandonment of the Contracts").

804.    As a direct and proximate cause of CBRE Heery's abdication of its duties and abandonment of the Mechanical Contract, SPC has been damaged in an amount to be proven at trial, together with interest at the maximum legal rates from dates according to proof, and attorneys' fees and costs.

805.     As a direct and proximate cause of CBRE Heery's abdication of its duties and abandonment of the Electrical Contract, Watson has been damaged in an amount to be proven at trial, together with interest at the maximum legal rates from dates according to proof, and attorneys' fees and costs.

## FIFTEENTH CLAIM FOR RELIEF

(Breach of Contract – CBRE Heery Failed to Mitigate Damages)

(*SPC & Watson v. CBRE Heery et. al.*)

806.     The Plaintiffs reallege and incorporate by reference Paragraph 1 through Paragraph 805 as if fully set forth herein.

807.     Under FAR § 552.236-15, "Schedules for Construction Contracts," Subsection (b), the Federal Acquisition Regulation states:

> "If, in the opinion of the Contracting Officer, the Contractor falls behind the approved schedule, the Contractor shall take steps necessary to improve its progress, including […] to submit for approval any supplementary schedule or schedules in chart form as the Contracting Officer deems necessary to demonstrate how the approved rate of progress will be regained."

808.     Pursuant to the Electrical Contract and the Mechanical Contract, which incorporated the Prime Contract by reference, CBRE Heery had an obligation to take the steps necessary to improve the Project's progress in circumstances in which the Project fell behind the USACE-approved Contract Schedule.

809.     Insofar as CBRE Heery claims that any of its other subcontractors caused or are responsible for any damages claimed herein, or that CBRE Heery's other subcontractor have a duty to indemnify CBRE Heery, CBRE Heery should be held liable because it failed to mitigate those damages.

810.     Acting as the Construction Manager At-Risk, under North Carolina common law, CBRE Heery had a legal duty to act reasonably and timely to mitigate the damages caused by its own actions or inactions, or by CBRE Heery's other Project subcontractors.

811. On February 10, 2016, CBRE Heery issued the USACE an explanation of what happened in the most recent Pay Period and admitted:

> "Temporary dry-in measures are insufficient to start drywall effort […] Schedule Recovery / Mitigation: No recovery actions are planned in the schedule other than improving the projected completion dates. [CBRE Heery] has indicated that a planned recovery effort could begin once curtainwall begins and areas are "dried-in" and available for finishes."

812. In CBRE Heery Schedule Narrative 13, CBRE Heery admitted to the USACE that it was actively failing to mitigate the damages caused by its other Project subcontractors when it stated:

> "Temporary dry-in measures are insufficient to start drywall effort."

813. In CBRE Heery Schedule Narrative 13, CBRE Heery admitted that (despite knowing and admitting that the Project was being impacted) "no recovery actions are planned in the schedule."

814. On March 7, 2016, CBRE Heery issued the USACE an explanation of what happened in the most recent Pay Period and admitted:

> "Potential Problem Areas or Impacts: Areas of risk related to completing critical path activities include; […] Temporary dry-in measures are insufficient to start drywall effort, Schedule Recovery / Mitigation: No recovery actions are planned in the schedule other than improving the projected completion dates. [CBRE Heery] has indicated that a planned recovery effort could begin once curtainwall begins and areas are "dried-in" and available for finishes."

815. In CBRE Heery Schedule Narrative 14, CBRE Heery admitted that it was actively failing to mitigate the damages caused by its other Project subcontractors when it stated:

> "Temporary dry-in measures are insufficient to start drywall effort."

816. In CBRE Heery Schedule Narrative 14, CBRE Heery admitted that (despite knowing and admitting that the Project was being impacted) "no recovery actions are planned."

817. On April 7, 2016, CBRE Heery issued the USACE an explanation of what happened in the most recent Pay Period and admitted:

> "Potential Problem Areas or Impacts: Areas of risk related to completing critical path activities include; […] Temporary dry-in measures are insufficient to start drywall effort […] Schedule Recovery / Mitigation: Several logic changes were

made in an attempt to recover the schedule. Changes include running Area C Levels 1 & 2 concurrently and Area D Levels 1 & 2 concurrently. Areas A & B can also run concurrent. While the current schedule did not reflect an improvement in the completion date, due to these changes, the plan is to increase labor and hours for activities occurring after building dry-in. The schedule should allow for improvement if this plan is implemented in the field. In the immediate time frame, the recovery plan is to improve the curtainwall and window glazing completion dates and thus improve the critical path completion date for the building."

818.    In CBRE Heery Schedule Narrative 15, CBRE Heery admitted that it was actively failing to mitigate the damages caused by the Building Enclosure Delay when it stated:

"Temporary dry-in measures are insufficient to start drywall effort […] the current schedule did not reflect an improvement."

819.    On May 5, 2016, CBRE Heery issued the USACE an explanation of what happened in the most recent Pay Period and admitted:

"Potential Problem Areas or Impacts: Areas of risk related to completing critical path activities include; […] Temporary dry-in measures are insufficient to start drywall effort […] Schedule Recovery/Mitigation: In the immediate timeframe, the recovery plan is to improve the curtainwall and window glazing completion dates and thus improve the critical path completion date for the building."

820.    In CBRE Heery Schedule Narrative 16, CBRE Heery admitted that it was actively failing to mitigate the damages caused by the Building Enclosure Delay when it stated:

"Temporary dry-in measures are insufficient to start drywall effort."

821.    On August 9, 2016, CBRE Heery issued the USACE an explanation of what happened in the most recent Pay Period and admitted:

"Potential Problem Areas or Impacts: Areas of risk related to completing critical path activities include […] Temporary dry-in measures are insufficient to start drywall effort […] Schedule Recovery / Mitigation: In the immediate time frame, the recovery plan is to improve the curtainwall and window glazing completion dates and thus improve the critical path completion date for the building […] Schedule Changes – A detailed listing of changes can be found in the attached report titled "SJ18 vs SJ19 Schedule Changes". In summary major changes include: Logic and duration changes that allow for building completion in December 2016 . . . Logic changes that allow for concurrent finishes in multiple

areas . . . Added duration to the site work activities which increased the overall duration for construction after building turnover from 72 to 141 calendar days . . . Logic changes to correct out-of-sequence progress."

822.    In CBRE Heery Schedule Narrative 19, CBRE Heery admitted that its mitigation measures, which included insufficient temporary dry-in measures, in fact worsened the situation ("Added duration to the site work activities which increased the overall duration for construction after building turnover from 72 to 141 calendar days").

823.    On October 20, 2016, CBRE Heery issued the USACE an explanation of what happened in the most recent Pay Period and admitted:

> "Potential Problem Areas or Impacts: Areas of risk related to completing critical path activities include […] Temporary dry-in measures are insufficient to start or progress drywall work in an efficient manner […] Schedule Recovery / Mitigation: No recovery plan exists other than to improve the current critical path completion dates for the building."

824.    In CBRE Heery Schedule Narrative 21, CBRE Heery admitted that it was actively failing to mitigate the damages caused by the Building Enclosure Delay when it stated:

> "Temporary dry-in measures are insufficient to start or progress drywall work in an efficient manner."

825.    In CBRE Heery Schedule Narrative 21, CBRE Heery admitted to that (despite knowing and admitting that the Project was being impacted) "no recovery plan exists."

826.    On November 3, 2016, CBRE Heery issued the USACE an explanation of what happened in the most recent Pay Period and admitted:

> "After the requested schedule recovery effort, the schedule required all area's finishes, beginning with drywall, to work concurrently. Due to issues with in-wall rough-in, framing inspections, 100% area dry-in, weather impact, and insufficient manpower, the recovery schedule is not being maintained […] Potential Problem Areas or Impacts: Areas of risk related to completing critical path activities include […] Temporary dry-in measures are insufficient to start or progress of finish drywall work in an efficient manner […] Schedule Recovery / Mitigation: No recovery plan exists other than to improve the current critical path completion dates for the building."

827.     In CBRE Heery Schedule Narrative 22, CBRE Heery admitted that it was actively failing to mitigate the damages when it stated:

> "[T]he recovery schedule is not being maintained […] temporary dry-in measures are insufficient."

828.     In CBRE Heery Schedule Narrative 22, CBRE Heery admitted to the USACE that (despite knowing that the Project was being impacted) "no recovery plan exists."

829.     On December 6, 2016, CBRE Heery issued the USACE an explanation of what happened in the most recent Pay Period and admitted:

> 'The critical path to project completion begins with Area B drywall work. This effort is critical for releasing other Area B finishes and in turn, building occupancy. […] Area B, finish dates have slipped further and continue to reside on the critical path. Due to incomplete areas of work such as in-wall rough-in, framing inspections, 100% area dry-in; in addition to weather impacts and insufficient manpower, the recovery schedule is not being maintained. […] In summary, the critical path is: 'B' Hang Drywall 100% 12/09/16."

830.     In CBRE Heery Schedule Narrative 23, CBRE Heery admitted that it was actively failing to mitigate the damages when it stated:

> "[T]he recovery schedule is not being maintained."

831.     On February 14, 2017, CBRE Heery issued the USACE an explanation of what happened in the most recent Pay Period and admitted:

> "Last month's critical path to project completion began with Area B drywall work. This effort is critical for releasing other Area B finishes and in turn, building occupancy […] Potential Problem Areas or Impacts: Areas of risk related to completing critical path activities include; Insufficient labor manpower to maintain required schedule durations."

832.     In CBRE Heery Schedule Narrative 25, CBRE Heery admitted that it was actively failing to mitigate the damages, which included supplementing its Drywall Subcontractor, when it admitted:

> "Insufficient labor manpower to maintain required schedule durations."

833.     On March 10, 2017, CBRE Heery issued the USACE an explanation of what happened in the most recent Pay Period and admitted:

"Last month's critical path to project completion began with the projected delivery and installation of interior doors. […] It's unlikely that subcontractors will be able to have enough manpower to support more than two concurrent areas of installation. Therefore, several changes were made to reestablish crew flow for finish trades such as paint, millwork, ACT Tile, doors, and flooring. Crew flow in this case means contractors finishing in one area prior to moving to the next area. The initial schedule was built assuming crew flow however; the area to area relationships were removed during multiple schedule recovery efforts. In general, new schedule logic requires finish crews to work Level 2, Areas C & D, concurrently; then they will move to Level 1 to work Areas C & D concurrently. Following completion of both levels of Areas C & D the finish crews will then move to Areas A & B to finish working in the building. Finish items that now reside on the critical path include; paint, millwork, and flooring. The table below indicates a few of these activities and the order of magnitude in terms of date shifts. […] Potential Problem Areas or Impacts: Areas of risk related to completing critical path activities include; Insufficient labor manpower to maintain required schedule durations […] Schedule Recovery / Mitigation: No recovery plan exists other than to improve the current critical path completion dates for the building."

834.    In CBRE Heery Schedule Narrative 26, CBRE Heery admitted that it was actively failing to mitigate the damages, which included supplementing its various finishes subcontractors, when it admitted:

"It's unlikely that subcontractors will be able to have enough manpower to support more than two concurrent areas of installation" and "Insufficient labor manpower to maintain required schedule durations."

835.    In CBRE Heery Schedule Narrative 26, CBRE Heery admitted that (despite knowing that the Project was being impacted) "no recovery plan exists."

836.    On June 9, 2017, CBRE Heery issued the USACE an explanation of what happened in the most recent Pay Period and admitted:

"The critical path to project completion runs through Level 1 flooring and punch work. […] Potential Problem Areas or Impacts: Areas of risk related to completing critical path activities include; Insufficient labor manpower to maintain required schedule durations […] Schedule Recovery / Mitigation: No recovery plan exists other than to improve the current critical path completion dates for the building. […] Schedule Changes – Minor logic changes were made to correct out-of-sequence progress."

837. In CBRE Heery Schedule Narrative 29, CBRE Heery admitted that it was actively failing to mitigate the damages when it admitted:

"Insufficient labor manpower to maintain required schedule durations."

838. In CBRE Heery Schedule Narrative 29, CBRE Heery admitted that (despite knowing that the Project was being impacted) "no recovery plan exists."

839. On July 5, 2017, CBRE Heery issued the USACE an explanation of what happened in the most recent Pay Period and admitted:

"Potential Problem Areas or Impacts: Areas of risk related to completing critical path activities include; Insufficient labor manpower to maintain required schedule durations […] Schedule Recovery / Mitigation: No recovery plan exists other than to improve the current critical path completion dates for the building […] Schedule Changes – Minor logic changes were made to correct out-of-sequence progress."

840. Exhibit 186 is a true and accurate copy of CBRE Heery's Schedule Narrative 30, dated 07/05/17.

841. In CBRE Heery Schedule Narrative 30, CBRE Heery admitted that it was actively failing to mitigate the damages when it admitted:

"Insufficient labor manpower to maintain required schedule durations."

842. In CBRE Heery Schedule Narrative 30, CBRE Heery admitted that (despite knowing that the Project was being impacted) "no recovery plan exists."

843. On August 4, 2017, CBRE Heery issued the USACE an explanation of what happened in the most recent Pay Period and admitted:

"Schedule slip this period was due to logic changes which required the 60-day transition period to occur after building commissioning and final inspection. Personnel relocations begin 10/12/17 […] Potential Problem Areas or Impacts: Areas of risk related to completing critical path activities include; Insufficient labor manpower to maintain required schedule durations […] Schedule Recovery / Mitigation: No recovery plan exists other than to improve the current critical path completion dates for the building […] Schedule Changes – Minor logic changes were made to correct out-of-sequence progress."

844. In CBRE Heery Schedule Narrative 31, CBRE Heery admitted that it was actively failing to mitigate the damages when it admitted:

"Insufficient labor manpower to maintain required schedule durations."

845. In CBRE Heery Schedule Narrative 31, CBRE Heery admitted that (despite knowing that the Project was being impacted) "no recovery plan exists."

846. As a direct and proximate cause of CBRE Heery's failure to mitigate the damages resulting from Causes of Action made in this Complaint, SPC has been damaged in an amount to be proven at trial, together with interest at the maximum legal rates from dates according to proof, and attorneys' fees and costs.

847. As a direct and proximate cause of CBRE Heery's failure to mitigate the damages resulting from Causes of Action made in this Complaint, Watson has been damaged in an amount to be proven at trial, together with interest at the maximum legal rates from dates according to proof, and attorneys' fees and costs.

## SIXTEENTH CLAIM FOR RELIEF

(Cardinal Change)

(*SPC & Watson v. CBRE Heery et. al.*)

848.    The Plaintiffs reallege and incorporate by reference Paragraph 1 through Paragraph 847 as if fully set forth herein.

849.    Based upon Article 2 of the Prime Contract and the Project NTP, CBRE Heery had an obligation to complete the Project by October 20, 2016, the Contract-Defined Completion Date.

850.    On June 10, 2020, the USACE had not yet issued CBRE Heery the Project's Certificate of Final Completion, which means that the actual Project Completion Date has been extended by at least 43.7 months longer than the Contract-Defined Completion Date ("Cardinal Change in Contract Time")

851.    SPC planned to execute the Mechanical Work by spending approximately 42,030 labor hours, but as a result of the Causes of Action made in this Complaint SPC actually spent approximately 62,282 labor hours, which represents a 48.2% increase in labor hours ("Cardinal Change in Mechanical Labor").

852.    Watson planned to execute the Electrical Work by spending approximately 27,854 labor hours, but Watson actually spent approximately 53,253 labor hours, which represents a 91.1% increase in labor hours ("Cardinal Change in Electrical Labor").

853.    The "Original Mechanical Contract Amount" is $5,905,700, but the revised "Total Mechanical Contract Amount" is at least $9,561,715, which represents at least a 61.9% increase in the Mechanical Contract Amount ("Cardinal Change in Mechanical Price").

854.    The "Original Electrical Contract Amount" is $4,978,000, but the revised "Total Electrical Contract Amount" is at least $8,411,076, which represents at least a 68.9% increase in the Mechanical Contract Amount ("Cardinal Change in Electrical Price").

855.    The Cardinal Change in Contract Time, the Cardinal Change in Mechanical Labor, and the Cardinal Change in Mechanical Price, among other material changes alleged in this Complaint, taken altogether in totality amount to a "Cardinal Change" to the Mechanical Contract.

856.    The Cardinal Change in Contract Time, the Cardinal Change in Electrical Labor, and the Cardinal Change in Electrical Price, among other material changes alleged in this Complaint, taken altogether in totality amount to a "Cardinal Change" to the Electrical Contract.

857.    As a direct and proximate cause of the Cardinal Change to the Mechanical Contract, SPC has been damaged in an amount to be proven at trial, together with interest at the maximum legal rates from dates according to proof thereof, and attorneys' fees and costs.

858.    As a direct and proximate cause of the Cardinal Change to the Electrical Contract, Watson has been damaged in an amount to be proven at trial, together with interest at the maximum legal rates from dates according to proof thereof, and attorneys' fees and costs.

### SEVENTEENTH CLAIM FOR RELIEF

(CBRE Heery Acted as Construction Manager At-Risk with Gross Negligence)
(*Plaintiffs v. CBRE Heery et. al.*)

859.    The Plaintiffs reallege and incorporate by reference Paragraph 1 through Paragraph 858 as if fully set forth herein.

860.    Acting as Construction Manager At-Risk, CBRE Heery had a duty to complete (and assumed the responsibility for) all of the following actions: (1) to resolve requests for information timely; (2) to timely notify subcontractors of changes impacting the Project Schedule; (3) to resolve changes and issues impacting the Project's progress; (4) to effectively issue field instructions; (5) to effectively maintain the Project Schedule; (6) to effectively administrate the Contract; (7) to accurately represent the Project's progress in periodic schedule updates; (8) to implement and enforce appropriate measures to recover the Contract Schedule; (9) to place the interests of its subcontractors above the interests of itself; (10) to properly notify the USACE in the event that an issue impacted the Project's progress so as to not prejudice the Plaintiffs; (11) to properly make claims impacting the subcontractors in accordance with the Prime Contract requirements (the "CM At-Risk Duties").

861.    CBRE Heery had a responsibility to perform the CM At-Risk duties with a reasonable standard of care similar to a like-situated Construction Manager At-Risk.

862.     CBRE Heery failed to perform its duties with a reasonable standard of care similar to a like-situated Construction Manager At-Risk.

863.     On January 9, 2015, CBRE Heery executed a Change Order issued by the USACE as a result of a "Change in Contract Specifications," which stated that the change is necessary:

> "[T]o accommodate for the Asbestos water line removal modification." (the "Asbestos Waterline Change").

864.     The Asbestos Waterline Change resulted in a total Prime Contract price increase of $165,244, and total extension to the time for performance of 35 calendar days.

865.     In the "Closing Statement" to the Asbestos Waterline Change, Linda Smith certified the following statement to the USACE:

> "It is further understood and agreed that this adjustment constitutes compensation in full on behalf of the contractor and its' subcontractors and suppliers for all costs and mark-ups directly or indirectly attributable to the change ordered, for all delays related thereto, and for the performance of the change within the time frame stated."

866.     Exhibit 187 is a true and accurate copy of Asbestos Waterline Change, dated 01/09/15.

867.     Linda Smith, CBRE Heery, failed to communicate with the Plaintiffs regarding the facts and circumstances surrounding the Asbestos Waterline Change and the cost and time impacts attributable to the change, including the delays related thereto.

868.     By accepting compensation for the Asbestos Waterline Change, and by not communicating with the Plaintiffs regarding the opportunity to receive compensation for the cost and time impacts attributable to the change, including the delays related thereto, Linda Smith, CBRE Heery, placed itself above the Plaintiffs, to the Plaintiffs detriment ("CBRE Heery's First Fiduciary Breach").

869.     On February 29, 2016, the USACE issued CBRE Heery a letter titled "Lack of Progress," which states, in part:

> "Dear Ms. Smith: Based on last month's progress earnings and the projected progress earnings currently under review for this month, this office is very concerned about your company's ability to maintain schedule […]."

870.    On May 24, 2016, the USACE issued CBRE Heery a letter, which states, in part:

> "Dear Ms. Smith: After a thorough review and analysis of last month's project schedule, this office is extremely concerned about your company's ability to maintain schedule and your ability to complete the project by the contractually agreed upon completion date […]."

871.    On May 15, 2017, the USACE issued CBRE Heery a letter titled "Progress and Project Completion," which states in part:

> "Dear Ms. Smith: I am extremely concerned about the Project Schedule and your company's ability to meet the completion dates promised in the May 10, 2017 Red Zone Meeting . . . I am simply expressing my concern to you based on what I am seeing and from what I am hearing from my project staff . . . I am also basing my concern on previous experience with projects of equal size and complexity . . . The dates promised to the Air Force are absolutely critical for successful procurement and coordination of this project. This project is extremely important to USACE and the Air Force Medical Command. Slow progress certainly has my attention and it has also captured the attention of the Contracting Officer and the Chief of Construction in the Savannah District Office. It is very possible that they will require a face to face meeting with yourself and Mr. Kemp in the District Office to discuss progress and the ramifications/penalties of not meeting the project completion date."

872.    Exhibit 188 is a true and accurate copy of USACE Letter to CBRE Heery, dated 05/15/17.

873.    On January 22, 2018, the USACE issued CBRE Heery a letter titled "Facility Completion and Move Date," which states, in part:

> "Dear Ms. Smith: I am very concerned with the amount of remaining work to be completed in the Medical Clinic. I, nor my field staff, see how the New Facility could possibly be ready for a move starting on March 2, 2018. Numerous unfinished items were identified in Serial Letter 08-56-123. To date, Government Architectural Room Inspections have not started and no User Training dates have been officially provided/scheduled. Milestone dates established in Red Zone Meetings have been missed. My field staff is ready for Inspections and will proceed with them as soon as you have completed your Internal Quality Control checks/verification. Due to the amount of remaining work to be accomplished, USACE has notified the Air Force that the move date of March 2, 2018 has been postponed until further notice. Considerable planning and scheduling will be required by the Air Force and various Government Agencies to support the move from the Old Clinic to the New Clinic. At the present time USACE cannot tell

131

the Air Force with any degree of confidence when the facility will be ready for permanent occupancy. USACE will not accept a facility that is not ready nor will it accept a facility with a sizeable punch list. USACE takes great pride in providing our customers with World Class Facilities that are complete and ready for use. My Staff will work closely with your staff and the Air Force to re-establish a realistic move date. I want to remind you that Liquidated Damages are being assessed on a daily basis and will continue to be assessed on a daily basis until project completion. I would highly encourage you to manage/push your subcontractors in every way possible to complete open/punch list items in a timely manner. I expect a written response to this letter no later than January 31, 2018."

874. CBRE Heery repeatedly failed to progress the Project according to the Contract Schedule and repeatedly misrepresented the actual work remaining within its Project Schedule updates.

875. On June 3, 2016, CBRE Heery issued the USACE a letter titled

"Delays to construction due to high water table," which states, in part: "As previously discussed, [CBRE Heery] is requesting a modification for time expended to over excavate and replace saturate soils encountered during site preparation and building foundation excavation. In exchange for USACE's consideration of this request, [CBRE Heery] is requesting a time extension only. All direct costs (including labor, material and equipment) and extended overhead costs will not be pursued […] Originally [CBRE Heery] thought that these schedule impacts could be absorbed in the project schedule. It is now apparent that the schedule impacts will be realized by [CBRE Heery] […] [CBRE Heery] is requesting a 55-day time extension and $0.00 (zero) to the contract for time […]"

876. Without consulting the Plaintiffs, and without acquiring their consent, CBRE Heery placed its own interests above the Plaintiffs and offered to forbear the Plaintiffs legal rights to recover any cost impacts resulting from what CBRE Heery admitted was a 55-day time impact in exchange for a concession in its dealings with the USACE ("CBRE Heery's Second Fiduciary Breach").

877. On June 20, 2016, in the "Contractor's Daily Report," in response to "Any delays encountered," Watson states:

"Building not dried in and waiting for information from [CBRE Heery]."

878. Exhibit 189 is a true and accurate copy of Watson's Daily Report, dated 06/20/16

879. Over the course of construction, CBRE Heery failed to provide the Plaintiffs with sufficient information in necessary time.

880. On June 24, 2016, the USACE issued CBRE Heery a letter titled "Phasing Bio-Environmental Demolition," which states, in part:

> "Dear Mr. Kemp: Reference is made to your letter dated June 2, 2016, requesting a modification for sequence of demolition of the Bio-Environmental Building. Your request has been reviewed by my office and may have partial merit based on the information provided. My office acknowledges that your revised accepted proposal included demolition of Bldg 2810 (Bio-Environmental) prior to constructing the new medical clinic. However, at the Initial Design Kickoff Meeting, [CBRE Heery] should have notified my office the phasing plan being pursued and designed was a change to your contract. Full evaluation of your request can not be performed because you have not identified the impacts."

881. Exhibit 190 is a true and accurate copy of the USACE Letter to CBRE Heery, dated 06/24/16.

882. CBRE Heery failed to properly notify the USACE of an event that CBRE Heery admitted substantially impacted the Project's progress.

883. CBRE Heery's failure to properly notify the USACE regarding the impacts caused by the Phasing Plan prejudiced the Plaintiffs ability to obtain an appropriate remedy to recover for resulting time and cost impacts, including the delays related thereto.

884. On June 24, 2016, the USACE issued CBRE Heery a letter titled "High Water Table Delays REA" which states, in part:

> "Dear Mr. Kemp: Reference is made to your letter dated June 3, 2016, requesting 55 day time extension for high water table impacts. Your request has been reviewed by my office and found to have no merit based on the information provided. Your letter claims the groundwater table was higher than anticipated and impacted your foundation and earthwork. No documentation has been provided to substantiate the differing site condition of a higher groundwater table. Documentation provided only included subcontractor daily reports discussing we soil. Wet soil does not constitute higher groundwater table."

885. Exhibit 191 is a true and accurate copy of the USACE Letter to CBRE Heery, dated 06/24/16.

886. CBRE Heery failed to properly provide documentation in accordance with the Prime Contract requirements to substantiate the differing Site condition that CBRE Heery admitted impacted the Project's progress.

887. CBRE Heery's failure to properly provide documentation necessary to support its claim prejudiced the Plaintiffs ability to obtain an appropriate remedy for the resulting time and cost impacts, including the delays related thereto.

888. On July 28, 2016, CBRE Heery executed a change order (the "Major Sequencing Change") issued by the USACE pursuant to FAR 52.243-4 CHANGES, which states, in part:

> "The contract completion date shall be extended by 60 calendar days by reason of this modification [...] It is further understood and agreed that this adjustment constitutes compensation in full on behalf of the contractor and its' subcontractors and suppliers for all costs and mark-ups directly or indirectly attributable to the change ordered, for all delays related thereto, and for the performance of the change within the time frame stated."

889. Exhibit 192 is a true and accurate copy of USACE Change Order, dated 07/28/16.

890. Linda Smith, CBRE Heery, failed to communicate with the Plaintiffs regarding the facts and circumstances surrounding the Major Sequencing Change and the cost and time impacts attributable to the change, including the delays related thereto.

891. By accepting compensation for the Major Resequencing Change, and by not communicating with the Plaintiffs regarding the opportunity to receive compensation for the cost and time impacts attributable to the change, including the delays related thereto, Linda Smith, CBRE Heery, breached its fiduciary duty to the Plaintiffs detriment ("CBRE Heery's Third Fiduciary Breach").

892. On March 29, 2017, Linda Smith, CBRE Heery, executed a change order (the "Major Design Change") issued by the USACE pursuant to FAR 52.243-4 CHANGES, which states, in part:

> "Total contract price is increased by $501,476 [...] The contract completion date shall be extended by 120 calendar days by reason of this modification [...] It is further understood and agreed that this adjustment constitutes compensation in full on behalf of the contractor and its' subcontractors and suppliers for all costs and mark-ups directly or indirectly attributable to the change ordered, for all

delays related thereto, and for the performance of the change within the time frame stated."

893.    Exhibit 193 is a true and accurate copy of USACE Change Order, dated 03/29/17.

894.    Linda Smith, CBRE Heery, failed to communicate with the Plaintiffs regarding the facts and circumstances surrounding the Major Design Change and the cost and time impacts attributable to the change, including the delays related thereto.

895.    By accepting compensation for the Major Design Change, and by not communicating with the Plaintiffs regarding the opportunity to receive compensation for the cost and time impacts attributable to the change, including the delays related thereto, Linda Smith, CBRE Heery, placed itself above the Plaintiffs, to the Plaintiffs detriment ("CBRE Heery's Fourth Fiduciary Breach").

896.    On April 14, 2017, the USACE issued CBRE Heery a letter titled "Payment Estimate Number 32 Returned," which states, in part:

> "Dear Ms. Smith: Reference is made to your Pay Estimate 32 and updated schedule received in this office on April 10, 2017. Review of your updated schedule has found twelve critical or near critical activities with reduced original durations from your previous schedule update. Reducing original durations has not been approved. No explanation or reasoning for duration reductions was given in the schedule narrative. Since the project is significantly behind schedule, it is unreasonable to justify reduced durations on critical activities without proof of increased resources and manpower, neither of which has been displayed. . . Please correct your schedule update to include the original un-revised durations for the twelve critical or near-critical activities. All future schedule updates must have pre-approval from this office for any logic revisions. All future schedule updates must have pre-approved logic or duration revisions will be returned, unprocessed."

897.    In violation of the Federal Acquisition Regulation, CBRE Heery improperly reduced original durations without prior consent from the Plaintiffs or approval from the USACE.

898.    On June 28, 2017, the USACE issued CBRE Heery a letter titled "Furniture Installation/ Project Scheduling," which states:

> "Dear Ms. Smith: My project field staff has informed me that a large shipment of furniture/equipment is expected to arrive on site July 10. If this information is correct, [CBRE Heery] will not be following the requirements of the RFP, nor

135

will it be following the approved Project Schedule. The RFP clearly describes the inspection process and the proper Government notification period for inspections. Inspections are required by the RFP as mandatory schedule activities. Your current schedule shows pre-final inspections prior to furniture installation . . . It is [CBRE Heery's] responsibility to schedule inspections and it is [CBRE Heery's] responsibility to schedule shipments when spaces are ready. USACE will not compromise quality for a lack of planning/scheduling on [CBRE Heery's] part. If a large shipment of furniture or equipment is received and the schedule or the inspection process is ignored, you will not be paid for the shipment nor will you be paid for stored materials. My staff will work with your staff in any way possible to keep the project moving in an expeditious manner but requirements will not be ignored or waived because [CBRE Heery] is behind schedule."

899. Over the course of construction, CBRE Heery repeatedly failed to follow the requirements established by the approved Project schedule.

900. Over the course of construction, CBRE Heery compromised quality through a lack of planning and scheduling, by among other things, ignoring the USACE-approved schedule requirement and proper inspection processes.

901. On July 14, 2017, the USACE issued CBRE Heery a letter titled "Pay App 35 Project Schedule Update," which states, in part:

"Dear Ms. Smith: I have reviewed Pay App 35 and the Project Schedule/Narrative. Please review and correct the logic associated with the 60 calendar day window in which the New Clinic is occupied with the existing Clinic still in operation. The schedule shows that the 60 calendar day window starting on 8-15-17 with an open for business date on 10-3-17. The schedule needs to show that the 60 day period starts at Beneficial Occupancy per contract requirements. USACE has no intention of requiring no work to occur in the 60 day period. As stated in various project meetings, USACE intends on allowing work to occur in the 60 day period if it does not affect existing Clinic operations (Asbestos, Lead abatement and similar activities). Also, the schedule shows a Beneficial Occupancy date of 10-03-17 and final I/O inspections on 10-24-17. Please review the logic in Phase three (3) of your schedule and correct as necessary. The schedule also needs to show a realistic completion date. Based on a recent walk thorough inspection, a substantial amount of work still needs to be performed in all areas of the facility. At the current time, I cannot estimate or predict when the new facility will be ready for use. A considerable amount of work has to be performed by the Air Force, on separate contracts, before the New Clinic can be occupied. I need you to provide a realistic date so my customers can plan accordingly. Show a realistic completion date on the schedule and work

towards that date. If these issues are not fixed on the next Pay App, that Pay App will not be accepted."

902. Over the course of construction, CBRE Heery failed to show a realistic expected Project completion date on its various Project Schedule updates.

903. Over the course of construction, CBRE Heery created and published schedules that had improper logic.

904. On July 14, 2017, the USACE issued CBRE Heery a letter titled "Pre-Final Inspection," which states, in part:

> "Dear Ms. Smith: My project field staff informed me that a Meeting/Inspection was requested on July 13th by [CBRE Heery] . . . My staff agreed to look rooms in more detail but it was already obvious that the rooms were not ready based on unfinished work by multiple trades . . . As you can see from the list generated by my staff, there is a substantial amount of remaining work to be done before an "Official Pre-Final" inspection can be held . . . I want to remind you that proper notification of inspections must be sent to my staff per the RFP. My Staff is very busy and have responsibilities on multiple projects so proper planning, scheduling and notification is very important. This project is extremely important to USACE and our Medical customers so any request made by your staff for inspections will be given a top priority . . . I am aware that you have had some problems with some of your subcontractors but I would like to point out that during the inspection, my staff reported to me that they only saw three (3) tradesmen working in the entire facility. One Plumber, One Electrician and One Sheet Rocker. I realize that the clinic is a large facility and I realize that my staff did not walk the entire facility/site but it is troubling that they only saw three (3) tradesmen for the amount of work that needs to be done. Please look at and manage this staffing situation closely with your project staff . . . My staff will work with your staff in any way possible to keep the project moving in an expeditious manner but Quality and Requirements will not be ignored or lessoned because [CBRE Heery] is behind schedule."

905. Exhibit 194 is a true and accurate copy of the USACE Letter to CBRE Heery, dated 07/14/17.

906. Over the course of construction, CBRE Heery failed to provide proper notification as required by the Prime Contract.

907. The Mechanical Work, the Electrical Work, and the Controls Work all relied upon CBRE Heery to properly plan, schedule, and notify the Plaintiffs of Project events.

908. On August 4, 2017, CBRE Heery issued the USACE an explanation of what happened in the most recent Pay Period and admitted:

> "Schedule slip this period was due to logic changes which required the 60-day transition period to occur after building commissioning and final inspection. Personnel relocations begin 10/12/17."

909. Over the course of construction, CBRE Heery created and published schedules that changed the Project Schedule logic, which resulted in schedule slip.

910. On August 17, 2017, the USACE issued CBRE Heery a letter titled "Structural Steel – Bolted Connections," which states, in part:

> "Dear Ms. Smith: During a recent inspection of the facility, my field staff has discovered two Structural Steel Deficiency's that are of major concern . . . This is very alarming and it must be addressed quickly to ensure the structural integrity of the facility. It is also very alarming that these connections were missed by your Steel Contractor, Third Party Steel Inspector and your Quality Control Team. It is of utmost importance that you develop a plan to promptly address and remedy these concerns with your Structural Designer of Record and your associated Steel Subcontractors/Inspectors. The plan needs to not only address the two locations identified, it also needs to ensure that all other structural connections have been installed per design. Finding problems of this magnitude this late in the project is very troubling and reflects poorly on your company's Quality Control system. I would like to remind you that Quality Control is a major component/factor in your final evaluation."

911. Exhibit 195 is a true and accurate copy of USACE Letter to CBRE Heery, dated 08/17/17.

912. Over the course of construction, CBRE Heery compromised quality through a lack of planning and scheduling.

913. On September 7, 2017, the USACE issued CBRE Heery a letter titled "Gypsum Board Finish," which states, in part:

> "Dear Ms. Smith: Several areas of the facility have Gypsum finishes that look deficient in Critical (Severe) lighting areas. […]. The areas of concern look

deficient in certain lighting conditions and need to be addressed promptly. When this project is complete, we want to turn over a World Class Facility to the Air Force and it is my hope that you want to do the same. Look at the areas of concern with your design/construction team and provide me with a written response on how you intend to address areas with Critical (Severe) lighting per GA-214."

914. Exhibit 196 is a true and accurate copy of USACE Letter to CBRE Heery, dated 09/07/17.

915. Over the course of construction, CBRE Heery compromised quality through a lack of planning and scheduling.

916. On January 12, 2018, the USACE issued CBRE Heery a letter titled "Existing Precast Buildings," which states, in part:

"Dear Ms. Smith: A second letter was sent to my attention regarding the relocation of the Existing Precast Building's on January 11, 2018 from Mr. Frank Kemp. I have reviewed the letter and still maintain my previous position that relocation of the Existing Precast Buildings is within the scope of your contract. Relocation of the buildings was discussed/clarified on four separate Bidder Inquiries from December 7, 2012 – December 21, 2012. (Bidder Inquiry numbers 4938213, 4958934, 4959173 and 4960486) The Governments intent was clarified with the individual responses and was not considered to be a contractual change. Your company is hereby directed to relocate the existing buildings per the contract drawings and documents. Relocation of the buildings has become a time sensitive issue. The buildings must be relocated in the very near future so that final electrical connections can be made prior to the move and occupancy of the new facility. Relocation of the existing precast buildings is within the scope of your contract and a modification to move them is not justified. If you do not concur with the determination of this office, please refer to the terms and conditions of FAR 52.233-1 DISPUTES. I want to remind you that Liquidated Damages are being assessed on a daily basis and will continue to be assessed on a daily basis until project completion. I consider multiple letters on this issue to be counterproductive. I would highly encourage you and your company to concentrate all remaining efforts and resources on completing this project in an expeditious manner."

917. CBRE Heery's failure to understand its base scope of work and to perform according to the Prime Contract impacted the Plaintiffs performance, for instance, Watson's ability to complete the final electrical connections prior to the move and occupancy of the new facility.

918. On January 16, 2018, the USACE issued CBRE Heery a letter titled "Pre-Final and Final Inspections," which states, in part:

> "Dear Ms. Smith: A letter was sent to my attention regarding Pre-Final and Final Inspections from Mr. Frank Kemp on December 14, 2017. Upon receipt of the letter, my field staff made appropriate preparations and planned for Pre-Final Inspections on January 3, 2018 as requested. To date, no inspections have occurred due to the fact that the building is not ready for inspections. It is my understanding that Internal Quality Control Inspections are still ongoing and no date has been re-established for Pre-Final Inspections with the Government. It has also been brought to my attention that this letter was also intended to serve as the required 21 calendar day notification for the Furniture, Fixture and Equipment (FFE) inspections. The following items are not ready/complete for inspection […] My staff is ready for Inspections and will proceed with them as soon as you have completed your Internal Quality Control checks/verification. The FFE inspections will require an additional level of inspections from the Air Force Medical Support Agency (AFMSA). Proper notification (21 days) is essential for scheduling and travel arrangements. I want to remind you that Liquidated Damages are being assessed on a daily basis and will continue to be assessed on a daily basis until project completion. I would highly encourage you to manage/push your subcontractors in every way possible to complete open/punch list items in a timely manner."

919. Exhibit 197 is a true and accurate copy of USACE Letter to CBRE Heery, dated 01/16/18.

920. CBRE Heery's failure to understand and be aware of the actual Project status impacted the Project's progress, for instance, the ability of the Project to pass Pre-Final Inspections.

921. The Mechanical Work, the Electrical Work, and the Controls Work all relied upon CBRE Heery to properly plan, schedule, and notify the Plaintiffs of Project events, such as Pre-Final Inspections.

922. On March 15, 2018, the USACE issued CBRE Heery a letter titled "Inspections – Site/Civil (Partial)," which states, in part:

> "Dear Ms. Smith: In accordance with Attachment "Q" (Acceptance & Closeout Requirements of the RFP) my staff started Civil/Site Inspections in various locations of the project on March 14th 2018. Frank Kemp stated that inspections could [not] be conducted by my staff due to the unresponsiveness of Civil Works Contracting (CWC). My staff has repeatedly asked for final inspections of the site per the requirements of the USACE Three Phase Inspection process. The Three Phase Inspection process is not only a requirement, it is part of the projects

approved Quality Control Plan. CWC was not willing to participant [sic] in the inspections so my staff did it on their own in an effort to help push the project along. Many deficiencies were found and noted. Enclosed you will find a list of punch list items and pictures in various locations (Partial). Additional items for the remainder of the site will follow, by letter, as they are completed. Please ensure these items get corrected in a timely manner."

923.    Exhibit 198 is a true and accurate copy of USACE Letter, dated 03/15/18.

924.    During the course of construction, CBRE Heery's failure to enforce the timely performance of its other Project subcontractors impacted the Plaintiffs performance.

925.    On June 25, 2018, the USACE issued CBRE Heery a letter titled "Liquidated Damages" which states, in part:

"Dear Mr. Kemp: Reference is made to your letter, dated June 18, 2018, requesting cessation of liquidated damages and my letter 08-56-115, dated October 23, 2017, concerning liquidated damages. Your request can not be granted at this time. As stated in my previous letter, liquidated damages will be assessed for each calendar day until completion of all project phases including the last phase. Currently, your company has recently transitioned from Phase 3 to Phase 4. You have Phases, 4, 5, 6, and 7 to complete. It is estimated you have approximately 6 months of work remaining and over $ 4,000,000 of work to complete. I disagree with your statement 'All remaining work items are considered minor nonconformance which do not affect the intended purpose of the project.' Currently, this project is incomplete and the entire project has not been accepted in accordance with contractual requirements."

926.    Exhibit 199 is a true and accurate copy of USACE Letter to CBRE Heery, dated 06/25/18.

927.    CBRE Heery materially failed to perform each of the following, but not limited to the following, duties with a reasonable standard of care: (1) to resolve requests for information timely; (2) to timely notify subcontractors of changes impacting the Project Schedule; (3) to resolve changes and issues impacting the Project's progress; (4) to effectively issue field instructions; (5) to effectively maintain the Project Schedule; (6) to effectively administrate the Contract; (7) to accurately represent the Project's progress in periodic schedule updates; (8) to implement and enforce appropriate measures to recover the Contract Schedule; (9) to place the interests of its subcontractors above the interests of itself; (10) to

properly notify the USACE in the event that an issue impacted the Project's progress so as to not prejudice the Plaintiffs; (11) to properly make claims impacting the subcontractors in accordance with the Prime Contract requirements ("CBRE Heery's Grossly Negligence Conduct as CM At-Risk").

928.     As a direct and proximate cause of CBRE Heery's failure to manage the Project in accordance with the reasonable standard of care similar to a like-situated Construction Manager At-Risk, SPC has been damaged in an amount to be proven at trial**,** together with interest at the maximum legal rates from dates according to proof, and attorneys' fees and costs.

929.     As a direct and proximate cause of CBRE Heery's failure to manage the Project in accordance with the reasonable standard of care similar to a like-situated Construction Manager At-Risk, Schneider has been damaged in an amount to be proven at trial**,** together with interest at the maximum legal rates from dates according to proof, and attorneys' fees and costs.

930.     As a direct and proximate cause of CBRE Heery's failure to manage the Project in accordance with the reasonable standard of care similar to a like-situated Construction Manager At-Risk, Watson has been damaged in an amount to be proven at trial, together with interest at the maximum legal rates from dates according to proof, and attorneys' fees and costs.

## EIGHTEENTH CLAIM FOR RELIEF

(CBRE Heery Acted as Design-Build Installation & Outfitting Contractor with Negligence)
(*Plaintiffs v. CBRE Heery et. al.*)

931.     The Plaintiffs reallege and incorporate by reference Paragraph 1 through Paragraph 930 as if fully set forth herein.

932.     The Prime Contract assigned CBRE Heery with the responsibility to act as the Project Design-Build Installation & Outfitting contractor, component integrator, Architect of Record, and Engineer of Record (the "DBIO Contractor").

933.     On its website, CBRE Heery advertised:

> CBRE | Heery designed and constructed a replacement for the existing 50-year-old, obsolete medical clinic (Building 2800) at Seymour Johnson Air Force Base.

142

The new state-of-the-art primary care clinic will provide world-class care to the servicemen and women and their families while promoting a healing environment. The striking design employed a tensioned fabric roof system that was symbolic of an airplane wing which yielded a light and airier environment. Sustainable features included a green roof to provide both surface cooling for the structure and a place for respite for patients and visitors. This is a unique, integrated procurement process for design, construction, and IO&T that utilizes all of the CBRE | Heery IPD services including BIM, but maintains a much higher level of design and budget control because of CBRE | Heery's integrated delivery. CBRE | Heery provided the potential for cost savings through value engineering during the design process allowing for the achievement of a 0-Sum contract change.

934.    To discharge its duty as DBIO Contractor, CBRE Heery internally assumed the responsibility to design and coordinate the vast majority of the Project Design, including but not limited to: (1) the Civil Design; (2) the Structural Design; (3) the Interior Design; (4) the Architectural Design; (5) the Landscape Design; (6) the Furniture Fixture & Equipment Design ("FFE Design"), to name a few.

935.    Under III. ADMINISTRATIVE REQUIREMENTS, A. DESIGN MEETINGS, 5. Meeting logistics, the Prime Contract states:

"Design Builder is responsible to coordinate the meeting preparation at the facility with HFO, USACE, and Med Group ahead of the design review meetings."

936.    Under FAR § 52.236-23, Responsibility of the Architect-Engineer Contractor (Apr 1984): Subsection (a), the Federal Acquisition Regulation states:

"The Contractor shall be responsible for the professional quality, technical accuracy, and the coordination of all designs, drawings, specifications, and other services furnished by the Contractor under this contract. The Contractor shall, without additional compensation, correct or revise any errors or deficiencies in its designs, drawings, specifications, and other services."

937.    Under FAR § 52.236-23, Responsibility of the Architect-Engineer Contractor (APR 1984): Subsection (b), the Federal Acquisition Regulation states:

"Neither the Government's review, approval or acceptance of, nor payment for, the services required under this contract shall be construed to operate as a waiver of any rights under this contract or of any cause of action arising out of the performance of this contract, and the Contractor shall be and remain liable to the

Government in accordance with applicable law for all damages to the Government caused by the Contractor's negligent performance of any of the services furnished under this contract."

938.    Under Chapter 83A, "Architects," § 83A-1, "Definitions," Subsection (7), North Carolina statutory law states:

"Practice of architecture' means performing or offering to perform or holding oneself out as legally qualified to perform professional services in connection with the design, construction, enlargement or alteration of buildings, including consultations, investigations, evaluations, preliminary studies, the preparation of plans, specifications and contract documents, administration of construction contracts and related services or combination of services in connection with the design and construction of buildings, regardless of whether these services are performed in person or as the directing head of an office or organization."

939.    If a DBIO Contractor enters into a construction project in connection with the design of buildings, then the industry, the professional community, and the law imposes upon that entity certain duties that it owes to the participants in that construction marketplace, regardless of whether the entity is in contractual privity with the party alleging breach.

940.    When CBRE Heery engaged in design on the Project, the industry, the professional community, and the law imposed upon CBRE Heery certain duties, which all DBIO Contractors owe to any and all construction marketplace participants, independent of whether the DBIO Contractor is operating under a contract.

941.    Under Section 21 NCAC 02.0202, "Applicability of Board Rules," the North Carolina Board of Architecture states:

"Rules adopted and published by the Board under provisions of Chapter 83A and Chapter 150B shall be binding upon every individual holding a license from the Board, and upon all professional corporations legally authorized to offer or to perform architectural services in this state. All licensees of the Board are charged with having knowledge of the existence of the Board rules and shall be deemed to be familiar with and have an understanding of their provisions. Each licensed person and entity shall affirm in their renewals that they have read the current architectural laws and rules." (the "Board's Rules")

144

942. The Board's Rules applied to CBRE Heery's performance on the Project, and CBRE Heery had a legal obligation to know and satisfy them.

943. Under Section 21 NCAC 02.0203, "General Obligations of Practice," the North Carolina Board of Architecture states:

> "As a primary obligation and responsibility, the architect shall conduct his office and all aspects of his practice in such manner as to 'safeguard life, health and property' . . . [i]n addition, an architect is also charged with the following personal and professional obligations of good practice: (1) the concern and purpose of the profession or architecture are the creation of a physical environment of use, order, and beauty through the resources of design, economics, technology, and management. The physical environment includes a spectrum of elements serving man, from the artifact and the building to the community and the region. (2) The profession of architecture calls for individuals of the highest integrity, judgment, business capacity and artistic and technical ability. An architect's honesty of purpose must be above suspicion. An architect acts as professional adviser to his client and his advice must be unprejudiced."

944. Under Section 21 NCAC 02.0210, "Incompetence," the North Carolina Board of Architecture states:

> "(a) In practicing architecture, an architect shall act with reasonable care and competence and shall apply the technical knowledge and skill which is ordinarily applied by architects of good standing, practicing in the same locality; (b) In designing a project, an architect shall take into account all applicable state and municipal building laws and rules . . . an architect shall not design a project in violation of such laws and rules […] I Architects preparing plans for building permits for projects . . . shall submit plans that are complete and buildable. Such plans shall conform with the State Building Code and local plan submission requirements. Professional judgment shall be exercised to reflect sufficient documentation necessary for plan approval."

945. CBRE Heery had a duty to perform all of its acts as DBIO Contractor with competence and reasonable care.

946. CBRE Heery, as Architect of Record and DBIO Contractor, owed all Project participants, and the greater public, the following duties: (1) to perform its duties with reasonable diligence; (2) to ensure that the Project Design met the intended use and purpose; (3) to develop and complete the Project Design in accordance with all applicable law; (4) to complete the Project Design timely; (5) to ensure that

the Project Design was accurate, buildable, and compatible with existing conditions; (6) to ensure that all design systems were properly integrated into the whole Project Design; (7) to apply good judgment in the resolution of interface issues; (8) to provide competent advice; (9) to provide competent management and coordination of the Project Design; and, (10) to ensure that the Project Design complied with the green building rating system, Leadership in Energy and Environmental Design ("LEED") Silver under the 2009 LEED Healthcare Program.

947. CBRE Heery had to satisfy each of these duties with the applicable standard of care.

948. The Standard of Care applicable to CBRE Heery is well-established by the industry and the law:

> "The DBIO Contractor shall perform its services consistent with the professional skill and reasonable care ordinarily provided by DBIO Contractor practicing in similar locality under similar circumstances. The DBIO Contractor shall perform its services as expeditiously as is consistent with such professional skill and reasonable care and with the orderly progress of the project."

949. Whether a "Standard of Care" is expressed within a contract is immaterial; professional DBIO Contractors practicing architecture impliedly warrant that they have exercised their duties, including their duty to act with diligence, competence, skill, and good judgment, with a sufficient Standard of Care when discharging those duties throughout the practice.

950. When CBRE Heery engaged in design on the Project, CBRE Heery impliedly warranted that it would exercise its duties with a sufficient Standard of Care similar to a like-situated DBIO Contractor.

951. CBRE Heery failed to perform its duties with a reasonable standard of care similar to a like-situated DBIO Contractor.

952. In December 3, 2013, CBRE Heery conducted a "Design Charette," which was an intensive planning session where CBRE Heery collaborated with the USACE to ensure that the Project Design met the USACE's expectations and the requirements established by the Prime Contract and the law.

953.    At the Design Charette, CBRE Heery reassured all Project participants that it planned to finalize the Project design according to the dates established by the Contract Schedule, which included a "Final Design" date of December 17, 2014 (the "Contract-Defined Final Design Date).

954.    Under the Mechanical Contract, CBRE Heery delegated to SPC a limited scope, which was to design certain mechanical components of the Project design (the "Mechanical Design"), which included certain components of the facilities' control systems.

955.    SPC delegated to Schneider a limited scope, which was to design certain components of the facilities' control systems, including the automatic temperature control system (the "Controls Design").

956.    Under the Electrical Contract, CBRE Heery delegated to Watson a limited scope, which was to design certain electrical components of the Project design (the "Electrical Design").

957.    Subsequently, Watson and SPC entered into a contract with Crenshaw, pursuant to which Crenshaw agreed to complete the Mechanical Design and the Electrical Design.

958.    Acting as the DBIO Contractor and component integrator, which meant that CBRE Heery had a duty to (and the Plaintiffs relied upon CBRE Heery to) integrate all Project Design elements into the whole, and to ensure that each were compatible, timely installed, and consistent with the Prime Contract's requirements.

959.    On February 28, 2014, the USACE issued CBRE Heery a letter titled "Project Schedule," which states, in part:

> "An electronic copy of the Project Schedule was received today by FedEx. A hard copy of the schedule was also received in the 35% review package. Just to be clear and to avoid confusion about how the Project Schedule gets officially received and approved., I want to take the opportunity to explain the process. The Project Schedule must be submitted in accordance with specification section 01 32 01.00 10 (Project Schedule)."

960.    On June 27, 2014, CBRE Heery issued the "65% Project Design."

961.    Subsequently, CBRE Heery changed the Transformer design criteria from 2000 KVA to 2500 KVA.

962. On August 25. 2014, CBRE Heery issued the "Early Site Package."

963. On October 29, 2014, CBRE Heery issued Architect's Supplemental Instruction #1 ("ASI #1").

964. On October 31, 2014, the USACE issued CBRE Heery a letter titled "Sitework NTP," which states, in part:

> "This office received your revised Early Site Package dated October 21, 2014 and electronic revision ASI#1 dated October 29, 20014 (sic) […] Let this letter serve as your Phase 1 and Phase 2 sitework Notice to Proceed."

965. On November 3, 2014, CBRE Heery issued the "100%" Project Design.

966. On January 16, 2015, CBRE Heery issued the "100% Corrected Final" Project Design.

967. CBRE Heery, their Architectural Design team, and their design subconsultants, including Cazador, did not get all of their coordination items determined for the 100% Corrected Final Project Design submittal.

968. The incomplete 100% Corrected Final Project Design caused continuing and additional corrdination efforts (and drawing changes) to accommodate changes that affected all Project Design systems.

969. On February 11, 2015, CBRE Heery issued Architect's Supplemental Instruction #4 ("ASI #4").

970. On April 22, 2015, CBRE Heery issued Architect's Supplemental Instruction #5 ("ASI #5").

971. On May 20, 2015, CBRE Heery issued Architect's Supplemental Instruction #5 Revision 1 ("ASI #5 Rev. 1").

972. On June 16, 2015, CBRE Heery issued Architect's Supplemental Instruction #5 Revision 2 ("ASI #5 Rev. 2") (the "Issued for Construction Project Design").

973. CBRE Heery provided the Issued for Construction Project Design six months after the Contract-Defined Final Design Date (the "IFC Project Design Delay").

974. On July 10, 2015, CBRE Heery issued Architect's Supplemental Instruction #7 ("ASI #7").

975. On August 13, 2015, CBRE Heery issued Architect's Supplemental Instruction #7 Revision 1 ("ASI #7 Rev. 1").

976. On October 22, 2015, CBRE Heery issued Architect's Supplemental Instruction #7 Revision 2 ("ASI #7 Rev. 2").

977. On January 12, 2016, CBRE Heery issued SPC a Letter of Recommendation, which states, among other things:

> "SPC Mechanical has performed to the highest standards on the SJAFB Medical Clinic Project. They expedited coordination drawings with other trades, submitted shop drawings in advance to ensure equipment was available for installation, their work has exceeded quality requirements and they have performed per the project schedule."

978. On February 11, 2016, CBRE Heery issued Architect's Supplemental Instruction #9 ("ASI #9").

979. On March 11, 2016, CBRE Heery issued Architect's Supplemental Instruction #9 Revision 1 ("ASI #9 Rev. 1").

980. On April 22, 2016, CBRE Heery issued Architect's Supplemental Instruction #10 ("ASI #10").

981. On June 2, 2016, CBRE Heery issued the USACE a letter titled "Letter of Concern," which states, in part:

> "Dear Mr. Blanchard: As discussed in our meeting, progress was significantly impacted in the early portion of the Project . . . Additionally, time has been lost due to delays in ordering permanent medical equipment and furniture due to the numerous changes that have been (sic) incurred. These changes include additional sensaphones, revised medical equipment from new (recently purchased) to relocated, and tie-in of the Tricare Building with paging and security access. Details of these delays are currently being assembled and will be forwarded for your review. We believe they will substantiate the reason for the BOD date noted below. Heery International has reviewed the anticipauted building occupancy date for the new medical clinic building We are highly

149

cognizant of the importance of this date for planning purposes. This date must be a realistic date that all parties are confident can be achieved while minimizing the final completion date of the Project. At this time the scheduled completion (BOD) date for the building is December 19, 2016."

982.     On June 8, 2016, Crenshaw issued Electrical Bulletin #11, which responded to Project Design changes initiated by CBRE Heery.

983.     On June 20, 2016, in the "Contractor's Daily Report," in response to "Any delays encountered," Watson states:

"Building not dried in and waiting on information from CBRE Heery."

984.     On January 5, 2017, Schneider, through SPC, issued CBRE Heery RFI 16, requesting necessary information related to the DDC System Design.

985.     On March 17, 2017, SPC followed up with CBRE Heery regarding RFI 16.

986.     On July 26, 2016, Crenshaw issued Mechanical Bulletin #11, which responded to Project Design changes initiated by CBRE Heery.

987.     On August 6, 2016, Crenshaw issued Electrical Bulletin #12, which responded to Project Design changes initiated by CBRE Heery.

988.     On April 4, 2017, as a result of CBRE Heery's DDC System Design Change Directive, Crenshaw issued Electrical Bulletin #13.

989.     On August 17, 2017, the USACE issued CBRE Heery a letter titled "Structural Steel – Bolted Connections," which states, in part:

"Dear Ms. Smith: During a recent inspection of the facility, my field staff has discovered two Structural Steel Deficiency's that are of major concern […] This is very alarming and it must be addressed quickly to ensure the structural integrity of the facility. It is also very alarming that these connections were missed by your Steel Contractor, Third Party Steel Inspector and your Quality Control Team. It is of utmost importance that you develop a plan to promptly address and remedy these concerns with your Structural Designer of Record and your associated Steel Subcontractors/Inspectors. The plan needs to not only address the two locations identified, it also needs to ensure that all other structural connections have been installed per design. Finding problems of this magnitude this late in the project is very troubling and reflects poorly on your

company's Quality Control system. I would like to remind you that Quality Control is a major component/factor in your final evaluation."

990.    On September 14, 2017, Mr. Robert Smith, Cazador, issued Mr. Frank Kemp, CBRE Heery, an email titled "Cazador Seymour Johnson AFB Additional Changes," which states:

"Frank, Sending the attached CO to add power poles/panels and other electrical hardware to the furniture as recently requested. As you are aware the IO Design was complete and accepted without power poles being added to the office furniture."

991.    Exhibit 200 is a true and accurate copy of Cazador Email, dated 09/14/17.

992.    In September 2017, CBRE Heery, acting as DBIO Contractor, caused a Project Design change to happen 34 months after the Contract-Defined Final Design Date.

993.    On September 18, 2017, the USACE issued CBRE Heery a letter titled "Window Blinds and Continuing Construction Activities," which states, in part:

"Dear Ms. Smith: It has come to my attention that a problem exists with the installation of the Window Blinds due to various technical details/issues. The window blind mock up that was presented to my field staff, for approval, was given consideration but was ultimately determined to be inadequate. The proposed solution does not look like a finished product, it looks like an afterthought and it must be changed. Over the course of the project USACE has accepted many designer changes without exception. This deviation does not compliment other architectural features of the facility. Being a Design Build Contractor, you certainly have the flexibility to make revisions to technical problems as long as you obtain Government approval. Coming up with an acceptable solution needs to be a top priority due to the fact that you have decided to place furniture in rooms with active construction and finishing activities still in progress. I am very concerned that furniture was placed in spaces prior to Architectural Pre-Final Inspection and Government acceptance. Furniture and Equipment is very expensive and it has been installed in construction areas without protection. For these reasons, I have instructed my staff to not pay for any furniture or equipment on future Progress Payments . . ."

994.    Exhibit 201 is a true and accurate copy of USACE Letter, dated 09/18/17.

995.    Over the course of construction, CBRE Heery made numerous design changes to correct various errors or omissions, including technical issues, such as those related to the Window Blinds, which the USACE alleged was incompatible with the architectural features of the Facility.

996. CBRE Heery, a practicing architect in the state of North Carolina, the Architect of Record, and the DBIO Contractor on the Project failed to perform all of (but not limited to) the following duties with a reasonable standard of care similar to a like-situated DBIO Contractor: (1) to perform its duties with reasonable diligence; (2) to ensure that the Project Design met the intended use and purpose; (3) to develop and complete the Project Design in accordance with all applicable law; (4) to complete the Project Design timely; (5) to ensure that the Project Design was accurate, buildable, and compatible with existing conditions; (6) to ensure that all design systems were properly integrated into the whole Project Design; (7) to apply good judgment in the resolution of interface issues; (8) to provide competent advice; (9) to provide competent management and coordination of the Project Design; and, (10) to ensure that the Project Design complied with the green building rating system, Leadership in Energy and Environmental Design ("LEED") Silver under the 2009 LEED Healthcare Program.

997. Under FAR § 52.236-23, Responsibility of the Architect-Engineer Contractor (APR 1984): Subsection (d), the Federal Acquisition Regulation states:

> "If the Contractor is comprised of more than one legal entity, each such entity shall be jointly and severally liable hereunder."

998. CBRE and Balfour are jointly and severally liable for CBRE Heery's negligent performance as the Project's DBIO Contractor.

999. As a direct and proximate cause of CBRE Heery's negligent performance as DBIO Contractor, SPC has been damaged in an amount to be proven at trial, together with interest at the maximum legal rates from dates according to proof, and attorneys' fees and costs.

1000. As a direct and proximate cause of CBRE Heery's negligent performance as DBIO Contractor, Schneider has been damaged in an amount to be proven at trial, together with interest at the maximum legal rates from dates according to proof, and attorneys' fees and costs.

1001. As a direct and proximate cause of Watson's negligent performance as DBIO Contractor, Watson has been damaged in an amount to be proven at trial, together with interest at the maximum legal rates from dates according to proof, and attorneys' fees and costs.

## NINETEENTH CLAIM FOR RELIEF

### (Quantum Meruit)

### (*SPC v. CBRE Heery et. al.*)

1002.    The Plaintiffs reallege and incorporate by reference Paragraph 1 through Paragraph 1001 as if fully set forth herein.

1003.    SPC furnished labor, equipment, materials, services, and supplies to the Project at CBRE Heery's direction.

1004.    SPC enriched and conferred benefits upon CBRE Heery by furnishing such labor, equipment, materials, services, and supplies.

1005.    SPC did not intend or expect to confer those benefits gratuitously and did not confer those benefits officiously.

1006.    SPC has been impoverished by furnishing such labor, equipment, materials, services, and supplies to the Project and by not being paid in full.

1007.    CBRE Heery's enrichment and SPC's impoverishment are because CBRE Heery engaged SPC to furnish such labor, equipment, materials, services, and supplies for the benefit of CBRE Heery.

1008.    CBRE Heery retained such labor, equipment, materials, services, and supplies at SPC's expense, without justification.

1009.    Because CBRE Heery requested SPC furnish such labor, equipment, materials, services, and supplies, the circumstances are such that it would be unjust not to pay SPC.

1010.    The total and reasonable value of the benefits conferred by SPC to CBRE Heery is not yet fully ascertained but is at least $3,738,376.

1011.    Should the Court determine that SPC has no remedy at law, equity should allow recovery for SPC's benefit.

## TWENTIETH CLAIM FOR RELIEF

### (Quantum Meruit)

### (*Watson v. CBRE Heery et. al.*)

1012. The Plaintiffs reallege and incorporate by reference Paragraph 1 through Paragraph 1011 as if fully set forth herein.

1013. Watson furnished labor, equipment, materials, services, and supplies to the Project at CBRE Heery's direction.

1014. Watson enriched and conferred benefits upon CBRE Heery by furnishing such labor, equipment, materials, services, and supplies.

1015. Watson did not intend or expect to confer those benefits gratuitously and did not confer those benefits officiously.

1016. Watson has been impoverished by furnishing such labor, equipment, materials, services, and supplies to the Project and by not being paid in full.

1017. CBRE Heery's enrichment and Watson's impoverishment are because CBRE Heery engaged Watson to furnish such labor, equipment, materials, services, and supplies for the benefit of CBRE Heery.

1018. CBRE Heery retained such labor, equipment, materials, services, and supplies at Watson's expense, without justification.

1019. Because CBRE Heery requested Watson furnish such labor, equipment, materials, services, and supplies, the circumstances are such that it would be unjust not to pay Watson.

1020. The total and reasonable value of the benefits conferred by Watson to CBRE Heery is not yet fully ascertained but is at least $3,559,416.

1021. Should the Court determine that Watson has no remedy at law, equity should allow recovery for Watson's benefit.

**TWENTY-FIRST CLAIM FOR RELIEF**

(CBRE Heery Breached the Unfair or Deceptive Trade Practices Act, N.C.G.S. § 75-16)

(*Plaintiffs v. CBRE Heery*)

1022. The Plaintiffs reallege and incorporate by reference Paragraph 1 through Paragraph 1021 as if fully set forth herein.

1023.    To prevail under NCGS § 75-16, the Plaintiffs must prove: (1) that CBRE Heery committed an unfair or deceptive act or practice; (2) that the act or practice was in or affecting commerce; and, (3) that the act or practice proximately caused actual injury to the Plaintiffs.

1024.    To determine whether a representation is deceptive in a business context, its effect on the average businessperson is considered.

1025.    Conduct is interpreted to be unfair or deceptive if it has the capacity or tendency to deceive.

1026.    The facts and circumstances surrounding the deceptive act or practice and the resulting impact on the marketplace determine whether the transaction is unfair or deceptive, and this determination is a question of law for this Court to determine.

1027.    There is ample evidence to support a finding that CBRE Heery committed numerous unfair acts as well as numerous deceptive trade practices, in and affecting the construction marketplace and the commerce flowing through the Mechanical Contract, the Controls Contract, and the Electrical Contract, which proximately caused actual injury to the Plaintiffs.

1028.    The Plaintiffs do not have to prove fraud, bad faith, or intentional deception, but proof of fraud necessarily constitutes a violation of NCGS § 75-16.

1029.    To establish a claim for common law fraud in North Carolina, the Plaintiffs must show: (1) that CBRE Heery made a false representation or concealed a material fact; (2) that it was reasonably calculated to deceive, (3) that it was made with intent to deceive, (4) that it did in fact deceive; and, (5) that the Plaintiffs suffered damage as a result.

1030.    Punitive damages are available under common law fraud.

1031.    When accompanied by aggravating circumstances, such as deception, a mere breach of contract may justify a treble damages recovery under G.S. § 75-1.1.

1032.    When in fact there is a continuous transaction that amounts to unfair and deceptive trade practices it does not matter that the same set of facts also constitutes a breach of contract.

1033.    Under North Carolina common law, the following actions or practices of a contracting party constitute fraud and, consequently, unfair and deceptive trade practices:

(1)    misrepresentations made to secure services and materials with no intent to pay;

(2)    intentionally withheld funds despite knowing such funds belong to the plaintiff;

(3)    when, having a pecuniary interest, a contracting party supplies information to guide a counterparty, without exercising reasonable care in communicating that information, such as providing false or misleading information about the status of construction, expected date of completion, and quality of the construction;

(4)    obtaining funds to pay subcontractors and material suppliers and then failing to pay them;

(5)    depriving a contracting party, for a significant period of time, money that it was unquestionably entitled to receive;

1034.    In pursuing a violation of § 75-1.1, knowing misrepresentation is not a necessary element, willfulness is not a prerequisite, and Good Faith is not a defense.

1035.    Under the Unfair or Deceptive Trade Practices Act, this Court, in its discretion, may treble the damages sustained by the Plaintiffs, as well as award attorneys' fees upon a finding that CBRE Heery willfully engaged in the act or practice, and that there was an unwarranted refusal by such party to fully resolve the matter which constitutes the basis of such suit.

1036.    There is ample evidence to support the finding that CBRE Heery willfully engaged in unfair acts and deceptive practices, and there was an unwarranted refusal by CBRE Heery to fully resolve the matter which constitutes the basis of this Complaint, and for these reasons, this Court should, in addition to trebling the damages, award attorney fees.

1037.    In order for misrepresentation to form the basis for an unfair and deceptive trade practices claim, a contracting party's words or conduct must possess the tendency or capacity to mislead or create the likelihood of deception.

1038. In general, this Unfair and Deceptive Trade Practices Act claim is based upon numerous unfair acts and deceptive trade practices committed by CBRE Heery, which occurred in the stream of commerce, and which significantly impacted the specific and broader construction marketplace, and which in fact damaged the Plaintiffs, and which include, but are not limited to the following unfair acts:

(1)     CBRE Heery has intentionally withheld Mechanical Contract amounts owed, for over 43 months, despite knowing that such funds belong to SPC, which has caused SPC to suffer damages ("CBRE Heery Unfair Payment Withholding Acts");

(2)     CBRE Heery has intentionally withheld Electrical Contract amounts owed, for over 43 months, despite knowing that such funds belong to Watson, which has caused Watson to suffer damages ("CBRE Heery Unfair Payment Withholding Acts");

(3)     CBRE Heery obtained Insurance Loss proceeds from the Insurer, on behalf of SPC, who was in fact damaged by the Insurable Event, and then CBRE Heery intentionally withheld those proceeds for at least 24 months, and upon information and belief, used those proceeds, despite knowing that such funds belonged to SPC, which has caused SPC to suffer damages ("CBRE Heery Insurance Fraud");

(4)     CBRE Heery wrongfully back-charged SPC and Watson for duration-related damages connected to the DDC System Design Change Directive, despite acknowledging that the Plaintiffs had complied with the original contract requirements, and despite making a claim for duration-related damages to the USACE and in so doing impliedly warrant, through the Severin Doctrine, that CBRE Heery is liable to the Plaintiffs for the damages caused by the CBRE Heery DDC System Design Change Directive (the "CBRE Heery Unfair DDC Issue Double Dealing");

(5)     CBRE Heery has intentionally concealed the nature and characteristics of Balfour's relationship to CBRE Heery, the USACE, the Project, and the liability related to the Causes of Action made in this Complaint, which is a concealed material fact, which has impacted the Plaintiffs ability to avoid the unnecessary waste caused by complex construction litigation ("CBRE Heery's Material Fact Concealment")

Altogether, these circumstances (but not only these circumstances) represent "CBRE Heery's Unfair Acts."

1039.    In general, this Unfair and Deceptive Trade Practices Act claim is based upon numerous unfair acts and deceptive trade practices committed by CBRE Heery, which occurred in the stream of commerce, and which significantly impacted the specific and broader construction marketplace, and which in fact damaged the Plaintiffs, and which include, but are not limited to the following deceptive trade practices:

(1)     CBRE Heery, having a substantial pecuniary gain, grossly misled the Plaintiffs by, among other things, negligently misrepresenting the expected time for performance, which induced the Plaintiffs to extend operations and suffer damages ("CBRE Heery's Gross Misrepresentation");

(2)     CBRE Heery, having a substantial pecuniary gain, grossly misled the Plaintiffs by, among other things, negligently misrepresenting the status of construction, expected date of completion, and quality of the construction, which induced the Plaintiffs to extend operations and suffer damages ("CBRE Heery's Deceptive Representation of Status");

(3)     Despite knowing that CBRE Heery's other Project subcontractors, including Southern Glass & Mirror, had caused major Project delay, which the Plaintiffs did not cause and could not possibly have controlled, and which led the USACE to enforce the recovery of liquidated damages, CBRE Heery, on multiple

occasions, threatened SPC and Watson with delay damages with the intent to induce, and it did induce, the Plaintiffs to accelerate their operations and suffer damage ("CBRE Heery's Deceptive Back-charge Threats");

(4)     CBRE Heery, having a substantial pecuniary gain, executed multiple Change Orders with the USACE, and certified within those Change Orders that the compensation obtained is made "on behalf of" the Plaintiffs and in full satisfaction of any amounts due to Plaintiffs, despite knowing that it had not received any consent from the Plaintiffs to forbear the Plaintiffs legal rights ("CBRE Heery's Deceptive Fiduciary Practices");

(5)     CBRE Heery repeatedly seized control and usurped the means, methods, schedule, strategy, and sequence of production related to the Electrical Work and the Mechanical Work, by, among other things, misdirecting the Plaintiffs to perform out-of-sequence installation, misdirecting the Plaintiffs to increase labor and to work during premium times, misdirecting the Plaintiffs to accelerate the Mechanical Work and the Electrical Work, and then denying Just compensation ("CBRE Heery's Unjust Dominion and Control Practices");

(6)     Over the course of construction, CBRE Heery repeatedly misrepresented and deceived the Plaintiffs with respect to CBRE Heery, and Balfour's intent to resolve the Plaintiffs requests for an equitable adjustment to the Mechanical Contract and the Electrical Contract, despite ultimately failing to make any meaningful attempt to resolve the Causes of Action made in this Complaint, and in so doing induced the Plaintiffs to substantially increased the damages sustained ("CBRE Heery's Deceptive Resolution Delay Practices")

Altogether, these circumstances (but not only these circumstances) represent "CBRE Heery's Deceptive Trade Practices."

1040. CBRE Heery's Unfair Acts and CBRE Heery's Deceptive Trade Practices occurred over the course of construction, and have included multiple false representations and concealment of material facts, which were reasonably calculated to deceive, and were made with the intent to deceive, and which did in fact deceive, and did in fact induce the Plaintiffs to finance, out-of-pocket, the expenditure of substantial labor, equipment, materials, services, and supplies for CBRE Heery's pecuniary gain ("CBRE Heery's Fraudulent Resolution Delay Strategy").

1041. On January 12, 2016, CBRE Heery issued SPC a letter, which stated that SPC had furnished such labor, equipment, materials, services, and supplies in compliance with the Mechanical Contract and performed to the highest standards:

> "SPC Mechanical has performed to the highest standards on the SJAFB Medical Clinic Project. They expedited coordination drawings with other trades, submitted shop drawings in advance to ensure equipment was available for installation, their work has exceeded quality requirements and they have performed per the project schedule. I would not hesitate to issue them another subcontract and would recommend them for any upcoming project that you may have."

1042. CBRE Heery knew and admitted that SPC—at least—did not cause or control the Project issues that caused delay and disruption prior to January 12, 2016, which includes delay and disruption caused by CBRE Heery's other Project subcontractors, including Southern Glass & Mirror, for which CBRE Heery made a performance bond claim against.

1043. On October 26, 2016, Mr. Alex Brink, Watson's Project Manager, emailed CBRE Heery stating, in part:

> "Please see attached notice of delay from our subcontractor, Simplex Grinnell. As noted in our schedule letter dated 8/12/16 we share the same concern that the schedule is not accurate on when the building will be ready for beneficial occupancy. We have not seen a copy of the September or October schedule so our concern is based on the August schedule."

1044. CBRE Heery's August Project Schedule update, and CBRE Heery's failure to provide schedules in either September or October, are examples of CBRE Heery's Deceptive Representation of Status practice.

1045.    On February 8, 2017, Watson emailed CBRE Heery and stated:

"Frank, I just wanted to follow up on our meeting on 1/31/17 to discuss/resolve your concerns […] We asked if there had been any major milestones that we had missed making. You mentioned the building dry-in date, but also said that Watson may not have affected that. You said that you were holding our billing to get our attention. You then said you would release it for payment. Our takeaway from the meeting was that we needed to continue to meet the finish dates for our activities and that the building would finish in a logical sequence." (the "CBRE Heery Unfair Payment Withholding Act")

1046.    Exhibit 202 is a true and accurate copy of the Watson Email to CBRE Heery, dated 11/08/17.

1047.    CBRE Heery's admission that it was withholding Watson's billing "to get Watson's attention" is an example of CBRE Heery's Unfair Payment Withholding Acts.

1048.    On April 20, 2017, Watson issued CBRE Heery a letter, which states, in part:

"Dear Mr. Kemp: This letter is to inform you again that we are concerned with the progress of the above-referenced project and we do not believe it will be complete on time. The latest schedule we have received (dated 1/25/17) shows a Beneficial Occupancy date of 6/01/17. Based on our walk through the building on 4/17, there are too many items such as flooring, painting, woodwork, and other finished [sic] left to do to meet this date. The apparent cause of the delay still appears to be the inability to get the building dried in enough to install sheetrock and wood at all locations. We are waiting on Vestibules 1928 and 1962 to be framed so we can complete our fire alarm conduit rough in (see attached photo). This is preventing our fire alarm subcontractor from completing the installation of his cabling which prevents him from megging out his circuits and installing his devices on the first floor. You asked us to meet with you on 1/31/17 because you were concerned with our progress and didn't think we had enough manpower on site because there were areas available for our work, but we didn't have any men working in them. We disagreed because the areas were not fully ready and our manpower was adequate for the work available. However, per your request, we sent additional manpower to the site the following week. As we expected, we completed the areas available and had to wait on ceiling grid to be installed (see attached photo) and we were installing lights and devices in unfinished areas. Please note that we are not responsible for cleaning light lenses covered with construction dust or replacing/straightening device plates that were removed by the painter. We have now had to pull the additional manpower from the job due to the lack of work available."

1049.    CBRE Heery's decision to usurp and control Watson's operations by causing Watson to increase its labor force and then subsequently denying Watson Just compensation for damages resulting from CBRE Heery's exercise of control is an example of CBRE Heery's Unjust Dominion and Control Practices.

1050.    On September 20, 2017, Watson issued CBRE Heery a letter titled "Notice of Intent to Submit a Request for Equitable Adjustment," which states, in part:

> "Dear Mr. Kemp, Watson remains committed to working with [CBRE Heery] to diligently complete the project as rapidly as is reasonably possible under the current circumstances. However, this letter is to notify you that Watson intends to submit a request for an equitable adjustment to the contract as a result of the effects caused by a multitude of project issues, including most recently, the tenth change or delay to the project completion date. These project issues have resulted in Watson suffering substantial financial losses. Accordingly, Watson will seek additional compensation for the costs resulting from these project issues that have been imposed upon us through no fault of our own […] the facts have proven that the contract schedule was not constructible. On September 15, 2017, [CBRE Heery] issued the tenth change or delay to the contract schedule, which moved the completion date to June 18, 2018. The current completion date now reflects a 20-month change or delay to our contract completion date. The constantly changing contract schedule (not to mention the abandoned original phasing plan) has caused chronic unplanned out-of-sequence and piecemeal installations, overtime work, and other effects, which have ultimately made it impossible for Watson to execute the electrical work as originally planned. Watson has previously notified [CBRE Heery] of its concerns with respect to these issues. On August 12, 2016, Watson notified [CBRE Heery] that it was concerned with project progress, and that it did not believe the July 7, 2016 revised schedule was constructible. Several schedule changes later, on April 20, 2017, Watson notified [CBRE Heery] that there were too many items such as flooring, painting, woodwork, and other finishes behind schedule to make the revised schedule practicable. Nevertheless, acting in good faith, Watson continued to diligently execute the electrical work. Unfortunately, these project issues have had a serious effect on Watson's cost of performance. However, to date, Watson has been unable to quantify the damages resulting from these issues based upon [CBRE Heery's] continued assurances that the pace would pick up, obstacles would be removed, and the revised completion date would be hit. But the target continues to shift. Watson can no longer rely on the expectations set by the latest schedule. Thus, Watson will now use its best efforts to quantify the damages associated with these project issues, such as the increased costs associated with innumerable out-of-sequence installations, additional costs due to directed overtime work, and extended costs for supervision and overhead. When

we have sufficient information, we will submit a request for an equitable adjustment to the contract. Through no fault of our own and for reasons that are beyond our control, we have been significantly damaged. Nevertheless, we remain firmly committed to working with [CBRE Heery] to mitigate these damages, and to complete the project as expeditiously as possible for the Corps of Engineers."

1051. Exhibit 203 is a true and accurate copy of Watson Letter to CBRE Heery, dated 09/20/17.

1052. On October 2, 2017, Watson notified Linda Smith, CBRE Heery, that it intended to submit a request for an equitable adjustment to the Electrical Contract as a result of the facts and circumstances impacting the Electrical Work:

"I am writing to request a meeting with you to discuss several important issues affecting Watson's performance on the project. We remain committed to working with [CBRE Heery] to diligently complete the project as rapidly as is reasonably possible under the current circumstances. However, I wanted to inform you that Watson intends to submit a request for an equitable adjustment to the contract as a result of the effects caused by numerous significant project issues, including most recently, the twelfth change or delay to the project completion date. These project issues have caused Watson to suffer substantial financial losses."

1053. As of the date of this Complaint, Linda Smith never accepted any of the Plaintiffs offers to meet to work towards an amicable resolution to the parties Complaint.

1054. On October 6, 2017, Watson issued CBRE Heery a letter titled "Notification of Intent to Submit a Request for Equitable Adjustment," in which Watson states:

"The contract assured Watson that 'time was of the essence,' and represented that all work required by the contract would be completed according to the original phasing plan and with the time specified in the original construction schedule. Consequently, Watson's plans (and contract price) to execute the electrical work fundamentally relied upon the contract schedule and its associated phasing plan, as well as the assurance that time was of the essence. But the facts have proven that the original construction schedule was not constructible. On meeting minutes dated September 13, 2017, [CBRE Heery] issued the twelfth change or delay to the contract schedule that pushed out the completion date […] The constantly changing contract schedule […] has caused chronic unplanned out-of-sequence and piecemeal installations, overtime work, and other negative effects, which have ultimately made it impossible for Watson to execute the electrical work as originally planned […] Through no fault of our own and for reasons that are beyond our control, we have been significantly damages. Nevertheless, we

remain firmly committed to working with [CBRE Heery] to mitigate these damages, and to complete the project as expeditiously as possible for the Corps of Engineers."

1055.    Exhibit 203 is a true and accurate copy of Watson Letter to CBRE Heery, dated 10/06/17.

1056.    On November 2, 2017, in response to SPC's good faith request for "an official approval" before implementing the DDC System Design Change Directive, CBRE Heery emailed SPC and stated:

"Liquidated damages are accruing at + $1,500 / day. [CBRE Heery] fully intends to charge SPC for all damages incurred including extended overhead for SPC's failure to meet project requirements. I highly suggest SPC immediately proceed with this work in order to minimize costs."

1057.    Exhibit 204 is a true and accurate copy of the CBRE Heery Email to Watson, dated 11/02/17.

1058.    CBRE Heery's "high suggestion" to proceed with work related to the DDC Systems Design Change Directive is an example of CBRE Heery's Unfair DDC Issue Double Dealing.

1059.    On November 9, 2017, despite CBRE Heery having complete knowledge of: (1) the CBRE Heery DDC System Design Change Directive; (2) the CBRE Heery Asbestos Waterline Delays; (3) the CBRE Heery Storm Drainage Delays; (4) the CBRE Heery Foundation Delays; (5) the CBRE Heery Structural Steel Delays; (6) the CBRE Heery Approval Delays; (7) the CBRE Heery Curtain Wall Delays; (8) the CBRE Heery Interior Wall Delays; (9) the CBRE Heery Roof Delays; (10) the CBRE Heery Building Enclosure Delays; (11) the CBRE Heery Gross Negligence as Construction Manager At-Risk; (12) the CBRE Heery Unrealistic Contract Schedule; (13) the CBRE Heery Failure to Accurately Represent Project Progress; (14) the CBRE Heery Contract Abandonment; (15) the CBRE Heery Failure to Mitigate Project Impacts, in response to Watson's Notice Letter, dated September 20, 2017, Mr. Frank Kemp, who was later fired by CBRE Heery and replaced by Mr. Ken Cheatwood, stated:

"Watson Electric has a number of outstanding punchlist items that have not been completed. Your claims of being delayed are a direct result of Watson not coordinating their work and a reluctance to staff the project with sufficient work force to complete the work […] please consider this as a 72 hour notice to complete this work immediately to prevent further delays and additional costs." (the "CBRE Heery Bad Faith Rejection")

1060.  On November 12, 2017, in response to the CBRE Heery Bad Faith Rejection, dated

November 9, 2017, Watson issued CBRE Heery a letter that states, in part:

"The purpose of this letter is to address the list of items explained in [CBRE Heery's] email […] dated Thursday, November 09, 2017. Watson Electrical would like to reassure [CBRE Heery] that it is committed to working together in good faith to diligently complete the Project, including all punch-list items, as rapidly as is reasonably possible under the current circumstances for the Corps of Engineers. As previously stated, Watson based its price to execute the electrical work on the contract terms and provisions, which represented – among other things – that the project would be completed by October 20, 2016. The contract assured Watson that 'time was of the essence.' However, innumerable unexpected issues, which were outside of Watson's control, have resulted in a 20-month delay to the final completion date, which far exceeded all parties' expectations at the time of Contract Award. These issues have caused Watson substantial damages. Consequently, Watson has a duty to mitigate these damages for the Corps of Engineers, and has been making its best efforts to do so. This includes efficiently allocating its resources to the Project to complete the electrical work as expeditiously as is possible under the substantially changed Project circumstances […] The above list of items illustrates the typical conditions encountered by Watson on this project. The contract assured Watson that [CBRE Heery] would effectively manage the overall project, and ensure that it was executed according to the original Phasing Plan, Contract Schedule, and industry norm construction sequences. Yet, on countless occasions [CBRE Heery] directed Watson to perform out-of-sequence piecemeal installations, which ultimately contradicted expectations set by the contract. The above list of items also demonstrates [CBRE Heery's] ineffective overall construction management. In the email, [CBRE Heery] states: 'Watson Electric has a number of outstanding punchlist items that have not been completed. Your claims of being delayed are a direct result of Watson not coordinating their work and a reluctance to staff the project with sufficient work force to complete the work.' This statement contradicts the facts, and is demonstrably false. Watson emphatically disagrees with [CBRE Heery's] statement. Watson has previously notified [CBRE Heery] that Watson intends to submit a request for an equitable adjustment to the contract as a result of the effects caused by a multitude of Project issues, including most recently, the 12th change or delay to the overall project completion date. Project issues such as [CBRE Heery's] misdirection, [CBRE Heery's] insistence that Watson 'hurry up and wait', innumerable out-of-sequence and piecemeal installations, to name a few, have cause Watson to suffer substantial financial losses.  Through no fault of our own and for reasons that are beyond our control, we have been significantly damaged. In your email, [CBRE Heery] states that Watson should turn its 'immediate attention' to the items listed. Notwithstanding the fact that Watson continues to be delayed by others on

165

several of these items, Watson assumes that [CBRE Heery] has discussed the project issues with the Corps of Engineers, and the Corps of Engineers has decided to prioritize time over cost. Therefore, Watson will increase its project staff by two full-time electricians for the remainder of the project, who will serve on stand-by. This letter hereby notifies [CBRE Heery] that Watson is not responsible for the unproductive downtime caused by [CBRE Heery's] direction to prioritize time over cost. Notwithstanding severe financial losses, Watson remains committed to working with [CBRE Heery] to mitigate the damages caused by a multitude of project issues, and to complete the project as expeditiously as possible for the Corps of Engineers."

1061.   Exhibit 205 is a true and accurate copy of Watson Letter to CBRE Heery, dated 11/12/17.

1062.   On November 15, 2017, the USACE issued CBRE Heery PAY ESTIMATE – CONTRACT PERFORMANCE ESTIMATE NO. 39, which states, in part:

"Retainage – 10% held for lack of progress and failing to maintain schedule."

1063.   Exhibit 206 is a true and accurate copy of USACE Pay Estimate 39 Remarks, dated 11/15/17.

1064.   On November 19, 2017, Watson issued CBRE Heery a letter that states, in part:

"As stated in Watson's letter dated November 12, 2017, Watson remains committed to working with [CBRE Heery] to mitigate the damages caused by a multitude of project issues, where (sic) were outside of Watson's control. […] As stated in our previous letter, Watson's interpretation of your direction to 'complete this work immediately' is that [CBRE Heery] has decided to prioritize time over cost. In response, Watson has increased its project staff by two full-time electricians. These electricians will be on stand-by for the remainder of the project, until such time as [CBRE Heery] directs otherwise. As indicated, Watson believes that your direction will result in a 'hurry up and wait' scenario, which will add cost to the project. Issues, such as this one, will for the basis for Watson's request for an equitable adjustment, which Watson is diligently working to complete. Watson would like to reassure [CBRE Heery] that we are dedicated to putting the Corps of Engineers first."

1065.   Exhibit 206 is a true and accurate copy of Watson Letter to CBRE Heery, dated 11/19/17.

1066.   On January 25, 2018, Watson offered to meet to discuss the Project issues with the aim to reach a fair and amicable resolution.

1067.   On June 7, 2018, Watson emailed Linda Smith, CBRE Heery, and stated:

"Linda, Watson has been seriously damaged on the SJAB project. Further to my voicemails and emails over the past month to you, I would like to schedule some time to discuss a path forward regarding SJAB project issues. I am hopeful that through discussion we can resolve them." (the "CBRE Heery Unfair Payment Withholding Acts")

1068.    On June 7, 2017, in response to Watson's email, Linda Smith, CBRE Heery, stated:

"I am on a project in Lafayette, LA and am no longer traveling to Seymour Johnson. Ken Cheatwood is now working with Frank to get the project completed and is frequently at the jobsite." (the "CBRE Heery Linda Smith Reassignment")

1069.    Exhibit 207 is a true and accurate copy of the email exchange, dated 06/07/18.

1070.    Shortly after CBRE Heery-defined Substantial Completion Date, CBRE Heery fired its Project Manager, Mr. Frank Kemp, and replaced him with Mr. Ken Cheatwood (the "CBRE Heery Frank Kemp Firing").

1071.    The CBRE Heery Smith Reassignment and the CBRE Heery Frank Kemp Firing demonstrate that, following the CBRE Heery-defined Substantial Completion Date, CBRE Heery abandoned the Mechanical Contract, the Electrical Contract, and the Project as a whole.

1072.    On June 29, 2018, Mr. Ken Cheatwood, CBRE Heery, met with Mr. Wendell Vinson, to discuss Watson's REA.

1073.    On July 16, 2018, Mr. Glenn Jardine, CBRE Heery's President, in reply to Mr. Tom Headlee, Watson's President, stated:

"Tom – I'd be happy to meet, let's check the dates a few weeks before then because my travel is unpredictable and turns on a dime. If I am in town – we will definitely get together. That has not been a great project for us, either; and I'd endorse having Ken and Wendell continue the discussion. I personally do not believe the COE has treated us fairly when we have requested REAs […] so more than happy to meet. Best regards – Glenn"

1074.    Exhibit 207 is a true and accurate copy of CBRE Heery Email to Watson, dated 07/16/18.

1075.    On July 24, 2018, Ms. Kristy Surles, SPC's Senior Construction Administrator, notified CBRE Heery that its ongoing failure to promptly pay SPC had forced SPC to turn to the Surety:

"All attempts made by SPC Mechanical for payment information, via countless emails, phone calls and messages, have gone unanswered. The account is well over 7 months past due. If you do not respond regarding payment by close of business Wednesday, July 25th, we will be forced to contact the bonding agency. Thank you in advance for your immediate attention to this urgent matter."

1076. On July 31, 2018, Mr. Ken Cheatwood, CBRE Heery, emailed SPC, and stated, in part:

"Per our telephone call last week, I said I would get back with you after I got up to speed with why SPC payment is being held. Yesterday I was in the [CBRE Heery] Atlanta office and got with Linda Smith to get the details on the current payment status with SPC. She explained to me that the initial design as done by SPC was changed. She explained to me that [CBRE Heery] believed SPC's original design was per the contract documents and that SPC & [CBRE Heery] have the right to pursue the additional time and cost associated with the redesign change […] Currently the total payment being held by [CBRE Heery] is $188,396 through CO #10 this includes $139,104 for LD's and partial [CBRE Heery] overhead costs."

1077. Exhibit 209 is a true and accurate copy of the CBRE Heery Email to SPC, dated 07/31/18.

1078. CBRE Heery's threat to charge SPC with liquidated damages and other duration-related damages on July 31, 2018, is an example of CBRE Heery's Deceptive Back-charge Threat practice.

1079. On August 3, 2018, Watson emailed CBRE Heery, and stated:

"See below email between Glenn Jardine and Tom Headlee. As indicated in the email, I would like to set up a time you and I could continue discussing the issues on the project."

1080. On August 9, 2018, Mr. Ken Cheatwood, CBRE Heery, met with Mr. Wendell Vinson, Watson, to discuss the Project issues and Watson's proposed path to reach an amicable resolution.

1081. On August 13, 2018, Watson emailed CBRE Heery a copy of the documents presented at the 09/09/18 resolution meeting, stating:

"I thought we had a productive discussion. As I've stated on many occasions, Watson is committed to reaching an amicable resolution to the issues. […] I also wanted to thank you in advance for taking the time to meet in Raleigh in a few weeks. Let me know a date and time, and I'll make myself available. At that meeting, I would like to share with you Watson's original estimate and plans to execute the electrical work."

1082.    Exhibit 210 is a true and accurate copy of the Watson Email to CBRE Heery, dated 08/13/18.

1083.    On August 20, 2018, CBRE Heery emailed SPC and stated:

> "I spoke with Styron on Friday the 10th and he informed me Southern Piping's position stating that if [CBRE Heery] would not make a payment to Southern Piping, Southern Piping would not be helping [CBRE Heery] with the DDC REA pursuit and has informed its subcontractor (Schneider) to not speak with [CBRE Heery] regarding same. I conveyed this to Linda Smith. On the same day and the response is; [CBRE Heery] will be proceeding with the REA on its own and no further payment will be made to Southern Piping unless [CBRE Heery] receives approval and payment for the DDC REA from the USACE. In closing [CBRE Heery] again reiterates its belief it is to Southern Piping's benefit and advantage to participate with [CBRE Heery] in pursuit of the DDC REA since there are three months of liquidated damages at stake."

1084.    Exhibit 211 is a true and accurate copy of the CBRE Heery Email to SPC, dated 08/20/18.

1085.    On August 23, 2018, Mr. Wendell Vinson, Watson's Project Executive, met with Mr. Ken Cheatwood, CBRE Heery's Project Executive, at which Mr. Vinson presented evidence in support of Watson's claim.

1086.    On August 24, 2018, CBRE Heery, through Linda Smith, notified SPC that the DDC System Design Change Directive resulted in significant duration-related damages:

> "At issue is the 3-month delay associated with the DDC controls. That delay is worth $136,080 in LD's not to mention another 3 months of general conditions […] The cost of the work may not be significant, but the delay certainly is […]."

1087.    On August 29, 2018, Mr. Wendell Vinson, Watson's Project Executive, met with Mr. Ken Cheatwood, CBRE Heery's Project Executive, at which Mr. Vinson presented evidence in support of Watson's claim.

1088.    On October 16, 2018, Watson's Project Leaders and CBRE Heery's Project Leaders met to discuss the Project issues that caused Watson to suffer substantial financial losses.

1089. On October 18, 2018, Watson emailed CBRE Heery, and reassured CBRE Heery that it was committed to negotiating a fair and equitable resolution to the parties' dispute:

> "As promised, please find attached a copy of the presentation. From the beginning, Watson's main goal was, and continues to be, to work towards a common understanding of the facts and circumstances surrounding the project issues, which has caused Watson to suffer major losses. We believe that the facts prove that the issues, which were far beyond Watson's control, seriously impacts Watson's plans to complete the electrical work on time and on budget. Nevertheless, acting in good faith, and for the benefit of the Corps and all parties to the project, Watson diligently worked to complete the electrical work as quickly as possible for [CBRE Heery]. Watson is now seeking nothing more than fair treatment."

1090. Exhibit 212 is a true and accurate copy of Watson Email to CBRE Heery, dated 10/18/18.

1091. On October 22, 2018, having exhausted its good faith efforts to reason with CBRE Heery, SPC provided the Surety with notice of its intent to submit a payment bond claim.

1092. Exhibit 213 is a true and accurate copy of SPC Letter to the Surety, dated 10/22/18.

1093. On November 9, 2018, the Surety acknowledged receipt of SPC's correspondence dated 10/22/18, and advised that Travelers is designated as the lead surety and authorized to conduct an investigation of this claim.

1094. Exhibit 214 is a true and accurate copy of Surety Letter to SPC, dated 11/09/18.

1095. On November 11, 2018, Mr. Glenn Jardine, CBRE Heery's Executive Officer, emailed Mr. Tom Headlee, Watson's President, stating in part:

> "I'll make sure we address your concerns & get this resolved." ("Jardine's First Deceptive Representation")

1096. In Jardine's First Deceptive Representation, CBRE Heery assured Watson that CBRE Heery would address and resolve Watson's request for an equitable adjustment to the Electrical Contract.

1097. As a direct and proximate cause of Jardine's Deceptive Representation, Watson forbore its then-existing legal position and, in good faith, continued to spend corporate resources to complete the Project, and to present the facts to CBRE Heery, despite sustaining increased damages.

1098.  On November 12, 2018, SPC submitted to the Surety certain enclosures in support of SPC's claims.

1099.  On November 14, 2018, Watson issued CBRE Heery a letter, which states, in part:

> "Unfortunately, [CBRE Heery] did not commence, prosecute, or progress the Work according to [CBRE Heery] Contract Schedule. For reasons completely outside of Watson's control, the nature of the Project and the conditions on Site significantly differed from those represented and warranted by the Contract, and [CBRE Heery] abandoned the Contract Schedule. Watson could not possibly have contemplated a more than two-year delay, and a near doubling of the schedule at the time that Watson and [CBRE Heery] entered into the Contract. At our meeting on October 16, 2018, you said that [CBRE Heery] has been working on a schedule with certain other Project subcontractors for the remaining scope of work. Watson would greatly appreciate the opportunity (and believe that this opportunity is contemplated by the Contract) to contribute to this process, especially considering that Watson is relying upon this information to complete the Site lighting work, which, in the end, will likely encounter a more than 30 month delay. As discussed in our meeting, all poles and pole lights have been delivered to the Site. However, Watson cannot complete its plan and be ready to execute the three or four activities associated with Site lighting, unless it has essential information from and dates related to all predecessor activities, such as the demolition subcontractor. To be prepared, Watson needs to provide its excavation subcontractor with as much notice as possible so that it can accommodate this impacted plan. Notwithstanding the above, Watson remains committed to diligently working in good faith to help [CBRE Heery] complete the Project as expeditiously as possible for the Corps, with the expectation that [CBRE Heery] will treat Watson fairly for its good faith efforts. Please forward [CBRE Heery's] schedule as soon as possible so that we can review it and plan our work accordingly. We look forward to continuing to work with [CBRE Heery] to complete this Project."

1100.  CBRE Heery did not provide CBRE Heery's Completion Schedule until February 20, 2019, nearly three months after Watson's request for information, which substantially impacted Watson's ability to mitigate its damages on the Project.

1101.  Notwithstanding the lack of necessary scheduling information, based upon Jardine's Deceptive Representation, Watson continued to work in good faith towards the completion of the Project.

1102.  On November 15, 2018, Mr. Tom Headlee, Watson's President, emailed Mr. Glenn Jardine, CBRE Heery's Executive Officer, and stated:

"I will (sic) like to find a way for us to [reach] a fair settlement […] I would like to come to Atlanta for us to meet and discuss how we resolve this issue. Please let me know you (sic) availability over the next few weeks." ("Plaintiffs Offer to Meet")

1103.    On November 15, 2018, in reply to the Plaintiffs Offer to Meet, Mr. Glenn Jardine, CBRE Heery's Executive Officer stated:

"Tom, I also like to get things done by year end and I also believe in long term relationships. I lead all of [CBRE Heery], and I am sure you would appreciate the fact we have levels of authority and management. I really need this issue to go through our chain of command before I get involved, otherwise it would be undermining the process. I will make sure our team addresses your concerns and we get this resolved." ("Jardine's Second Deceptive Representation").

1104.    Relying upon Jardine's Second Deceptive Representation, a statement from CBRE Heery's Executive Officer that he would "make sure" CBRE Heery addressed Watson's concerns to "get this resolved," the Plaintiffs forbore their then-existing legal position and, in good faith, continued to spend labor, equipment, materials, services, and supplies, under CBRE Heery's direction, to complete the Project for the benefit of CBRE Heery and the USACE.

1105.    On November 26, 2018, the Surety acknowledged receipt of SPC's correspondence dated November 12, 2018, and stated in part:

"We are presently reviewing your submittal and will send a complete copy to [CBRE Heery] to elicit its response to the claim in light of this additional documentation. Upon receipt of a response from [CBRE Heery] we will communicate the initial results of our independent investigation to you."

1106.    Exhibit 215 is a true and accurate copy of Surety Letter to SPC, dated 11/26/18.

1107.    On January 25, 2019, with the understanding that the parties were working together in good faith towards a common understanding of the facts, Watson issued CBRE Heery a "draft copy" (in Word format) of a comprehensive document intended to help CBRE Heery understand how the Project issues were damaging Watson, which includes the following excerpt:

"Watson has been severely damaged by the facts and circumstances surrounding the Project issues, which were completely outside of Watson's control, and caused by risks that Watson did not assume. Watson's request for an equitable

adjustment proves that Watson is entitled to a $3,432,675 increase to the Contract Price […] On August 10, 2017, Watson notified [CBRE Heery] that it intended to submit a request for an equitable adjustment to the Contract when, in part, the effects of the Project issues stopped impacting Watson's performance. This has yet to happen. Nevertheless, soon after that date, in a series of (what Watson considered to be) productive meetings, Watson and [CBRE Heery] discussed the facts and circumstances surrounding the Project issues, and their impact on Watson's cost and time to perform the Electrical Work. Watson has greatly appreciated [CBRE Heery's] willingness to meet and to discuss the Project issues, and would like to continue these productive discussions. Watson's intent is to avoid wasting money on lawyers, experts, and consultants, and to negotiate a fair and equitable settlement to the Project issues, and to move forward in cooperation towards an amicable resolution."

1108. On January 28, 2019, SPC submitted to CBRE Heery its notice of intent to submit a request for an equitable adjustment to the Mechanical Contract, stating in part:

"This letter is in response to Traveler's Casualty and Surety Company of America's (the 'Surety's') letter dated November 26, 2018, in which Ms. Aimee Sorbo stated that the Surety would 'communicate the initial results' of its independent investigation of SPC's payment bond claim dated October 22, 2018, 'upon receipt of a response from [CBRE Heery's]' This letter is also to notify [CBRE Heery] that SPC intends to submit a request for equitable adjustment to the Contract, to recover substantial losses that SPC has suffered as a result of [CBRE Heery's] conduct on the SJAB Project, which includes [CBRE Heery's] almost 17-month payment delay. Over sixty days have elapsed since the Surety acknowledged receipt of SPC's payment bond claim, and yet the Surety continues to fail to provide SPC with any communication. I suspect that this is because [CBRE Heery] has failed to diligently respond to the Surety. [CBRE Heery's] ongoing failure to compensate SPC for its good faith efforts to help [CBRE Heery] complete the Project for the benefit of the United States Army Corps of Engineers ('USACE') is emblematic of [CBRE Heery's] conduct on the SJAB Project. And it represents yet another unexpected condition—completely outside of SPC's control—that SPC has encountered on the Project, which ultimately caused SPC to suffer major losses." ("SPC's REA NOI")

1109. Exhibit 216 is a true and accurate copy of SPC's REA NOI, dated 01/28/19.

1110. On January 31, 2019, with the understanding that the parties were working together in good faith towards a common understanding of the facts, Watson issued CBRE Heery a "draft copy" (in Word format) of a comprehensive document intended to help CBRE Heery understand how the Project issues were damaging Watson, stating in its cover email:

"The purpose of the attached is to carefully explain the facts and the reasons why Watson believes that it is entitled to an equitable adjustment to the Contract. As I have stated on many occasions, we are committed to working this out. […] I would like to once again suggest that we get a few of the guys together to review the calculations. If, when we go over the numbers, you and your team discovers an issue, Watson is open to making any necessary changes—even if that means reducing the overall amount. Ultimately, our goal is to work with [CBRE Heery], in cooperation, towards an amicable resolution. […] in the end, I believe that it will have been the right thing to do for both of our organizations."

1111.    Exhibit 217 is a true and accurate copy of the Watson Email to CBRE Heery, dated 01/31/19.

1112.    On February 11, 2019, SPC issued the USACE a Freedom of Information Act Request, which produced a substantial amount of the documents that prove the truth of the Causes of Action made in this Complaint, and which have been admitted herein.

1113.    Exhibit 218 is a true and accurate copy of the SPC FOIA Request, dated 02/11/19.

1114.    On February 12, 2019, having taken into considering certain points made by CBRE Heery, Watson issued a document intended to help CBRE Heery further understand how the Project issues had damaged Watson, which includes the following excerpt:

"Moving Forward Towards an Amicable Resolution. Watson is entitled to compensation for the labor, equipment, materials, and services that Watson has duly furnished, under the direction of [CBRE Heery], and for the mutual benefit of both [CBRE Heery]—to complete the Project—and the United States Army Corps of Engineers—to improve its property. On August 10, 2017, Watson notified [CBRE Heery] that it intended to submit a request for an equitable adjustment to the Contract when, in part, the effects of the Project issues stopped impacting Watson's performance. But as proved in this letter, that impacts are ongoing. Nevertheless, soon after August 10, 2017, in a series of (what Watson considered to be) productive meetings, Watson and [CBRE Heery] discussed the facts and circumstances surrounding the Project issues, and their impact on Watson's cost and time to perform the Electrical Work. […] Most importantly, for the benefit of the United States Army Corps of Engineers, Watson remains committed to diligently working with [CBRE Heery], in good faith, to help [CBRE Heery] complete the Project as expeditiously as possible for the Corps. Notwithstanding the difficult circumstances, and major Project losses, Watson has never given up. Watson reassures [CBRE Heery] that it will finish the job. Watson's only expectation is that [CBRE Heery] treat Watson equitably and fairly for its good faith efforts. Considering the above, I suggest that we meet to

174

discuss the best path forward to achieve a fair and equitable resolution to the Project issues. As previously discussed, I believe this begins with Watson and [CBRE Heery] working in cooperation to review Watson's damage calculations to confirm that they are properly performed, reasonable, based upon the facts, and ultimately, in an amount that results in a fair settlement for both sides."

1115.    Exhibit 219 is a true and accurate copy of Watson Letter to CBRE Heery, Watson's REA, dated 02/12/19.

1116.    While CBRE Heery was deceptively representing that it intended to negotiate in good faith with Watson, it was improperly, and without providing any factual or legal basis, back-charging SPC for duration-related damages exceeding $200,000.

1117.    On February 15, 2019, SPC issued CBRE Heery a letter, which states, in part:

"As stated in SPC's previous letter, SPC intends to submit a request for an equitable adjustment to the Contract to recover substantial losses caused by [CBRE Heery's] grossly negligent performance on this Project, including its breach of the Prompt Payment Act. In the meantime, please provide a copy of the Design Issue REA that [CBRE Heery] submitted to USACE and all relevant documentation and documents, including emails, and the USACE's response. Additionally, please provide SPC with a written deductive Change Order Request that proves exactly how SPC caused a 92-day delay to the Project."

1118.    Exhibit 220 is a true and accurate copy of SPC Letter to CBRE Heery, dated 02/15/19.

1119.    Subsequently, upon information and belief, CBRE Heery rehired Linda Smith as an hourly-paid consultant to work on the Plaintiffs claims ("Linda CBRE Heery's Paid Consultant").

1120.    On March 29, 2019, Watson's Project Executive, Mr. Wendell Vinson, issued Linda Smith, CBRE Heery's Consultant, a letter that states, in part:

"Good Afternoon Linda, The purpose of this note is to reintroduce myself, and to move Watson's request for an equitable adjustment forward. I understand from Mr. Ken Cheatwood, that you've returned to the SJAB Project to help Watson and [CBRE Heery] work towards resolving Watson's REA. [...] I expect that Ken has explained to you the substance of our many discussions, which date back to the Summer 2018. On February 12, 2019, Watson issued [CBRE Heery] a letter, which attempted to summarize those discussions. I have attached a copy for your convenience. As stated more thoroughly in the letter, Project issues, which were completely outside of Watson's control, resulted in a substantial time and cost impact to Watson's plans. From the start, Watson has made it clear that

its goal is to work together with [CBRE Heery] towards reaching a fair settlement. When should Watson expect [CBRE Heery] to respond to the attached letter? And if not, then I suggest that you and I get together to discuss where we go from here. I will make myself available on any data and at any time next week."

1121.  Exhibit 221 is a true and accurate copy of Watson Email to CBRE Heery, dated 03/29/19.

1122.  On April 2, 2019, CBRE Heery, through Linda Smith CBRE Heery's Paid Consultant, stated in part:

"Wendell, I am the midst of doing significant research to respond to your REA. I still have several more files to go through before even starting on a response. I would note that I have found evidence that Watson is not quite as blameless as your REA would suggest. Also in case you were not aware, this project has received 402 non-compensable calendar days of time extensions from the Government of which a substantial number were weather days. We also submitted for another 106 days through and REA that at this point has been denied. I estimate that I still have a few more weeks of research before a reply to your REA can be developed. Sincerely, Linda Smith."

1123.  Exhibit 222 is a true and accurate copy of CBRE Heery Email to Watson, dated 04/02/19.

1124.  CBRE Heery's response on April 2, 2019 is an example of CBRE Heery's Fraudulent Resolution Delay Strategy, which was performed in the stream of commerce, and which did induce the Plaintiffs to suffer increased damages, including the forbearance of then-existing legal rights.

1125.  On April 5, 2019, the USACE issued CBRE Heery an email, which stated:

"I received a letter today from Southern Glass stating that they have not received payment in well over a year for change orders and other contracted work on the Medical Clinic Project. The claims made by Southern Glass are in direct conflict with signed prompt pay certifications from [CBRE Heery]. I will follow up next week with an official letter to your home office regarding this potentially serious issue." ("Linda's Bad Faith Failure to Pay")

1126.  Exhibit 223 is a true and accurate copy of USACE Email to CBRE Heery, dated 04/05/19.

1127.    Over the course of the Project, CBRE Heery manifested a pattern of bad faith conduct, including executing prompt pay certificates to the USACE, accepting money from the USACE, and then withholding it from Project subcontractors.

1128.    On April 8, 2019, Mr. Wendell Vinson, Watson, emailed Linda Smith, CBRE Heery, and stated in part:

> "And thank you again in advance for your efforts to help Watson and [CBRE Heery] reach a common understanding of the facts. Ken and I worked together for quite some time. During our discussions, I explained how the Project circumstances substantially hurt Watson, but I hope that I made it clear that Watson is only seeking to recover losses caused by Project issues completely outside of Watson's control, and in general, nothing more than fair treatment. To help you get up to speed, I would like to suggest that you and I get together so that I can provide you with an overview of Watson's position. I believe that such a meeting would be mutually beneficial for both Watson and [CBRE Heery]. If you provide me with a date and time, at any location, then I will make myself available."

1129.    Exhibit 224 is a true and accurate copy of the Watson Email to CBRE Heery, dated 04/08/19.

1130.    Linda CBRE Heery's Paid Consultant never responded to Watson's invitation to meet, dated April 8, 2019.

1131.    On April 19, 2019, SPC issued CBRE Heery a letter, which states, in part:

> "As we noted in our February 15, 2019 letter, SPC hoped to avoid the conflict and waste associated with litigation, in large part out of its respect for the relationship that it has with the United States Army Corps of Engineers. However, [CBRE Heery's] ongoing lack of payment (and [CBRE Heery's] payment bond surety's complete and utter lack of communication or action related to SPC's basic request to recover its outstanding contract balance and retainage) has forced SPC to revisit its damages, which were completely outside of SPC's control. SPC has been badly damaged on this Project. Does [CBRE Heery] actually believe that it is reasonable to state that SPC should have foreseen that it would be forced to continue to invest valuable corporate resources into the SJAB Project, nearly 40-months following the Mechanical Contract's "Substantial Completion" date, on a Project that [CBRE Heery] represented would require only 20-months of actual construction? SPC believes that [CBRE Heery's] position is completely unreasonable. The Contract Time has nearly tripled, from 20 months to 60 months. SPC could not possibly have

contemplated such an incredible time extension at the time that the parties entered into the Mechanical Contract. The SJAB project schedule extension is, by far, the longest project schedule extension that SPC has ever encountered, in its 54-year history. SPC has now calculated that it has invested millions of dollars of labor, equipment, materials, supplies, and services into the Project without compensation from [CBRE Heery] or its Payment Bond Surety. Based on these facts and SPC's substantial actual damages, SPC has no choice but to recover the damages that it is entitled to recover from [CBRE Heery], some of which were caused by the circumstances surrounding [CBRE Heery's] DDC system change directive."

1132. Exhibit 225 is a true and accurate copy of SPC Letter to CBRE Heery, dated 04/19/19.

1133. On April 23, 2019, CBRE Heery, through Linda Smith, the person responsible for the Project, issued the USACE a letter titled "Complaint of Non-Payment – Southern Glass," which states, in part:

"We are in receipt of your serial letter 08-56-161 dated April 8, 2019 and the attached complaint of non- payment from Southern Glass. Be advised that Southern Glass has not accurately represented the status of their contract. The final contract amount for Southern Glass after those backcharges have been assessed is $1,937,078.36, which is the amount they have been paid to date. I have attached the following documents substantiating our position and establishing that Southern Glass and their bonding company, RLI Insurance Company, were well aware of [CBRE Heery's] intent to recover damages. (1) E-mail from Frank Kemp to Linda smith confirming a phone call had been made to Southern Glass's bonding company requesting their involvement (2) E-mail from Ira Sussman of RLI Insurance to Frank Kemp acknowledging Frank's request for assistance (3) E-mails between Frank Kemp and Linda Smith documenting [CBRE Heery's] attempts to replace Southern Glass and terminate their contract for non-performance (4) Notice of Default letter to Southern Glass and RLI Insurance (5) E-mail from Frank Kemp to Ryan Issel and the Southern Glass providing the status of outstanding work (6) E-mail from Frank Kemp to Ryan Issel providing the current contract amount and noting further deductive change orders were coming and noting that LD's have yet to be deducted (7) Meeting notice documenting [CBRE Heery] was meeting weekly with Southern Glass and their bonding company (8) E-mail from Frank Kemp to Ryan Issel and Southern Glass itemizing change orders (9) E-mail from Frank Kemp to Ryan Issel and Southern Glass transmitting change order 20 which was a backcharge for first floor window sill repairs and reduced the contract amount to $1,950,292 (10) Letter to bonding company dated 12/5/18 stating that [CBRE Heery] does not consider the claim finalized due to outstanding claims from follow on subcontractors and withholding of LD's by the USACE (11) List of change

orders to Southern Glass that reflect the current contract amount of $1,937,078. I trust the attached information fully informs you of our current position regarding Southern Glass. It is of note that the current contract amount for Southern Glass does not reflect assessment of any portion of the liquidated damages currently being withheld by the USACE."

1134.    On April 24, 2019, Linda Smith, CBRE Heery's Paid Consultant, issued SPC a letter that states, in part:

"SPC may have been informed by now that without SPC's assistance in assembling the REA all of the pertinent data was not provided and the REA was subsequently rejected by the USACE."

1135.    Exhibit 226 is a true and accurate copy of CBRE Heery Letter to SPC, dated 04/24/19.

1136.    CBRE Heery's April 24, 2019 communication regarding issues related to the DDC Systems Design Change Directive is an example of CBRE Heery's Unfair DDC Issue Double Dealing.

1137.    On April 29, 2019, Mr. Wendell Vinson, Watson, followed up with Linda CBRE Heery's Paid Consultant, and stated in part:

"Just wanted to follow up on the email from last month You estimated a few more weeks of research before you could reply. I would still suggest that you and I get together, so that I can provide you with an overview of Watson's position. If you provide me with a date and time, at any location, I will make myself available."

1138.    On April 29, 2019, Linda CBRE Heery's Paid Consultant issued Watson an email, which states in part:

"Wendell, I'm afraid I haven't made much progress since my email. I lost my mother the middle of the month and I've had my hands full and will continue to have my hand's full as I am the executer of the estate. I apologize for the delay but I will complete my review as soon as possible."

1139.    On May 14, 2019, after having induced the Plaintiffs to expend substantial corporate resources over at least 20 months, Linda Smith, CBRE Heery's Paid Consultant, stated:

"We are in receipt of [Watson's REA] and after review have found it to be without merit . . . [i]n conclusion, [CBRE Heery] will not be processing Watson's claim." ("CBRE Heery's Bad Faith Determination")

1140.    On May 24, 2019, Watson's President, Mr. Tom Headlee, issued Mr. Glenn Jardine,

CBRE Heery's President, a letter that states, in part:

> "In light of these substantial good faith efforts, Watson is surprised and
> disappointed by Ms. Smith's letter. In the spirit of cooperation, you and I agreed
> to instruct our senior Project leaders to work together in cooperation to reach a
> common understanding of the facts, with the intent to amicably resolve our
> differences and to avoid the unnecessary corporate waste caused by litigation.
> After numerous discussions between our respective teams, I offered to meet you
> in Atlanta to find a way to get this resolved. On November 15, 2018, you stated:
> 'Tom, I also like to get things done by year end [2018] and I also believe in long
> term relationships. I lead all of [CBRE Heery], and I am sure you would
> appreciate the fact we have levels of authority and management. I really need this
> issue to go through our chain of command before I get involved, otherwise it
> would be undermining the process. I will make sure our team addresses your
> concerns and we get this resolved.' Relying upon this apparent promise to
> reciprocate Watson's good faith efforts, Watson has invested a substantial
> amount of time, money, and effort to meet with [CBRE Heery], and in the spirit
> of transparency, to present the facts and evidence that supports Watson's
> position. When Watson learned that [CBRE Heery] had brought Ms. Smith back
> to the Project to review Watson's position on the issues, Watson was encouraged,
> because Watson believed that Ms. Smith would help to bring the parties closer to
> an amicable resolution. Regrettably, the opposite has happened. On at least three
> separate occasions over the past three months, Watson's Project Executive, Mr.
> Vinson, offered to meet Ms. Smith to build upon the understanding that Mr.
> Vinson and [CBRE Heery's] Project Executive, Mr. Cheatwood, had developed
> over nearly a year of productive and amicable discussions. Mr. Vinson was
> prepared to provide whatever further supporting documents that would help put
> the parties in a position to make a rational compromise. But in each case Ms.
> Smith either rejected or completely ignored Mr. Vinson's offers to meet. Instead,
> Ms. Smith opted to work in isolation, which may help to explain the results. Ms.
> Smith's letter presents many basic facts that Mr. Vinson and [CBRE Heery's]
> Project Executive, Mr. Cheatwood, had previously discussed at length, settled
> upon, and which Watson had already taken into consideration as a rational basis
> for compromise. Ms. Smith's response has unfortunately set our organizations on
> a path to litigation, which Watson has been trying, in good faith, to avoid from
> the start. Based upon Ms. Smith's letter, Watson has had no option but to seek
> legal counsel: Watson has reviewed the matter with its counsel, and Watson has
> been informed that in their opinion Watson is correct and entitled to an equitable
> adjustment to the Contract Price and Contract Time. [...] While Mr. Vinson and
> Mr. Cheatwood, and their respective teams, had already amicably settled many of
> the facts presented by Ms. Smith, Watson would like to nevertheless once again
> briefly restate its position on each of the 20 points that Ms. Smith presented [...]
> Based upon Ms. Smith's letter, instead of cooperating to reach an amicable

resolution, [CBRE Heery] has provided Watson with no choice but to exercise its rights in terms of the Contract. Section 15.9 'Legal Forum' of the Contract, states: 'Any disputes or claim arising out of the Contract, or from a material breach of the Contract, and which is not resolved by the terms and provisions of the Contract, will be submitted to the court in and where the Project is located or where Construction Manager's principal place of business is located.' Watson is committed to pursuing recovery through litigation should [CBRE Heery] believe that it is preferable to rational-based negotiations. In April 2019, 70-months after submitting its Contract Price, [CBRE Heery] has promised to provide Watson with access to its work areas to complete the Site lighting portion of the Electrical Work. It is completely unreasonable for [CBRE Heery] to argue that the Contract contemplated the risks that have caused Watson to invest direct labor into the Project for 53.5 months, when the Contract represented Watson would only have to invest direct labor into the Project for 14.5 months. Notwithstanding this fundamental change to Watson's expectations, Watson has diligently and in good faith worked with [CBRE Heery] to complete the Electrical Work for the benefit of the United States Army Corps of Engineers. It is only right and just that [CBRE Heery] treat Watson equitably. Regrettably, Ms. Smith apparently disagrees. I believe that as the Chief Operating Officers of our respective companies, we have a fiduciary duty and an ethical responsibility to meet, in a last effort, to discuss the possibility of avoiding the unnecessary corporate waste that results from litigation. If you agree, please provide me with any date and time, at any location, at your earliest convenience, and I will make myself available."

1141.    Exhibit 227 is a true and accurate copy of Watson Letter to CBRE Heery, dated 05/24/19.

1142.    On May 28, 2019, Watson's President, Mr. Tom Headlee, emailed CBRE Heery's President, Mr. Glenn Jardine, and stated:

"The last time we corresponded you indicated a chain of command that needed to be followed and I understand that process. I am emailing you because I do not know any other person to contact. […] Ken turned over the information to Linda Smith for her review. We received her response. After reading the response. I was surprised. Her response lacked the depth of knowledge of the project that I would expect from a person in her position. It was discouraging. Our hopes for resolving this matter without resorting to attorneys was diminished to the point we felt it necessary to involve our attorney in the response to her letter. I have attached our response to Linda's letter. […] Please let me know what you recommend for the next step in the process."

1143.    Exhibit 228 is a true and accurate copy of the Watson Email to CBRE Heery, dated 05/28/19.

1144. On May 28, 2019, CBRE Heery's President, Mr. Glenn Jardine, issued Watson's President, Mr. Tom Headlee an email, which states in part:

> "Tom, thank you for your email. It is true that we would always prefer to work things out as a team before we have to resort to having to call in the lawyers, I am sure we could agree on that […] I would like to try and get as much resolved and off the table before we have to resort to enlisting outside help."

1145. Exhibit 229 is a true and accurate copy of CBRE Heery Email to Watson, dated 05/28/19.

1146. On May 29, 2019, CBRE Heery's President, Mr. Glenn Jardine, issued Watson's President, Mr. Tom Headlee an email, which states, in part:

> "Thanks for the feedback and insight. Let me look into this matter, I may have to involve someone from Balfour Beatty that has the expertise to really drill down into the issues. Please stand by while I make some calls, I appreciate your willingness to get this resolved at this level before escalating. Best regards-Glenn."

1147. Exhibit 230 is a true and accurate copy of CBRE Heery Email to Watson, dated 05/29/19.

1148. After two weeks without hearing a response, on June 12, 2019, Watson's President, Mr. Tom Headlee, emailed CBRE Heery's President, Mr. Glenn Jardine, and stated:

> "I wanted to follow up to see if you had any success in talking with Balfour Beatty."

1149. Exhibit 231 is a true and accurate copy of the Watson Email to CBRE Heery, dated 06/12/19.

1150. On June 12, 2019, CBRE Heery's President, Mr. Glenn Jardine, issued Watson's President, Mr. Tom Headlee an email, which states in part:

> "Yes, there was a call last week and BB now has a representative evaluating the info. I was out of town but I know about the call and transfer of info. Please stand by, once I get any info I will pass it along. While you have been frustrated with Linda in the past. it might be wise to stay in touch with her as she is our liaison with BB. Thank you-Glenn."

1151. Exhibit 232 is a true and accurate copy of CBRE Heery Email to Watson, dated 06/12/19.

1152. On June 12, 2019, Watson's President, Mr. Tom Headlee, emailed CBRE Heery's President, Mr. Glenn Jardine, and stated:

> "If possible, I would like to get the contact information for person at BB. I would like to make sure all the information gets to that individual including our response to Linda's letter. I am sure you understand. Also, I believe it would be beneficial for us to start a dialogue with them. If you could send that to me, I would appreciate it."

1153. Exhibit 233 is a true and accurate copy of the Watson Email to CBRE Heery, dated 06/12/19.

1154. On June 17, 2019, CBRE Heery's President, Mr. Glenn Jardine, issued Watson's President, Mr. Tom Headlee an email, which states, in part:

> "You will be hearing from BBC shortly, stand by. Thank you- Glenn."

1155. Exhibit 234 is a true and accurate copy of CBRE Heery Email to Watson, dated 06/17/19.

1156. As of the date of this Complaint, Balfour has not corresponded with any of the Plaintiffs.

1157. CBRE Heery's response on June 17, 2019 is an example of CBRE Heery's Fraudulent Resolution Delay Strategy, which was performed in the stream of commerce, and which did induce the Plaintiffs to suffer increased damages, including the forbearance of then-existing legal rights.

1158. On July 3, 2019, SPC issued CBRE Heery its Request for Equitable Adjustment, which states, in part:

> "On January 28, 2019, SPC notified [CBRE Heery] of its intent to submit a request for an equitable adjustment to the Mechanical Contract. Since that time, SPC has performed a thorough investigation of the issues impacting the progress of the work. The facts demonstrate that the actual conditions encountered by SPC on the Project materially differed from the Mechanical Contract's representations. The facts also prove that [CBRE Heery] failed to perform its duties as the Project's Construction Manager At-Risk, and the Project's Design Builder and component integrator. SPC has applied industry accepted best methods to quantify the cost impacts caused by the Project's extreme 33-month delay and other issues affecting labor productivity. SPC could not possibly have contemplated these issues at the time the parties entered into the Mechanical Contract. SPC is entitled to a $3,947,100 adjustment to the Mechanical Contract as equitable compensation for labor, equipment, materials, services, and supplies that SPC has diligently and in good faith provided for the benefit of [CBRE

Heery] and the Unites States Army Corps of Engineers to improve the Seymour Johnson Air Force Base property [...] [CBRE Heery] is breaching its fiduciary duty by withholding compensation from SPC uncontested amounts such as SPC's outstanding contract balance, retainage, and approved change orders. [CBRE Heery] is also breaching its fiduciary duties by back-charging SPC for liquidated damages and [CBRE Heery's] general conditions. [CBRE Heery] has failed to provide facts and documentation to prove that SPC caused the delays that have resulted in USACE charging [CBRE Heery] with liquidated damages. And [CBRE Heery] has failed to provide any evidence to prove that SPC has caused [CBRE Heery's] "general conditions" costs to increase. On October 22, 2018, SPC issued Travelers with its notice of intent to submit a Bond Claim. On November 26, 2018, Travelers issued SPC a letter, which states: 'Upon receipt of a response from [CBRE Heery], we will communicate the initial results of our independent investigation to you.' Since that time, Travelers has provided SPC with no substantive communication. SPC's assumption is that [CBRE Heery] has failed to communicate its response to Travelers. Or if it did respond, SPC's assumption is that [CBRE Heery] failed to provide Travelers with sufficient information. Perhaps this letter will contain sufficient information for Travelers to communicate the initial results of its independent investigation." ("SPC's REA")

1159.   Exhibit 235 is a true and accurate copy of SPC Letter to CBRE Heery, dated 07/03/19.

1160.   On July 12, 2019, Watson's President, Mr. Tom Headlee, emailed CBRE Heery's President, Mr. Glenn Jardine, and stated:

"I wanted to follow up on your email below. We have not been contacted as of yet by BBC. I wanted to see if you could update me on the status. If you can provide me the contact at BBC, I am happy to contact them and take you out of the loop."

1161.   Exhibit 236 is a true and accurate copy of the Watson Email to CBRE Heery, dated 07/12/19.

1162.   On July 12, 2019, CBRE Heery's President, Mr. Glenn Jardine, issued Watson's President, Mr. Tom Headlee an email, which states, in part:

"I will follow up, sorry you have not yet been contacted."

1163.   Exhibit 237 is a true and accurate copy of the CBRE Heery Email to Watson, dated 07/12/19.

1164.    On July 16, 2019, Schneider issued the Surety a letter with the subject "Payment Bond Claim," which states, in part:

> "Schneider has suffered substantial financial losses as a result of the Project issues that it did not cause, and because of Project issues that it could not possibly control. Acting as [CBRE Heery's] lead Surety, Travelers has a legal obligation to provide Schneider with $477,799 in relief for uncompensated additional labor, equipment, materials, services, and supplies that Schneider spent for the benefit of [CBRE Heery] and the United States Army Corps of Engineers, to improve the Seymour Johnson Air Force Base property."

1165.    Exhibit 238 is a true and accurate copy of Schneider Letter to the Surety, Bond Claim, dated 07/16/19.

1166.    On July 25, 2019, Watson's President, Mr. Tom Headlee, emailed CBRE Heery's President, Mr. Glenn Jardine, and stated:

> "I was following up to see if you had any luck. No one from BB has contacted us. Would it better for me to contact them at this point? I am willing to do that if you will provide me a contact at BB."

1167.    Exhibit 239 is a true and accurate copy of the Watson Email to CBRE Heery, dated 07/25/19.

1168.    On July 26, 2019, CBRE Heery's President, Mr. Glenn Jardine, issued Watson's President, Mr. Tom Headlee an email, which states, in part:

> "Tom – let us check in w/ BBC. Linda, could you please poke your BBC contact to see what's the status?"

1169.    Exhibit 240 is a true and accurate copy of CBRE Heery Email to Watson, dated 07/26/19.

1170.    On July 26, 2019, Linda CBRE Heery's Paid Consultant issued Watson's President, Mr. Tom Headlee an email, which states:

> "We are meeting with the BBC attorneys 8/6 and 8/7 to go over the claim. We'll have a better idea of status after that meeting."

1171.    Exhibit 241 is a true and accurate copy of CBRE Heery Email to Watson, dated 07/26/19.

1172.    On July 30, 2019, Watson's President, Mr. Tom Headlee, emailed CBRE Heery's President, Mr. Glenn Jardine, and stated:

> "While I am disappointed that we are encountering further delays to resolution of this dispute, I am pleased to learn BBC is involved."

1173.    Exhibit 242 is a true and accurate copy of the Watson Email to CBRE Heery, dated 07/30/19.

1174.    On July 30, 2019, CBRE Heery's President, Mr. Glenn Jardine, issued Watson's President, Mr. Tom Headlee an email, which states:

> "understand, this is a complicated project w/ many stakeholders, some of which don't always agree w/ one another. Appreciate your patience, the right people are involved and we all want this behind us."

1175.    Exhibit 243 is a true and accurate copy of CBRE Heery Email to Watson, dated 07/30/19.

1176.    On August 7, 2019, CBRE Heery issued Watson a letter, which states, in part:

> "During the past week [CBRE Heery] and BBC have met to discuss your claim. There is interest in settling this claim as expeditiously as possible however Watson will need to provide backup for the damages noted on page 16 of your claim. Without this information the team has no means of adequately evaluating any cost impact to Watson. Please provide this information at your earliest convenience."

1177.    Exhibit 244 is a true and accurate copy of CBRE Heery Letter to Watson, dated 08/07/19.

1178.    CBRE Heery's letter on August 7, 2019 is an example of CBRE Heery's Fraudulent Resolution Delay Strategy, which was performed in the stream of commerce, and which did induce the Plaintiffs to suffer increased damages, including the forbearance of then-existing legal rights.

1179.    Even though Watson had already provided substantial documentary evidence supporting its REA, the Defendant's Deceptive Representation induced Watson to spend even more corporate resources on providing information requested by CBRE Heery.

1180.    On August 12, 2019, CBRE Heery issued SPC a letter, which states, in part:

> "Last week [CBRE Heery] and BBC met to discuss your claim. There is interest in settling this claim as expeditiously as possible however SPC will need to

provide backup for the damages noted on page 41 of your claim. Without this information the team has no means of adequately evaluating any cost impact to SPC. Please provide this information at your earliest convenience." ("Defendant's Deceptive Representation")

1181. Exhibit 245 is a true and accurate copy of CBRE Heery Letter to SPC, dated 08/12/19.

1182. CBRE Heery's letter on August 12, 2019 is an example of CBRE Heery's Fraudulent Resolution Delay Strategy, which was performed in the stream of commerce, and which did induce the Plaintiffs to suffer increased damages, including the forbearance of then-existing legal rights.

1183. On August 16, 2019, Watson submitted its Revised REA, requesting $3,385,466.

1184. Exhibit 246 is a true and accurate copy of Watson Letter to CBRE Heery, dated 08/16/19.

1185. On August 28, 2019, SPC issued CBRE Heery a letter, which states, in part:

"We appreciate [CBRE Heery] and Balfour Beatty Construction Company's commitment to reach an expedited resolution of SPC's request for an equitable adjustment to the Mechanical Contract. We provide the attached information pursuant to your August 12, 2019 request for documentation supporting our damage calculations. To provide context for the supporting documents, this letter includes the cost impact section of SPC's REA. Note that SPC has made several minor updates to certain values to reflect and represent the most current and up-to-date accounting. SPC also engaged consultants, who reviewed the basis for our calculations in certain categories. The result of their recommendations, and our updates, is an 11% reduction in SPC's REA. Considering this, to avoid any potential unnecessary confusion, please allow Section 1 incorporated herein, which is SPC's revised and final representation of its damages, to completely supplant Section 4 of SPC's REA, dated July 3, 2019. SPC is prepared and available to meet with your team to review and explain the calculations as well as all supporting documents at a mutually convenient date, time, and location. To facilitate an expedited review of SPC's damages, SPC offers the following reference table […] Notwithstanding difficult circumstances, acting in good faith, with the understanding of the Project's importance for the United States Army Corps of Engineers, SPC diligently completed the Mechanical Work, despite suffering substantial losses. [CBRE Heery] has previously acknowledged SPC's efforts and quality performance. On January 12, 2016, [CBRE Heery] issued SPC a letter, which stated that—through the most difficult parts of the Project—SPC had performed successfully: 'SPC Mechanical has performed to the highest standards on the SJAFB Medical Clinic Project. They expedited coordination drawings with other trades, submitted shop drawings in advance to ensure equipment was available for installation, their work has exceeded quality requirements and they have performed per the project schedule. I would not

187

hesitate to issue them another subcontract and would recommend them for any upcoming project that you may have.' We appreciate [CBRE Heery's] acknowledgement of SPC's performance and, again, thank you for your commitment to fairness and an expedited resolution. We look forward to working together to close out this difficult Project, which ultimately resulted in an impressive facility that we believe will help the United States Army Corps of Engineers better serve our Veterans."

1186. Exhibit 247 is a true and accurate copy of SPC Letter to CBRE Heery, dated 08/28/19

1187. On September 18, 2019, SPC certified its damages as part of the DDC System Design Change Directive REA.

1188. On September 25, 2019, the Surety issued SPC a letter, which states, in part:

"Surety does not possess sufficient information; claim denied."

1189. On October 16, 2019, Watson's President, Mr. Tom Headlee, emailed CBRE Heery's President, Mr. Glenn Jardine, and stated:

"I am hoping to get some insight from you on the status. In early August, [CBRE Heery] and Balfour Beatty stated that there is interest in settling Watson's REA as 'expeditiously as possible.' On August 16th, at [CBRE Heery] / Balfour Beatty's request, we sent a very detailed back up to our REA. We were very optimistic that in short order we could begin trying to negotiate a settlement. […] How much more time does Balfour need to evaluate our backup? When can we sit down and figure out if we can settle it? I believe we have been very patient."

1190. Exhibit 248 is a true and accurate copy of the Watson Email to CBRE Heery, dated 10/16/19.

1191. On November 12, 2019, Linda CBRE Heery's Paid Consultant issued Watson's President, Mr. Tom Headlee an email, which states, in part:

"Litigation is never the preferred method of resolution. Nevertheless, should litigation occur, [CBRE Heery] would move to join into the lawsuit those other Subcontractors/Parties, who by contract would be responsible to indemnify us for damages alleged in the suit. Such action would significantly slow the proceedings, as well as, complicate the judicial process given multiple parties. It is not our intent to 'stonewall' Watson Electrical or any subcontractor. However, damages alleged by Watson could be the result of performance by other who would owe monetary damages for such performance."

1192. Exhibit 249 is a true and accurate copy of CBRE Heery Email to Watson, dated 11/21/19.

1193. On November 26, 2019, Watson's President, Mr. Tom Headlee, issued a letter to CBRE Heery's President, Mr. Glenn Jardine, titled "Second Request for Meeting," stating, in part:

> "Linda's response suggests that the benefits of following [CBRE Heery's] resolution plan outweigh some delay in finalizing all subcontractor claims. Linda's response is light on clarity and detail. What exactly is [CBRE Heery's] resolution schedule, sequence, and strategy? Please provide your resolution plan, including the schedule, sequence, and strategy, for our consideration. The MEP Subcontractors will then determine if it is in our best interest to continue to wait patiently for [CBRE Heery] to come to the table. Mr. Walker, Mr. Hicks, and I are willing, available, and would appreciate the opportunity to meet with you at any time before Christmas to discuss your resolution plan. Please provide a convenient date and time that the three of us can meet with you at your office in Atlanta."

1194. Exhibit 250 is a true and accurate copy of the Watson Letter to CBRE Heery, dated 11/26/19.

1195. CBRE Heery's President, and Linda CBRE Heery's Paid Consultant, never once made themselves available to meet to work towards resolution, despite repeatedly offering to do just that.

1196. On March 20, 2020, Mr. Tom Headlee, Watson, issued Mr. Glenn Jardine, CBRE Heery, a letter titled "SECOND REQUEST FOR MEETING" which states:

> "After receiving your response, through Linda, to my request for a meeting dated October 28, 2019, I reached out to SPC Mechanical and Schneider Electric. Mr. Bill Walker, SPC's Vice President, and Mr. Jim Hicks, Schneider's General Manager, they are copied on this letter. Based upon the facts, we believe that we are entitled to a full recovery at law. However, we also believe that there is a rational basis for compromise. In early August 2019, you issued Watson and SPC letters that expressed an intent to negotiate an expedited resolution to our REAs. As a negotiated resolution is our preference, we welcomed this overture. Since August, [CBRE Heery] has not initiated a single meeting to discuss resolution or offered a single action that moves the process forward. The MEP Subcontractors are losing confidence that [CBRE Heery] is committed to compromise. As Watson, SPC, and Schneider have had similar experiences on this project, the MEP Subcontractors view the Project issues, including the causes of the time and cost impacts, as well as liability, in the same way. (see attached- Exhibit 1 What Happened) We have entered into a Joint Prosecution & Defense Agreement to help simplify the situation. Linda's response suggests that the benefits of following [CBRE Heery's] resolution plan outweigh some delay in finalizing all

189

subcontractor claims. Linda's response is light on clarity and detail. What exactly is [CBRE Heery's] resolution schedule, sequence, and strategy? Please provide your resolution plan, including the schedule, sequence, and strategy, for our consideration. The MEP Subcontractors will then determine if it is our best interest to continue to wait patiently for [CBRE Heery] to come to the table. Mr. Walker, Mr. Hicks, and I are willing, available, and would appreciate the opportunity to meet with you at any time before Christmas to discuss your resolution plan. Please provide a convenient date and time that the three of us can meet with you at your office in Atlanta. Please feel free to call me to discuss. My mobile number is 252-230-5000."

1197. Exhibit 251 is a true and accurate copy of Watson Letter to CBRE Heery, dated 03/20/20

1198. On March 20, 2020, Mr. Tom Headlee, Watson's President, issued Mr. Glenn Jardine, CBRE Heery's Executive Officer, and Mr. Mark Birch, Balfour's Executive Officer, an unconditional offer to settle the Causes of Action made in this Complaint:

> "Watson, SPC, and Schneider continue to believe that costs and expenses incurred in litigation, including but not limited to court costs, attorneys' fees, and expert witness fees, not to mention substantial corporate resources, are avoidable, if all parties come to the table for reasonable discussions. Unfortunately, based on [CBRE Heery's] lack of action, we have little choice. This is our latest attempt to move this process forward before filing suit. Despite the fact that it is less than what is according to any reasonable measure owed, in a final good faith gesture to settle our differences, Watson, SPC, and Schneider are willing to accept $5,485,378, to avoid instituting legal action."

1199. Exhibit 252 is a true and accurate copy of Watson Email to CBRE Heery, dated 03/20/20.

1200. On March 31, 2020, in response, Linda CBRE Heery's Paid Consultant, issued Mr. Tom Headlee, Watson's President, a counteroffer of zero dollars ($0), stating:

> "[CBRE Heery] lacks a basis for evaluation" ["CBRE Heery's Resolution Stonewall"].

1201. Exhibit 253 is a true and accurate copy of CBRE Heery's Email to Watson, dated 03/31/20.

1202. On April 8, 2020, in response to CBRE Heery's Bad Faith Counteroffer, Mr. Tom Headlee, Watson's President, issued Mr. Glenn Jardine, CBRE Heery's Executive Officer, and Mr. Mark Birch, Balfour's Executive Officer, an email, which states:

"Litigation is undesirable in any environment. But even if long and complicated, relief from the court provides, if nothing else, a process with an end. It provides certainty. Another request to 'be patient' does not. It seems infinite with no end. From the beginning we've done our best to communicate our desire to reach a fair settlement through good faith negotiations. We now need certainty of process. I am confident that [CBRE Heery] / Balfour have enough experience and understanding from our multiple comprehensive submissions that we have provided and your own information, as well as, to make two basic determinations: 1. Is the MEP team entitled to relief? 2. If yes, then what is a fair and reasonable ballpark amount? You want to see more information and further analysis. In contrast, we believe that the parties have exchanged adequate information to answer these two questions and to begin negotiations without further delay or escalation. This is the reason why we were encouraged by your August 2019 letter inviting further discussion, and this is the reason why we have been discouraged by your subsequent refusal to begin the process [...] Pursuant to your offer, please provide your attorney's information." ("Watson's Request for Information")

1203.  Exhibit 244 is a true and accurate copy of Watson Request for Information, dated 04/08/20.

1204.  CBRE Heery ignored and failed to provide the Plaintiffs with CBRE Heery's attorney's information.

1205.  CBRE Heery obtained a substantial pecuniary gain as a result of CBRE Heery's Unfair Acts, CBRE Heery's Deceptive Trade Practices, and CBRE Heery's Fraudulent Resolution Delay Strategy, all of which occurred in the stream of commerce, induced the Plaintiffs to not only spend substantial corporate resources to finance the completion of the Project, without equitable compensation, but also to divert valuable corporate resources to meet, investigate, organize, prepare, and present facts and evidence in support of the Plaintiffs' position in this dispute.

1206.  As a direct and proximate result of CBRE Heery's violation of N.C.G.S. § 75-16, the Plaintiffs respectfully request that this Court treble the Plaintiffs total damage claim of $7,827,834 and award the Plaintiffs at least $23,483,502 together with interest at the maximum legal rates from dates according to proof, and attorneys' fees and costs.

**TWENTY-SECOND CLAIM FOR RELIEF**

(Breach of Contract – CBRE Heery Breached the Implied Duty of Good Faith & Fair Dealing)

(*SPC & Watson v. CBRE Heery*)

1207.    The Plaintiffs reallege and incorporate by reference Paragraph 1 through Paragraph 1201 as if fully set forth herein.

1208.    CBRE Heery breached the covenant of Good Faith & Fair Dealing which is an implied duty under the Mechanical Contract and the Electrical Contract by, among other things, wrongfully blaming CBRE Heery's own failures to perform under the Prime Contract, such as its failure to deliver the Project according to the Contract-Defined Completion Date, on the Plaintiffs.

1209.    As a direct and proximate result of CBRE Heery's breach of the implied duty of Good Faith and Fair Dealing, SPC has been damaged in an amount to be proven at trial**,** together with interest at the maximum legal rates from dates according to proof, and attorneys' fees and costs.

1210.    As a direct and proximate result of CBRE Heery's breach of the implied Duty of Good Faith and Fair Dealing, Watson has been damaged in an amount to be proven at trial, together with interest at the maximum legal rates from dates according to proof, and attorneys' fees and costs.

## TWENTY-THIRD CLAIM FOR RELIEF

(Recovery of Fees Pursuant to N.C.G.S. § 6-21.6, N.C.G.S. or alternatively, under § 44A-35)

(*SPC & Watson v. CBRE Heery et. al.*)

1211.    The Plaintiffs reallege and incorporate by reference Paragraph 1 through Paragraph 1205 as if fully set forth herein.

1212.    Pursuant to N.C.G.S. § 6-21.6(a)(1), a "business contract" is defined as:

> "A contract entered into primarily for business or commercial purposes. The term does not include a consumer contract, an employment contract, or a contract to which a government or a governmental agency of this State is a party."

1213.    On January 6, 2014, SPC entered into the Mechanical Contract primarily for business or commercial purposes, which means the Mechanical Contract is a "business contract" in terms of N.C.G.S. § 6-21.6(a)(1).

192

1214. On May 9, 2014, Watson entered into the Electrical Contract primarily for business or commercial purposes, which means that the Electrical Contract is a "business contract" in terms of N.C.G.S. § 6-21.6(a)(1).

1215. Pursuant to N.C.G.S. § 6-21.6(a)(4). A reciprocal attorneys' fees provision is defined as:

> "A provision by which each party agrees 'to pay or reimburse the other parties for attorneys' fees and expenses incurred by reason of any suit, action, proceeding, or arbitration involving the business contract.'"

1216. Under Article 15.6 "Attorney's Fees," the Electrical Contract and the Mechanical Contract states:

> "In the event any arbitration or litigation arises between Construction Manager and Subcontractor over the provisions of the Contract, the work contracted for, the payment thereof, or otherwise, the prevailing party will be entitled to recover all costs and expenses incurred in such litigation, including but not limited to court costs, attorney's fees, and expert witness fees, arising before, during, or after trial, including any costs, attorney's fees, or expenses incurred in any appeal therefrom."

1217. Pursuant to N.C.G.S. § 6-21.6(a)(1), "Reciprocal attorneys' fees provisions in business contracts," are valid and enforceable so long as all the parties sign the contract, as specified in section 6-21.6(b).

1218. The Electrical Contract and the Mechanical Contract satisfy the specific technical requirements established by N.C.G.S. § 6-21.6(b), including the signatory requirements, and therefore the Electrical Contract and the Mechanical Contract each include a valid and enforceable reciprocal fees provision.

1219. Pursuant to N.C.G.S. § 6-21.6(d), it states:

> "Reasonable attorneys' fees and expenses shall not be governed by (i) any statutory presumption or provision in the business contract providing for a stated percentage of the amount of such attorneys' fees or (ii) the amount recovered in other cases in which the business contract contains reciprocal attorneys' fees provisions."

1220.  N.C.G.S. § 6-21.6(c) provides a list of factors that this Court may consider when determining the reasonable attorneys' fees, expenses, and other costs that the Plaintiffs are entitled to recover, including but not limited to: (1) the relative economic circumstances of the parties; (2) settlement offers made prior to the institution of the action; (3) offers of judgment pursuant to Rule 68 of the North Carolina Rules of Civil Procedure and whether the judgment finally obtained was more favorable than such offers; (4) whether a party unjustly exercised superior economic bargaining power in the conduct of the action; (5) the timing of settlement offers; (6) the amounts of settlement offers as compared to the verdict; (7) the terms of the business contract.

1221.  In response to the substantial Bona Fide efforts made by SPC and Watson to resolve all Causes of Action made in this Complaint, CBRE Heery imposed new conditions upon SPC and Watson.

1222.  SPC and Watson have presented substantial evidence in response to CBRE Heery's multiple requests over the past three years, which have proved the damages resulting from the Causes of Action alleged in this Complaint.

1223.  SPC and Watson have made numerous good faith unconditional offers to settle the disputes that form the basis for this Complaint.

1224.  CBRE Heery has not made any unconditional settlement offers.

1225.  CBRE Heery unjustly exercised superior economic bargaining power in the conduct of its actions over the course of the Project.

1226.  CBRE Heery's failure and refusal to work towards a fair and reasonable settlement has been unwarranted and has resulted in the Plaintiffs expending significant time and resources to prepare for trial.

1227.  The Plaintiffs have taken substantial actions to investigate, organize, and present facts and evidence proving both the factual and legal basis for each of the Causes of Action alleged in this Complaint, but CBRE Heery has not reciprocated.

1228.  CBRE Heery has failed and refused to acknowledge that the Causes of Action made in this Complaint have merit—this even includes requests to recover the payment of outstanding contract

amounts duly owed under the Mechanical Contract and the Electrical Contract, which CBRE Heery has received from the United States Army Corps of Engineers.

1229. CBRE Heery has failed and refused to acknowledge the improvements to the Property resulting from the Plaintiffs additional labor, equipment, materials, services, and supplies spent on the Project.

1230. As a direct and proximate cause of CBRE Heery's obstinacy, including its failure and refusal to acknowledge the merit of the Causes of Action made in this Complaint, the Plaintiffs have had to undergo unnecessary discovery, expend substantial corporate resources, and have now wasted valuable judicial resources necessary for the proper and timely administration of Justice in the State of North Carolina.

1231. Pursuant to N.C.G.S. § 44A-35 (2015), this Court may, in its discretion, award reasonable attorneys' fees and other expenses to a prevailing party in a bond enforcement action:

> "[U]pon a finding that there was an unreasonable refusal by the losing party to fully resolve the matter which constituted the basis of the suit or the basis of the defense."

1232. Pursuant to N.C.G.S. § 44A-35 (2015), a prevailing party is a plaintiff:

> "[W]ho obtains a judgment of at least fifty percent (50%) of the monetary amount sought in a claim."

1233. As a direct and proximate cause of CBRE Heery's unreasonable refusal to meet to resolve the matters which constitute the basis of this Complaint as well as CBRE Heery's unwarranted refusal to settle, the Plaintiffs have been damaged in an amount to be determined at trial.

## PRAYERS FOR RELIEF

WHEREFORE, in the United States of America, for the use and benefit of the Plaintiffs, SPC, Watson, and Schneider pray for judgment as follows:

**ON THE FIRST CLAIM FOR RELIEF**
(Recovery on Miller Act Payment Bonds)
(*SPC v. CBRE Heery et. al.*)

1.      Under the First Claim for Relief, that the Court enter Judgment in favor of Plaintiff, SPC, for damages in the amount of at least **$3,738,376.00** plus interest, reasonable attorney's fees and costs.

**ON THE SECOND CLAIM FOR RELIEF**

(Recovery on Miller Act Payment Bonds)

(*Watson v. CBRE Heery et. al.*)

2.      Under the Second Claim for Relief that the Court enter Judgment in favor of Plaintiff, Watson, for damages in the amount of at least **$3,559,416.00** plus interest, reasonable attorney's fees and costs.

**ON THE THIRD CLAIM FOR RELIEF**

(Recovery on Miller Act Payment Bonds)

(*Schneider v. CBRE Heery et. al.*)

3.      Under the Third Claim for Relief that the Court enter Judgment in favor of Plaintiff, Schneider, for damages in the amount of at least **$530,042.00** plus interest, reasonable attorney's fees and costs.

**ON THE FOURTH CLAIM FOR RELIEF**

(Breach of Contract & N.C.G.S. § 22C – CBRE Heery Failed to Make Prompt Payment)

(*SPC v. CBRE Heery et. al.*)

4.      Under the Fourth Claim for Relief that the Court enter Judgment in favor of Plaintiff, SPC, for damages in the amount of at least **$202,653.00** plus interest, reasonable attorney's fees and costs.

**ON THE FIFTH CLAIM FOR RELIEF**

(Breach of Contract & N.C.G.S. § 22C – CBRE Heery Failed to Make Prompt Payment)

(*Watson v. CBRE Heery et. al.*)

5.     Under the Fifth Claim for Relief that the Court enter Judgment in favor of Plaintiff, Watson, for damages in the amount of at least **$173,950.00** plus interest, reasonable attorney's fees and costs.

## ON THE SIXTH CLAIM FOR RELIEF

(Breach of Contract – CBRE Heery Failed to Pay Electrical Contract Changes)

(*Watson v. CBRE Heery et. al.*)

6.     Under the Sixth Claim for Relief that the Court enter Judgment in favor of Plaintiff, Watson, for damages in the amount of at least **$105,119.00** plus interest, reasonable attorney's fees and costs.

## ON THE SEVENTH CLAIM FOR RELIEF

(CBRE Heery Breached its Fiduciary Duties & Committed Insurance Fraud)

(*SPC v. CBRE Heery*)

7.     Under the Seventh Claim for Relief that the Court enter Judgment in favor of Plaintiff, SPC, for damages in the amount of at least **$20,985.00** plus interest, reasonable attorney's fees and costs.

## ON THE EIGHTH CLAIM FOR RELIEF

(Breach of Contract)

(*SPC & Watson v. CBRE Heery et. al.*)

8.     Under the Eighth Claim for Relief that the Court enter Judgment in favor of Plaintiff, SPC, for damages in the amount of at least **$245,715.00** plus interest, reasonable attorney's fees and costs.

9.     Under the Eighth Claim for Relief that the Court enter Judgment in favor of Plaintiff, Schneider, for damages in the amount of at least **$42,146.00** plus interest, reasonable attorney's fees and costs.

10.     Under the Eighth Claim for Relief that the Court enter Judgment in favor of Plaintiff, Watson, for damages in the amount of at least **$209,456.00** plus interest, reasonable attorney's fees and costs.

## ON THE NINTH CLAIM FOR RELIEF
(Breach of Contract – CBRE Heery Failed to Provide a Realistic Schedule)
(*SPC & Watson v. CBRE Heery et. al.*)

11.     Under the Ninth Claim for Relief that the Court enter Judgment in favor of Plaintiff, SPC, for damages in an amount to be proven at trial**,** together with interest at the maximum legal rates from dates according to proof, and attorneys' fees and costs.

12.     Under the Ninth Claim for Relief that the Court enter Judgment in favor of Plaintiff, Watson, for damages in an amount to be proven at trial**,** together with interest at the maximum legal rates from dates according to proof, and attorneys' fees and costs.

## ON THE TENTH CLAIM FOR RELIEF
(Breach of Contract – CBRE Heery Failed to Properly Manage the Project Schedule)
(*SPC & Watson v. CBRE Heery et. al.*)

13.     Under the Tenth Claim for Relief that the Court enter Judgment in favor of Plaintiff, SPC, for damages in an amount to be proven at trial**,** together with interest at the maximum legal rates from dates according to proof thereof, and attorneys' fees and costs.

14.     Under the Tenth Claim for Relief that the Court enter Judgment in favor of Plaintiff, Watson, for damages in an amount to be proven at trial**,** together with interest at the maximum legal rates from dates according to proof thereof, and attorneys' fees and costs.

## ON THE ELEVENTH CLAIM FOR RELIEF
(Breach of Contract – CBRE Heery Materially Hindered & Delayed Performance)
(*SPC & Watson v. CBRE Heery et. al.*)

15.     Under the Eleventh Claim for Relief that the Court enter Judgment in favor of SPC, for damages in an amount to be proven at trial**,** together with interest at the maximum legal rates from dates according to proof, and attorneys' fees and costs.

16.     Under the Eleventh Claim for Relief that the Court enter Judgment in favor of Watson, for damages in an amount to be proven at trial**,** together with interest at the maximum legal rates from dates according to proof, and attorneys' fees and costs.

**ON THE TWELFTH CLAIM FOR RELIEF**

(Breach of Contract – Implied Warranties Not Met)

(*SPC & Watson v. CBRE Heery et. al.*)

17.     Under the Twelfth Claim for Relief that the Court enter Judgment in favor of Plaintiff, SPC, for damages in an amount to be proven at trial, together with interest at the maximum legal rates from dates according to proof, and attorneys' fees and costs.

18.     Under the Twelfth Claim for Relief that the Court enter Judgment in favor of Plaintiff, Watson, for damages in an amount to be proven at trial, together with interest at the maximum legal rates from dates according to proof, and attorneys' fees and costs.

**ON THE THIRTEENTH CLAIM FOR RELIEF**

(Breach of Contract – CBRE Heery Actively Interfered with Performance)

(*SPC & Watson v. CBRE Heery et. al.*)

19.     Under the Thirteenth Claim for Relief that the Court enter Judgment in favor of Plaintiff, SPC, for damages in an amount to be proven at trial**,** together with interest at the maximum legal rates from dates according to proof, and attorneys' fees and costs.

20.     Under the Thirteenth Claim for Relief that the Court enter Judgment in favor of Plaintiff, Watson, for damages in an amount to be proven at trial**,** together with interest at the maximum legal rates from dates according to proof, and attorneys' fees and costs.

**ON THE FOURTEENTH CLAIM FOR RELIEF**

(Breach of Contract – CBRE Heery Abdicated its Duties)

(*SPC & Watson v. CBRE Heery et. al.*)

21.     Under the Fourteenth Claim for Relief that the Court enter Judgment in favor of Plaintiff, SPC, for damages in an amount to be proven at trial, together with interest at the maximum legal rates from dates according to proof, and attorneys' fees and costs.

22.     Under the Fourteenth Claim for Relief that the Court enter Judgment in favor of Plaintiff, Watson, for damages in an amount to be proven at trial, together with interest at the maximum legal rates from dates according to proof, and attorneys' fees and costs.

**ON THE FIFTEENTH CLAIM FOR RELIEF**

(Breach of Contract – CBRE Heery Failed to Mitigate Damages)

(*SPC & Watson v. CBRE Heery et. al.*)

23.     Under the Fifteenth Claim for Relief that the Court enter Judgment in favor of Plaintiff, SPC, for damages in an amount to be proven at trial**,** together with interest at the maximum legal rates from dates according to proof, and attorneys' fees and costs.

24.     Under the Fifteenth Claim for Relief that the Court enter Judgment in favor of Plaintiff, Watson, for damages in an amount to be proven at trial**,** together with interest at the maximum legal rates from dates according to proof, and attorneys' fees and costs.

**ON THE SIXTEENTH CLAIM FOR RELIEF**

(Cardinal Change)

(*SPC & Watson v. CBRE Heery et. al.*)

25.     Under the Sixteenth Claim for Relief that the Court enter Judgment in favor of Plaintiff, SPC, for damages in an amount to be proven at trial, together with interest at the maximum legal rates from dates according to proof thereof, and attorneys' fees and costs.

26.     Under the Sixteenth Claim for Relief that the Court enter Judgment in favor of Plaintiff, Watson, for damages in an amount to be proven at trial, together with interest at the maximum legal rates from dates according to proof thereof, and attorneys' fees and costs.


**ON THE SEVENTEENTH CLAIM FOR RELIEF**

(CBRE Heery Acted as Construction Manager At-Risk with Gross Negligence)

(*Plaintiffs v. CBRE Heery et. al.*)

27.     Under the Seventeenth Claim for Relief that the Court enter Judgment in favor of Plaintiff, SPC, for damages in an amount to be proven at trial**,** together with interest at the maximum legal rates from dates according to proof, and attorneys' fees and costs.

28.     Under the Seventeenth Claim for Relief that the Court enter Judgment in favor of Plaintiff, Schneider, for damages in an amount to be proven at trial, together with interest at the maximum legal rates from dates according to proof, and attorneys' fees and costs.

29.     Under the Seventeenth Claim for Relief that the Court enter Judgment in favor of Plaintiff, Watson, for damages in an amount to be proven at trial**,** together with interest at the maximum legal rates from dates according to proof, and attorneys' fees and costs.


**ON THE EIGHTEENTH CLAIM FOR RELIEF**

(CBRE Heery Acted as Design-Build Installation & Outfitting Contractor with Negligence)

(*Plaintiffs v. CBRE Heery et. al.*)

30.     Under the Eighteenth Claim for Relief that the Court enter Judgment in favor of Plaintiff, SPC, for damages in an amount to be proven at trial, together with interest at the maximum legal rates from dates according to proof, and attorneys' fees and costs.

31.     Under the Eighteenth Claim for Relief that the Court enter Judgment in favor of Plaintiff, Schneider, for damages in an amount to be proven at trial, together with interest at the maximum legal rates from dates according to proof, and attorneys' fees and costs.

32. Under the Eighteenth Claim for Relief that the Court enter Judgment in favor of Plaintiff, Watson, for damages in an amount to be proven at trial, together with interest at the maximum legal rates from dates according to proof, and attorneys' fees and costs.

**ON THE NINETEENTH CLAIM FOR RELIEF**
(Quantum Meruit)
(*SPC v. CBRE Heery et. al.*)

33. Under the Nineteenth Claim for Relief that the Court enter Judgment in favor of Plaintiff, SPC, for damages in the amount of at least **$3,738,376.00** plus interest, reasonable attorney's fees and costs.

**ON THE TWENTIETH CLAIM FOR RELIEF**
(Quantum Meruit)
(*Watson v. CBRE Heery et. al.*)

34. Under the Twentieth Claim for Relief that the Court enter Judgment in favor of Plaintiff, Watson, for damages in the amount of at least **$3,559,416.00** plus interest, reasonable attorney's fees and costs.

**ON THE TWENTY-FIRST CLAIM FOR RELIEF**
(CBRE Heery Breached the Unfair or Deceptive Trade Practices Act, N.C.G.S. § 75-16)
(*Plaintiffs v. CBRE Heery*)

35. Under the Twenty-First Claim for Relief that the Court enter Judgment in favor of Plaintiff, SPC, for damages in the amount of at least **$11,215,128.00** plus interest, reasonable attorney's fees and costs.

36.     Under the Twenty-First Claim for Relief that the Court enter Judgment in favor of Plaintiff, Schneider, for damages in the amount of at least **$1,590,126.00** plus interest, reasonable attorney's fees and costs.

37.     Under the Twenty-First Claim for Relief that the Court enter Judgment in favor of Plaintiff, Watson, for damages in the amount of at least **$10,678,248.00** plus interest, reasonable attorney's fees and costs.


**ON THE TWENTY-SECOND CLAIM FOR RELIEF**
(Breach of Contract – CBRE Heery Breached the Implied Duty of Good Faith & Fair Dealing)
(*SPC & Watson v. CBRE Heery*)

38.     Under the Twenty-Second Claim for Relief that the Court enter Judgment in favor of Plaintiff, SPC, for damages in an amount to be proven at trial**,** together with interest at the maximum legal rates from dates according to proof, and attorneys' fees and costs.

39.     Under the Twenty-Second Claim for Relief that the Court enter Judgment in favor of Plaintiff, Watson, for damages in an amount to be proven at trial, together with interest at the maximum legal rates from dates according to proof, and attorneys' fees and costs.


**ON THE TWENTY-THIRD CLAIM FOR RELIEF**
(Recovery of Pursuant to N.C.G.S. § 6-21.6, or alternatively, under § 44A-35)
(*SPC & Watson v. CBRE Heery et. al.*)

40.     Under the Twenty-Third Claim for Relief that the Court enter Judgment in favor of Plaintiff, SPC, for damages including interest, reasonable attorney's fees, and costs, in the amount of at least $75,000.00.

41.     Under the Twenty-Third Claim for Relief that the Court enter Judgment in favor of Plaintiff, Watson, for damages including interest, reasonable attorney's fees, and costs, in the amount of at least $75,000.00.

**ON ALL CLAIMS FOR RELIEF**

      42.      That the Court tax the costs of this action against the Defendants.

      43.      That the Plaintiffs have and recover such further relief as the Court may deem just and proper.

Respectfully submitted,

**SMITH TERRY JOHNSON & WINDLE**

By: /s/ Steven L. Smith

Steven L. Smith, NC Bar 29591

Smith Terry Johnson & Windle Construction Law

11525 N. Community House Rd., Suite 425

Charlotte, North Carolina 28277

ssmith@smithterrylaw.com

(704) 944-3244 – Telephone

*Attorney for all Plaintiffs*